**POMERANTZ LLP**
Omar Jafri (admitted *pro hac vice*)
Brian O'Connell (SBN: 314318)
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 881-4850
Email: ojafri@pomlaw.com
        boconnell@pomlaw.com

*Lead Counsel for Lead Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE AFFIRM HOLDINGS, INC. SECURITIES LITIGATION | Case No. 3:22-cv-07770-WHO<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

1

**TABLE OF CONTENTS**

2                                                                                          **Page**

3     TABLE OF CONTENTS...................................................................................................i

4     NATURE OF THE ACTION ..........................................................................................1

5     JURISDICTION AND VENUE ......................................................................................5

6     PARTIES ........................................................................................................................6

7     SUBSTANTIVE ALLEGATIONS ................................................................................7

8           Background ...........................................................................................................7

9           Regulatory Scrutiny of Risks to Consumers from Affirm's BNPL Offerings....................8

10          The CFPB Investigation and Report Confirm That Affirm Exposed Consumers
            to Harm ...............................................................................................................9

11          SBPC's Report Shows Affirm Originated High-Risk Loans for Vulnerable Students .....13

12          A Further CFPB Survey Shows the BNPL Industry Preys on the Working Poor .............17

13          The Interplay Between Affirm's Funding Sources and Interest Rates ............................20

14          Defendants Were Aware Of Interest Rate Risks, the Company's Business Metrics, Its
15          Focus on Vulnerable Consumers, and Predatory Practices of Merchant-Partners ...........22

16          Confidential Witness Accounts Support an Inference of Scienter....................................26

17    AFFIRM AND THE INDIVIDUAL DEFENDANTS MADE FALSE OR MISLEADING
      STATEMENTS DURING THE CLASS PERIOD ........................................................27

18          Defendants' Misleading Statements About Affirm's Credit Offerings and Attempts to
19          Minimize the Risks of Regulatory Scrutiny Because of Consumer Harm .......................27

20          Defendants' Misleading Statements Related to the Risk of Rising Interest Rates on
            Affirm ..............................................................................................................37

21    ADDITIONAL ALLEGATIONS OF SCIENTER........................................................51

22          Core Operations ...................................................................................................51

23          Temporal Proximity of Misrepresentations to Admissions and Adverse News Enhances
24          Scienter ..............................................................................................................52

25    LOSS CAUSATION......................................................................................................53

26          The Truth About Regulatory Risks Begins to Emerge ....................................................53

27          The Truth About the Company's Concealed Exposure to Rising Interest Rates Begins
            to Emerge Through a Series of Partial Disclosures ........................................................54

28    POST-CLASS PERIOD ADMISSIONS ........................................................................57

i

PLAINTIFFS' CLASS ACTION ALLEGATIONS..................................................................58

COUNT I .............................................................................................................................60

COUNT II ............................................................................................................................62

PRAYER FOR RELIEF .....................................................................................................63

DEMAND FOR TRIAL BY JURY ....................................................................................63

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Mark Kusnier and additional Plaintiff Chris Meinsen (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Complaint for Violations of the Federal Securities Laws (hereafter the "Complaint" or the "Amended Complaint") against Defendants Affirm Holdings, Inc. ("Affirm" or the "Company"), Max Levchin ("Levchin"), and Michael Linford ("Linford") (collectively, "Defendants"), allege the following, based upon personal knowledge as to Plaintiffs and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public filings, conference calls Defendants held with analysts and investors, any public announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, articles about Defendants and their industry in financial publications or other news outlets, regulatory publications, interviews with knowledgeable former employees of the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a Class consisting of all persons who purchased or otherwise acquired Affirm's common stock between February 12, 2021 and February 8, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.    Affirm is a subprime lender that earns income from interest-bearing loans that charge up to 36%, sells loans, and pools loans into asset-backed securities purchased by corporations, hedge funds and similar organizations.  The Company generated most of its revenue from these activities during the Class Period.  Affirm also offers an alternative form of credit known as buy-now, pay-later ("BNPL") that allows a borrower to split a retail transaction into smaller, interest-free installments and pay the full price over a short period of time after goods or services are purchased.  Some of Affirm's BNPL loans are offered without interest, but all contain predatory aspects that harm vulnerable consumers.

Nevertheless, Defendants repeatedly made misleading claims that Affirm was "honest and "transparent" with no "gotchas" such that it could "improve lives"; that it "strived to put [consumer] interest" ahead of its own interest; and that it "level[ed] the playing field" rather than causing consumers to become "inadvertent victims."

3.      After these misrepresentations were made throughout 2021, on December 16, 2021, the Consumer Financial Protection Bureau ("CFPB") announced that it was investigating Affirm and a handful of other BNPL providers to determine whether they engaged in conduct that harmed consumers. On this news, Affirm's stock price declined by over 10% and continued to fall over the next two trading days.   Meanwhile, Defendants continued to make misleading statements, falsely stating that their interests were aligned with customers, and that Affirm was an honest alternative to the predatory credit card industry, when in fact Affirm's products lacked the basic protections afforded to credit card purchases.

4.      Then, on March 3, 2022, the Student Borrower Protection Center ("SBPC") issued a report that found that Affirm partnered with predatory unaccredited and/or for-profit "schools," like "Made Institute," "Art of Living Maui," and "Haircation" to finance educational loans, often at high interest rates.   These for-profit institutions provide barely any real employment prospects in return, and contribute to what is already a national crisis of crushing student debt.   On this news, Affirm's stock price again fell by over 8% and continued to fall on the next trading day.   Affirm's platform continues to be used by many of these unaccredited institutions even today.   Defendants were aware of these facts since they claimed to possess advanced machine learning tools that provided information about borrower profiles and granular details on a transaction-by-transaction level, and monitored their merchant partners to ensure they were "delivering honest and delightful experiences."

5.      On September 15, 2022, the CFPB released a Report on the BNPL industry's impact on consumers, which confirmed that Affirm's BNPL products did in fact expose consumers to considerable harm, including but not limited to (a) overextension of credit through loan stacking and sustained usage, (b) unintended debt transactions through deceptive designs used by Affirm, (c) exploitation of consumer data to deceptively promote specific products on its own app, (d) a loss of the freedom of agency because

Affirm's BNPL products stripped consumers of the dispute resolution protections available to credit card purchases, (e) delayed refunds, and (f) a lack of choice because of the forced use of autopay.

6.    After the September 2022 Report was released, Defendants repeatedly mischaracterized its findings, but their bizarre interpretation of this Report was debunked on the same day that it was released.  On that day, the Director of the CFPB released a lengthy public statement, in which he identified the various ways in which BNPL loans harm consumers, outlined numerous ways in which they do not even afford the kinds of protections that credit cardholders already have due to regulatory gaps, and instructed the CFPB's staff to consider rules that offered BNPL borrowers the baseline protection that federal law already affords to credit cardholders.  The Director of the CFPB also stated that compulsory examinations of Affirm and other BNPL providers should be considered by the staff. After the CFPB's Report was released, Affirm's stock price again fell by over 8% over the next few trading days.

7.    In March 2023, the CFPB released a survey confirming that Affirm's BNPL loans prey on the working poor in the United States.  Defendants were aware of the survey and its findings; their own statements about access to granular information about borrowers are indicative of knowledge.  Confidential Witness ("CW") accounts described in this Complaint further support that Defendants acted with at least deliberate recklessness.

8.    During the Class Period, Defendants also made false and misleading statements about another critical issue that touched almost every aspect of Affirm's business.  Starting in the spring of 2021, high level officials in the federal government publicly signaled that the Federal Reserve's Federal Funds Rate ("Federal Funds Rate") would increase to contain an overheating economy.  By the end of 2022, the Federal Funds Rate increased substantially from nearly 0% to over 4% as the government sought to tamp down a high rate of inflation.  Analysts repeatedly posed pointed questions to Affirm and the Individual Defendants about whether Affirm's business model was protected from or vulnerable to rising interest rates, and they were not truthful in response.  Throughout the Class Period, Defendants falsely claimed to have carefully studied the impact of rates, that the business was not vulnerable to rate changes in the short term, and that they had "levers" and "controls" to drive performance as rates increased.

9.      In the beginning of the Class Period, Defendant Linford, the Company's Chief Financial Officer ("CFO"), claimed to understand the significance of rising interest rates with an extremely high degree of specificity, but downplayed the risk to investors, stating that Defendants had stress tested the Company's revenue model, and Affirm was well-positioned "to succeed in any rate environment that we've seen in the past 20 years." The "rate environments" that Linford mentioned over the past Federal Funds Rates over the last 20 years have ranged from zero to 5.25%. Linford stated that there would be little to no impact on a key profitability metric called revenue less transaction costs (hereafter "RLTC"),[1] even if the benchmark rates increased to 650 basis points, or 6.5%. Linford and the Company's founder and Chief Executive Officer ("CEO"), Levchin, continued to make false and misleading statements throughout the Class Period asserting that Affirm had reliable, diversified sources of funding with locked in commitments, and artificially minimizing the very real risk to the Company from increased interest rates. Defendants made these false statements even as interest rates rapidly rose in 2022, and after funding partners demanded more money because of a fear of rising interest rates. Even the CFPB's September 2022 Report acknowledged that rising interest rates appeared to negatively impact the industry's margins in the beginning of 2022, and Defendants' statements were so misleading that they were disbelieved by their own employees in the Capital Markets group, the department responsible for securing funding for the Company, according to another CW.

10.      Linford continued to downplay the risks of increased interest rates through the end of 2022, even as Affirm's stock price repeatedly declined after missing analyst expectations, raising pointed questions about the impact of rising interest rates on Affirm's business. This attempt to counter negative information in the market was supported by Levchin's claim that he watched "the numbers like a hawk" to ensure that Affirm was never on the wrong side of a deal, and Linford's claim that he was "certain" how funding would unfold over the next 6 to 12 months because he had "thought about this a lot," and was "very careful on protecting the profit in the loan."

11.      In February 2023, weeks after Linford's final misrepresentations to investors downplaying the risks from increased interest rates, the Company announced disastrous financial results,

---

[1] As used herein, RLTC refers to RLTC as a percentage of the Company's gross merchandise value ("GMV"), which is industry jargon for the total dollar amount generated from originating loans.

missing revenue targets. Even worse, RLTC plummeted to half of its Class Period high as transaction costs from credit losses ballooned and the quantity of loans on the Company's balance sheet substantially increased. Defendants conceded that higher interest rates and spreads remained a "headwind" for RLTC in the ***short-term*** because funding costs increased, but to minimize the damage to Affirm's stock price, they falsely claimed that the headwind would "attenuate" as the Company "exit[ed]" fiscal year 2023. Defendants also announced that they would shift the increased cost of funding onto customers by charging exorbitant interest rates of up to 36%, revealing to investors that Affirm's business model was not, in fact, protected from rising rates. On this news, the Company's stock price again plunged by over 20% over the next few trading days.

12. After the Class Period ended, a high-level executive at Affirm publicly admitted that the yields demanded by the Company's funding partners "***were increasing throughout***"[2] 2022 because interest rates rose. Even Linford ultimately admitted that "it's hard to see through [and] look round corners. The future has got so much uncertainty in it."

13. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities upon the partial disclosures and/or materialization of the concealed risks thereof, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

15. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). In addition, Affirm's principal place of business is located in this District, the Individual Defendants reside in this District, and a substantial part of the events or omissions that give rise to the claims alleged in this Action occurred in this District.

---

[2] All emphases are added and internal quotations are omitted throughout this Complaint unless otherwise indicated.

16.     In connection with the statements and acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.     Lead Plaintiff Mark Kusnier, as set forth in his previously-filed declaration (ECF Nos. 1-1, 1-2), purchased the Company's securities at artificially inflated prices during the Class Period, and was damaged as a result of the federal securities law violations alleged herein.

18.     Additional named Plaintiff Chris Meinsen also purchased the Company's securities at artificially inflated prices during the Class Period, and was damaged as a result of the federal securities law violations alleged herein.  *See* Exhibit 1 to the Declaration of Brian P. O'Connell attached hereto.

19.     Defendant Affirm is incorporated under the laws of Delaware with its principal place of business located in San Francisco, California.  The Company's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "AFRM."

20.     The Company was founded by Defendant Levchin, who served as the Chairman of the Company's Board of Directors and CEO at all relevant times during the Class Period.

21.     Defendant Linford served as the Company's CFO at all relevant times during the Class Period.

22.     Defendants Levchin and Linford are sometimes referred to herein as the "Individual Defendants."

23.     The Individual Defendants possessed the power and authority to control the contents of Affirm's SEC filings, press releases, and other communications with investors throughout the Class Period.  The Individual Defendants knew about Affirm's public statements alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions within Affirm, and access to material information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from investors, and that the positive representations being made were then materially false

1    and misleading.  The Individual Defendants are liable for the misleading statements and omissions

2    alleged herein.

3    <div align="center">**SUBSTANTIVE ALLEGATIONS**</div>

4    **Background**

5        24.    Affirm is a subprime lender that derives most of its revenue from interest earned on loans

6    that it originates or purchases from its bank partners, fees and gains from reselling loans either through

7    securitizations or directly to third party buyers like insurance companies or hedge funds, loan servicing

8    fees, and interchange fees earned from debit cards.[3]  According to the Company's Annual Report filed

9    with the SEC on Form 10-K for the fiscal year that ended on June 30, 2022, ("2022 Form 10-K"), over

10   65% of the Company's revenue was generated from these aforementioned sources and their share of

11   total revenues has grown even further since that time.  The remaining amount came from merchant

12   network revenue or fees that Affirm charges merchants for transactions processed through the

13   Company's platform.

14       25.    The Company also earns a minority of its revenue from BNPL products it labels "Split

15   Pay" and "Core 0%" loans.  Moreover, in Fiscal Years 2021 and 2022, these transactions have barely

16   been over 20% of total GMV.  While certain BNPL products charge no interest, the average percentage

17   rate of interest across the portfolio of Affirm's loan products is in the high 20s, a fact that Linford

18   admitted at a Shareholder Fireside Chat held on December 6, 2022.  That puts Affirm's average charged

19   rate as ***higher*** than credit cards, which according to Forbes Advisor's weekly credit card interest rates

20   report have an average rate of 24.25% today.

21       26.    Despite charging higher average rates than credit cards and affording consumers fewer

22   protections, the Company repeatedly condemns "legacy" payment options like credit cards, and claims

23   that Affirm's platform is designed to avoid harmful and deceptive conduct prevalent in such legacy

24   payment options because it is simple, transparent and "put[s] people first."  Defendants' claims with

25   respect to interest-free BNPL products were equally deceptive.  Throughout the Class Period,

26

27

28   [3] A subprime lender is a credit provider that specializes in borrowers with low or "subprime" credit
     ratings.  Because these borrowers represent a higher risk of default, subprime loans are associated with
     relatively high rates of interest.  *See*, *e.g.*, https://www.investopedia.com/terms/s/subprimelender.asp.

Defendants selectively touted positive attributes of their BNPL offerings such as no late or hidden fees, but omitted to disclose known predatory aspects as detailed herein.

27.     The majority of the Company's overall loan volume remains interest-bearing, a fact acknowledged by Libor Michalek, ("Michalek"), the Company's President of Technology, Risk and Operations, at the Morgan Stanley Technology & Telecom Conference held on March 7, 2023.  At this same conference, Michalek explained that it was important for the Company to charge interest up to 36% given the Company's reliance on interest-bearing loans.  In the last few years, most of Affirm's loans were originated through Cross River Bank in New Jersey, but the Company has now shifted originations to other bank partners located in other states because interest rates over 30% are considered criminal usury in New Jersey.  It is worth noting that on March 8, 2023, Cross River Bank stipulated to a Consent Order with the Federal Deposit Insurance Corporation in connection with the violations of fair lending laws and discriminatory underwriting practices.

**Regulatory Scrutiny of Risks to Consumers from Affirm's BNPL Offerings**

28.     In December 2021, known regulatory risks began to materialize when the CFPB opened an inquiry into BNPL lending, an industry in which Affirm was a leading player.  The CFPB ordered Affirm and four of its competitors to collect information, and raised concerns about the accumulation of debt by vulnerable consumers, regulatory arbitrage and data harvesting.  On September 15, 2022, the CFPB released a Report entitled Buy Now, Pay Later: Market trends and consumer impacts ("CFPB Report" or "September 2022 Report").  The CFPB Report was based on feedback from state regulators, nonprofit organizations, and data provided by industry participants, including Affirm, and provided an in-depth view of Affirm's BNPL offerings during the Class Period.  It confirmed that Affirm's BNPL offerings carry serious risks of consumer harm as fully explained in Paragraphs 29 through 41. Additional known indicia of consumer harm are identified in Paragraphs 42 through 50.  In March 2023, the CFPB published a new study on the demographic and financial profiles of BNPL customers, confirming that Affirm and its peers prey on economically vulnerable individuals.  The details of that new study are identified in detail in Paragraphs 51 through 56.

**The CFPB Investigation and Report Confirm That Affirm Exposed Consumers to Harm**

29.      On December 16, 2021, the CFPB opened an inquiry into companies that offer BNPL loans, ordering Affirm and four of its competitors to submit data that would allow the CFPB to provide the public with information about industry practices and risks.  The CFPB's press release issued on the same day stated that the orders to submit marketing information were prompted by its concern that BNPL companies harvested consumer data, engaged in regulatory arbitrage and effectuated the harmful accumulation of debt.

30.      On September 15, 2022, the CFPB published the findings of this investigation the CFPB Report.  Its findings were based on data that Affirm directly provided to the CFPB about its BNPL offerings for the years 2019 through 2021.  Specifically, Affirm produced data related to its financial performance as well as policies and procedures that concerned underwriting, repayment, late fees and product disputes.  In connection with the September 2022 Report, the CFPB also considered comments submitted to the agency by state regulators, nonprofit organizations and consumers.  Contrary to Defendants' misrepresentations during the Class Period, the CFPB found that the BNPL industry was less transparent, not more transparent, than providers of legacy credit products like credit cards.

31.      The CFPB Report identified several vulnerabilities in the credit profile of a BNPL customer.  Half were 33 years old or younger, a demographic Affirm admits targeting.  For example, at the conference organized by MoffettNathanson on May 11, 2021, Linford admitted that the Company targets younger consumers.

32.      Levchin and Linford have repeatedly claimed that Affirm's BNPL offerings are designed to "level the playing field" for consumers because Affirm does not charge late fees or deferred interest. But, the CFPB Report demonstrates that late fees are only one aspect of harm to consumers and not as significant as Levchin and Linford claimed, and that all BNPL providers harmed vulnerable consumers in other ways, which were not accurately disclosed to investors.  According to the CFPB, only 10.5% of all borrowers are charged late fees and the late fees collected as a percentage of GMV for lenders who charge them was merely 0.28% in 2021.  Only 57% of late fees charged were actually collected in 2021.  Nor can the risk of consumer harm be limited to incurring late fees or compounded interest as the September 2022 Report clearly shows.  In fact, the September 2022 Report identifies Affirm as an

example of an entity that enabled many harmful consequences for consumers. It did not single out Affirm as a positive example, as Levchin and Linford falsely claimed. To the contrary, it identified numerous harmful practices endemic to the five BNPL companies studied, and attributes them to the whole industry, including Affirm. For instance, the CFPB expressed concern about how all five BNPL lenders required disputes to be resolved by merchants, causing inordinate time lags, and forcing consumers to continue installment payments of disputed amounts, basic protections that are available to credit card purchases but which Affirm and its peers reject.

33. The CFPB further cited with approval comments received during the pendency of the investigation, which concluded that the younger, lower-income borrowers Affirm targets are at grave risk of buying more and accumulating more debt than they can afford. It identified how forced autopay creates a risk of leading to overdraft and deprives borrowers of freedom of agency. It recognized the Student Borrower Protection Center's (SBPC) serious concerns about how Affirm and other BNPL lenders enable the financing for non-accredited "educational" institutions like online cosmetology classes or fitness certifications, which are ineligible for genuine federal education loans. *See also* Paragraphs 42 through 50. This harmful practice, which Affirm embraced, has escalated over the last few years.

34. In addition, the CFPB observed that the business model of BNPL lenders is driven by mobile phone apps. These apps, including Affirm's, are designed to increase consumption and debt by "push[ing] customers" to retailers through referral links. They function as a virtual mall steering consumers to online retail transactions payable through BNPL loans. Machine learning is used to target those products and services that a consumer will find most tempting for prominent display. To emphasize these points, the CFPB quoted Levchin's May 2021 admission that Affirm was ***"fundamentally a marketing device for merchants."*** It again singled out Affirm as a Company that tries to "drive repeat" use, causing vulnerable consumers to become overburdened. As the CFPB concluded:

> BNPL lenders' shift toward proprietary app usage ***reinforces the common-sense notion that, when it comes to driving online purchase conversion, there is a strong financial incentive for a tech platform to expand its "home field advantage:" the extent to which it can keep a user on its own desired UX path.*** As one submission to the CFPB's public BNPL request for comment put it: The BNPL model combines consumer surveillance, AI-

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

driven data analytics, personalization, deep integration across platforms, retailers and applications, and real-time effects.

That submission also offered an assessment of the consumer impact of the data-driven ecosystem that BNPL lenders have fostered: "We believe it will create an unfair and potentially costly environment for consumers, who are being lured—as BNPL companies openly claim—into spending more money at greater frequency."

35.     The CFPB Report also flagged concerns of consumer manipulation via the use of "dark patterns," which it considers a "deceptive design." Dark patterns are instances where companies exploit customer behavior to unwittingly coerce the customer into performing targeted actions. Examples of dark patterns include disguised advertisements that trick customers into clicking on a link or trick questions that force answers in a manner that was not intended. The September 2022 Report credited academic research on the BNPL industry confirming the use of dark patterns. A comparison of checkout flow with dark patterns to one that did not include such deceptive devices showed that 82% of respondents exposed to them used BNPL as a payment option while only 59% of those who did not see dark patterns did so. Other studies discussed in the September 2022 Report confirmed that BNPL providers use experiential nudges to increase impulsive purchases. Notably, the September 2022 Report described this as an industry problem, thus suggesting that Affirm, along with its peers engaged in this harmful and deceptive practice.

36.     The September 2022 Report also confirmed that the BNPL industry harvests consumer data. Affirm and the Individual Defendants misleadingly claimed during the Class Period that they do not sell a customer's data to third parties. But, as the CFPB pointed out, "the fact that BNPL lenders usually restrict their data usage to 'first pay' scenarios does not eliminate *potential consumer risks*." Instead, it can be used to build profiles employed to promote specific products, and to deceptively drive consumer choices toward an intended goal.

37.     Most importantly, the CFPB identified serious risks of debt overextension given the individual profile of a typical BNPL borrower. These risks include loan stacking and sustained usage of BNPL offerings. Loan stacking occurs when a borrower takes out multiple loans from different BNPL lenders but is not able to repay some or all of them. According to the CFPB, loan stacking is particularly acute in the BNPL industry because companies like Affirm choose to run only soft credit inquiries, and thus do not have visibility into a borrower's loan activity on other BNPL platforms.

11

Sustained usage of BNPL is perhaps the most troubling risk of them all.  It occurs when frequent BNPL usage threatens a borrower's ability to meet other financial obligations such as paying for rent, utilities, mortgages, auto loans and student loans.  This risk is not abstract.  Some studies of BNPL lending in countries where it has been used longer show that 20% of borrowers reduced or went without essentials like buying food in order to meet their BNPL loan obligations.  Defendants cannot take issue with this finding or its significance.  On June 18, 2021, at the RBC 2021 Capital Markets Financial Technology Conference, Linford admitted that the BNPL market in the United States is immature with low penetration rates compared to other countries.  And, the September 2022 Report cited studies and consumer surveys conducted in the United States too, which demonstrate that between 20% to 50% of BNPL borrowers regret their purchases, and 32% of them "delay[ed] or skipp[ed] paying an essential bill due to the payments on [their] Buy Now Pay Later plans."

38.    The CFPB Report's section on overextension risks identified Affirm as a BNPL provider that touts higher average order value compared to other payment options as a measure of driving incremental sales.  The CFPB concluded that this data point suggests that consumers are "spending (and borrowing) more than they otherwise would."  The conclusion is reaffirmed by the fact that Affirm touts "repeat usage" of BNPL to both merchants and investors as a key measure of its success.

39.    During the Class Period, the Individual Defendants repeatedly mischaracterized the September 2022 Report's conclusions, claiming that it somehow whitewashed Affirm's predatory practices.  Defendants' attempt to reimagine the CFPB Report's findings cannot be reconciled with the statements of CFPB Director Rohit Chopra ("Chopra"), released on the same day that the September 2022 Report became public.  Chopra correctly concluded that BNPL is nothing more than a credit card substitute with fewer protections, similar to plans peddled decades ago.  He agreed that the risk of overextension in the BNPL industry is greater than in traditional payment methods because companies like Affirm harvest consumer data in more sophisticated ways to drive repeat usage.  Significantly, Chopra identified numerous ways in which the BNPL industry provides less protection for consumers than traditional banks that provide credit cards because of regulatory loopholes.  At no time did Chopra suggest that Affirm served consumer interests better than its peers, or avoided the predatory practices he deemed harmful.

40.     Chopra emphasized that BNPL providers do not provide dispute protection that credit card issuers are required to offer.  Moreover, under federal law, credit cards companies are required to assess before extending credit whether borrowers can repay their debts to avoid harmful risks of overextension.  BNPL companies like Affirm are not required to do the same.  Chopra also agreed that BNPL companies use dark patterns and dynamically adjust product prices based on consumer behavior more than credit card issuers.  According to Chopra, "this heavy reliance on data, combined with a mismatch on transparency and choice, elevates the risk of what the [R]eport describes as 'overextension.'"  Chopra emphasized the September 2022 Report's concern that BNPL providers "may have no idea how many other loans a consumer may have with other" BNPL providers.

41.     Chopra concluded his remarks by stating that it would be in the public's interest for BNPL providers like Affirm to "adhere to many of the baseline protections that Congress has already established for credit cards."  He also said that the CFPB staff had been instructed to identify BNPL providers' data surveillance practices that "may need to be curtailed," and provide options on how the BNPL industry "can develop appropriate and accurate credit reporting practices."  Finally, Chopra stated that the CFPB was considering whether BNPL providers should be required to submit to compulsory examinations like credit card companies, and instructed the CFPB staff to consider rules that regulate the industry to prevent consumer harm.

**SBPC's Report Shows Affirm Originated High-Risk Loans for Vulnerable Students**

42.     The SBPC is a nonprofit organization that focuses on solutions to alleviate the burden of student debt for millions of Americans.  It has analyzed and reported on the emergence of "Shadow Student Debt," a term for the broad set of risky loans made available outside the traditional private student loan market.  Recently the SBPC has been concerned with the exploitation of students by FinTech companies.  Increasingly, students have relied on Fintech companies for financing to pay for predatory for-profit educational institutions.  The SBPC conducted an investigation and released a report entitled "Shadow Student Debt" on July 17, 2020.  Shadow Student Debt, STUDENT BORROWER PROTECTION CENTER, July 2020 (hereafter the "Shadow Student Debt Report").  The Shadow Student Debt Report documented that a web of predatory and largely unaccredited and for-profit schools

1    is enabled by fintech companies to "drive students to take on billions in risky, high-cost shadow student

2    debt." *Id.*

3        43.    This predatory behavior has now extended to the BNPL industry.  On March 3, 2022, the

4    SBPC released a Report entitled "Point of ~~Sale~~ Fail: How a Flood of 'Buy Now, Pay Later' Student

5    Debt is Putting Millions at Risk" (hereafter the "SBPC Report") in which it described how BNPL was

6    offered as a method of payment for tuition expenses at unaccredited schools that are otherwise ineligible

7    for federal student loans.  The SBPC Report found that increasingly BNPL companies like Affirm drove

8    students towards risky loans to pay for the cost of education at questionable for-profit schools.    In

9    particular, the SBPC Report specifically identified 17 instances where Affirm offered financing for

10   unaccredited, unregulated for-profit online "schools."  Affirm's BNPL platform was offered as a

11   payment option for expensive classes in midwifery, cosmetology, cybersecurity, creative writing, and

12   other unaccredited vocational training.  The SPBC Report observed an "increasing trend of companies

13   in [the BNPL industry] seeing lucrative opportunities in education financing."

14       44.    Like the CFPB, the SBPC also concluded that running soft credit checks as is typical in

15   the BNPL industry limits the ability to make good-faith determinations about the borrower's ability to

16   repay the loan.  This has a devastating effect on consumer credit profiles.  According the SBPC, while

17   BNPL payments made to for-profit schools are not reported to credit bureaus, delinquencies are.

18       45.    In describing the for-profit institutions, the SBPC Report found that the courses offered

19   cost hundreds or thousands of dollars to attend, and BNPL financing "only heightens" the risks of default

20   and delinquency.  Meanwhile, the attraction of BNPL with soft credit checks, a feature of BNPL by

21   design, has proven to be a temptation for consumers: studies show that 23 percent of consumers are

22   "very" or "extremely" interested in using BNPL to finance education, and the socioeconomic group

23   most interested in utilizing BNPL for education is living paycheck to paycheck.

24       46.    As the SBPC's Press Release announcing its report on March 3, 2022 pointed out, "the

25   structure of BNPL loans means that students will likely have to begin repayment before any job or

26   promotion that their course of study promised materializes, generating a timing mismatch that could

27   heighten financial risk."  Further, because these for-profit schools do not face public reporting

28   requirements, students' abilities to assess representations about employment prospects are extremely

limited.  In addition, according to the SBPC Report, Affirm offered to finance courses that were particularly active in online credentialing programs for "upskilling," which have been especially alluring during post-Covid employment disruptions.  However, such programs do not fall under any formal oversight and fail to offer proof that graduates have the career prospects that these courses advertise. As the SBPC Report concludes, "these courses frequently serve as low-quality vehicles to trap borrowers in piles of unaffordable debt."

47.    For example, Haircation offers financing through Affirm for a $1,450 online course teaching students about hair extensions. Made Institute offers a $13,000 online fashion design certification that can be financed through Affirm.  As of the date of the SBPC Report, a student could also take a $500 "life force energy" healing certification course at the Art of Living Maui.  The SBPC Report also notes that several technology upskilling for-profit institutions offer financing through Affirm, but "there is no evidence that these courses provide any pedagogical value or produce the career outcomes to which they point."

48.    As another example, the American Fitness Professionals Associaton ("AFPA") offers "a wide range of professional certifications in the fields of fitness, personal training, holistic wellness, and nutrition."  On its website, it advertises that through Affirm, a student can "Pick the loan that fits your budget over 3, 6, or 12 months."  It notes that "a $950 purchase may charge 20% APR":

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17    49.    However, in the fine print, AFPA notes that the rate actually could go as high as 30%,

18    and that a down payment may be required.

19
20
21



22
23
24
25
26
27

28    50.    The SBPC Report was submitted as a public comment to the CFPB on March 25, 2022,

1    and cited in the CFPB's September 2022 Report, and was thus known to BNPL industry participants.

2    **A Further CFPB Survey Shows the BNPL Industry Preys on the Working Poor**

3        51.    BNPL providers, including Affirm did not provide adequate data to assess the profile of

4    a typical BNPL borrower in conjunction with the initial investigation.   However, after receiving

5    additional data, on March 2, 2023, the CFPB released a survey entitled: "Consumer Use of Buy Now

6    Pay Later: Insights from the CFPB Making Ends Meet Survey ("CFBP Survey").[4]  This survey confirms

7    that Affirm targets, and profits off of, the working poor.

8        52.    According to the CFPB Survey, Defendants' repeated representations that BNPL is a

9    *substitute* for traditional payment methods such as credit cards were false.  To the contrary, the CFPB

10    Survey found that BNPL users actually stack BNPL loans on top of traditional credit, and thus are

11    "[m]ore likely to borrow using credit and retail cards, personal loans, student debt, and auto loans

12    compared to non-BNPL borrowers."  The CFPB Survey also reported that "BNPL borrowers were, on

13    average, much more likely to be highly indebted, revolve on their credit cards, have delinquencies on

14    traditional credit products, and use high-interest financial services such as payday, pawn, and overdraft

15    compared to non-BNPL borrowers."  In fact, BNPL users had nearly double the credit card and retail

16    debt compared to non-BNPL users.  *See* Figure 6 from the CFPB Survey below:

17

18

19

20

21

22

23

24

25

26    _____

27    [4] *Available at* https://www.consumerfinance.gov/data-research/research-reports/consumer-use-of-buy-

28    now-pay-later-insights-from-the-cfpb-making-ends-meet-survey/.



53.     The CFPB Survey also noted that Black, Hispanic, female consumers, and those with household incomes between $20,001 to $50,000 were significantly more likely to use BNPL offerings compared to white, non-Hispanic, and male consumers.  The CFPB Survey further found that those with incomes above $200,000 were the least likely demographic group to use BNPL.[5]  *See* Figure 2 Below from the CFPB Survey:

---

[5] The CFPB Survey said that the "lower likelihood of utilization among those with the lowest income, $20,000 and lower, may [] be attributed to supply factors such as where BNPL is advertised," or that they may have "insufficient disposable income for consumption in general," as well as a lower approval rate.

1

2

3



FIGURE 2:    PERCENT OF EACH GROUP THAT USED BNPL

4

5

6

7

8

9

10

11

12

13

14

15

16

17    54.    In addition, the CFPB Survey found that BNPL borrowers have lower liquidity and

18  savings on average compared to consumers who did not use BNPL, and exhibit measures of financial

19  distress at rates higher than non-BNPL users.  69% of surveyed BNPL borrowers carried over a credit

20  card balance from one billing cycle to the next.  This exposed the borrowers to interest rates of well over

21  20%.  Borrowers who used BNPL were also 26 percentage points more likely to have a credit card

22  overdraft, 12 percentage points more likely to use alternative financial services such as payday/pawn

23  loans, and 27 percentage points more likely to have revolved on their credit card in the past billing cycle

24  than non-BNPL users.

25    55.    The CFPB Survey further showed that BNPL borrowers, on average, have lower average

26  credit scores than consumers who do not use BNPL.  An average BNPL user has a subprime credit score

27  (under 670), while a non-BNPL user has an average credit score classified as near prime (670-739).  *See*

28  below:

1

2

3

4

5

6

7

8

9

10

11

12

13

14



FIGURE 3:    AVERAGE CREDIT SCORES BY BNPL STATUS

15    56.    The CFPB Survey also reported that 88% of BNPL users have an open credit card, which

16    was 13 percentage points more than non-BNPL users, and that BNPL users were more than 2.5 times as

17    likely to be delinquent on a credit product than non-BNPL users (18% vs. 7%).

**The Interplay Between Affirm's Funding Sources and Interest Rates**

18

19    57.    Affirm has three funding sources.  First, it has warehouse lending facilities with certain

20    banks providing it capital to originate or purchase loans.  These are subject to floating interest rates.

21    Affirm's warehouse facilities mature between 2023 and 2029, and allow borrowings up to 12 months

22    before the maturity date.  Second, Affirm uses forward flow arrangements to sell loans to wholesale

23    buyers such as pension funds, insurance companies and hedge funds.  These arrangements allow Affirm

24    to offload the economic interest in the loan to third parties, but the Company continues to service the

25    loans and earns revenue from this activity.

26    58.    Third, Affirm bundles and resells loans through asset-backed securitizations.  As the

27    servicer of these trusts, Affirm has the "power to direct the activities that most significantly affect" their

28

economic performance.  2022 Form 10-K at 128.  During the Class Period, more than a third of Affirm's loan portfolio was funded by securitizations.

59.    From the beginning of the Class Period, central banks and market commentators discussed the end of the zero-rate regime that had been present during the first year of the Covid pandemic, and much of the prior decade.  Between March 2022 and March 2023, central banks around the world raised interest rates significantly in an attempt to tame inflation.  In the United States, the Federal Reserve raised the Federal Funds Rate from a target range of 0.25%-0.5% to 4.75%-5.00%.[6] These rate hikes adversely impacted all of Affirm's funding sources, even though Linford repeatedly denied or downplayed the risks.  Unable to favorably sell or securitize loans as it had in the past, Affirm more than doubled the amount of loans retained on its balance sheet.  The total amount of loans that Affirm retains on its balance sheet has increased from $1.76 billion in the second quarter of 2021 to $3.47 billion in the second quarter of 2023.

60.    Warehouse facilities with floating rates became more expensive and yields that investors demanded for asset-backed securities over the benchmark rate began to increase.  This is evident in the securitizations that Affirm arranged during the Class Period.  Between February 2021 and May 2022, the opening coupon rate Affirm paid for its most senior tranche for an asset-backed security rose from 0.88% to 4.30%, and increased to 6.61% in January 2023 for its most senior tranche.  The loans underlying these securities as well as other loans that Affirm sold through forward flow arrangements also became riskier because delinquency rates doubled from low delinquencies during the pandemic.

61.    Data collected by Morningstar, Inc., an investment research and management firm, shows that the weighted average credit score of borrowers for Affirm's securitizations shifted from near-prime in 2021 to near sub-prime in 2022.  According to the CFPB Survey, credit scores between 580 and 669 are considered subprime and credit scores between 669 and 739 are considered near-prime.  According to the Morningstar reports, weighted average credit scores of borrowers of the underlying loans in Affirm's shorter term securitizations declined from 686 to 690 in August 2020 and February 2021 to a range between 668 and 674 in 2022 and early 2023.  These reports are not available to ordinary investors

---

[6] The Federal Reserve's Open Markets Committee sets the Federal Funds Rate, also known as the federal funds target rate, as a range between an upper and lower rate limit, in .25% ranges.

upon reasonable inquiry. Additional red flags also emerged in the Class Period. In early 2022, Affirm delayed a securitization solely because investors raised serious concerns about rising interest rates as described by CW1 in detail in Paragraphs 73 through 76. On November 4, 2022, Bloomberg reported that Affirm abandoned a $350 million bond plan because investors demanded much higher yields than Affirm intended to pay. According to Morningstar, the underlying assets pooled for the deal were BNPL loans.

**Defendants Were Aware Of Interest Rate Risks, the Company's Business Metrics, Its Focus on Vulnerable Consumers, and Predatory Practices of Merchant-Partners**

62.    Defendants' own statements concede their Class Period knowledge of the misrepresented and concealed facts, raising a strong inference of scienter. Throughout the Class Period, Defendants touted their access to granular data about predatory practices designed to overextend customers, harvesting of data to create consumer profiles, interest rate risk and credit risk in SEC filings as well as commentary during public events. For instance, on March 10, 2021, Linford attended the Truist Securities Technology, Internet & Services Conference. At this event, Linford touted the Company's models for assessing credit risk as superior to Affirm's competitors, and stated that "we're always ingesting more data and more signal into the model and training it on more transactions and more consumers." On an earnings conference call held on May 10, 2021, Levchin made similar claims when he bragged about the Company's "proprietary machine learning," an application of artificial intelligence tools, to support the assertion that "we're able to personalize offers for consumers, more efficiently at proven price credit, and manage risk in ways that achieve better credit outcomes."

63.    On September 28, 2021, Affirm held an Investor Forum where Michalek, the Company's President of Technology, Risk and Operations, confirmed that Affirm collects granular data on borrowers related to shopping, payments and purchasing power down to the stock keeping unit level in an effort to drive repeat usage. On November 17, 2021, at the Citi 11th Virtual FinTech Conference, Linford went further when he disparaged the risk assessment tools of traditional financial institutions and Affirm's competitors to claim that the Company's machine learning capabilities "can accurately predict for pools of consumers [what] losses are going to be, and we can price relationships with merchants and consumers and a lot of that risk that we're taking." These kinds of statements were not

about underwriting quality in the aggregate.  At a February 10, 2022 earnings conference call, Levchin specified that tools like this allowed the Company to model each individual borrower's ability to pay down to an individual transaction, allowing the Company to "deliver a reliable forward-looking picture of both consumers and our own cash flow."

64.    At an earnings conference call held on May 12, 2022, Levchin confirmed that credit performance and borrower profiles were monitored at the highest levels of Affirm, including the head of risk together with the executive team, when he said that "[i]t's not a thing we sort of get together and say, all right, it's been a quarter, let's talk about it.  Like we talk about it literally every Monday morning . . . and we review all our numbers, and say, hey, how do we feel about the American consumer at the highest level?"   Thus, Defendants were aware of or recklessly ignored granular information showing that BNPL loans drove borrowers to become overextended.

65.    Defendants' assertions were not limited to monitoring creditworthiness in the abstract or limited to surveillance of borrower data.  In the 2022 Form 10-K, Affirm represented that it monitored "***merchants'*** creditworthiness, consumer complaints and dispute rates, changes in consumer repayment behavior, ***and other data to give consumers the confidence that merchants integrated with Affirm are committed to delivering honest and delightful experiences***."   Thus, Affirm was aware of predatory merchants, including unaccredited and/or for-profit online "schools" like Haircation and Made Institute.

66.    Levchin also boasted in November 2021 that the Company had hired individuals from "key supervising regulators" like the CFPB to join its legal and compliance team, providing Defendants insight into the CFPB's regulatory process.  Thus, Defendants knew or recklessly ignored that the CFPB did not approve of its predatory BNPL practices.

67.    On September 15, 2022, Linford repeatedly mischaracterized the CFPB's September 2022 Report, claimed that "we've solved all these problems already," without providing any specifics, acknowledged the CFPB's concerns about loan stacking and "lack of reporting," but asserted that "we're heavily invested in trying to get that right for the whole space" without providing any proof.  Regardless, Linford's acknowledgment about overextension risks and his claim that Affirm was invested in "trying to get that right" admits knowledge that these practices were a major problem if not resolved.

68.     Similar representations were made that demonstrate access to information or knowledge or reckless disregard for the risk of rising interest rates and their negative impact on the Company's funding costs.  Linford spoke with a great degree of specificity on this topic throughout the Class Period.  For example, Linford assuaged investors' rate fears just after United States Secretary of the Treasury Janet Yellen warned in early 2021 that interest rates would soon need to increase.  On May 11, 2021, Linford attended the MoffettNathanson Payments, Processors, and IT Services Summit.   At this conference call, Linford was specifically asked about how an increase in interest rates would affect Affirm's business, and Linford responded that Affirm had stress tested its revenue model and, based on the results of those tests, the Company was "well positioned to succeed in any rate environment that we've seen over the past 20 years."  He further stated that:

> We believe there's a real misconception about interest rates in Affirm out there right now. ***We believe that we're really well positioned to succeed in any rate environment that we've seen over the past 20 years.***
>
> There -- ***we have gone back and stress tested our model, business model, revenue model, the level of what we call contribution profit or revenue less transaction cost, we've gone back 20 years of rates and stimulated it through our business and we're good, which means we can get it for like 650 basis points of rates.***
>
> And like while we believe that like everybody that rates won't stay at zero forever and that we are going to have to start reacting to a higher rate environment, we  think the first derivative, i.e., the change in rates it just doesn't impact us.  ***Seventy-five percent of our portfolio is funded with fixed rate or no polluting -- no interest rate exposure at all and the 25% that's funded with interest rates, but that we're in complete control over.***
>
> ***So, in the short-term kind of first derivatives shocks doesn't worry us at all.  And longer-term we can go back over two decades and still be good with respect to our unit economics and that's before we pull any of our cost or revenue levers, which are huge.***  So, on the revenue side, look, the higher the break the more valuable a 0% offer is.  It's just different, right?  If you're a consumer -- if you're a consumer and rates are 0, a 0% offer is less compelling as when the rates are at 3%, 4% or 5%.So we know that the product is more valuable and how we monetize it is a thing that we can do either through the merchant, which we tested during COVID where we had to tighten credit and our product was valuable enough that merchants chose to continue to pay us more merchant fees to support the same level of approvals.  ***And we think the same will hold out in a higher rate environment.***

69.     The Federal Funds Rate was over 5% between 2006 and 2007.  It did not cross over 5% during the Class Period.  It has not come close to "650 basis points."[7]   Given Linford's affirmative

---

[7] "Basis point" refers to 1/100th of a percent. 650 basis points as used above refers to 6.5%.  *See* https://www.investopedia.com/terms/b/basispoint.asp.

representations about stress test results over a 20-year period, and his repeated assurances throughout the Class Period that there would be little to no short-term impact on Affirm from an increase in interest rates, Affirm's funding costs should not have unexpectedly increased, as the Company ultimately admitted they would when it announced disastrous financial results for the second quarter of 2023 on February 8, 2023.  Funding costs did, in fact, increase within weeks of Linford's misrepresentation that the short term risk was minimal, as detailed herein in Paragraphs 132 through 133, 136 through 138, and Paragraphs 164 through 167 because of an increase in interest rates as Defendants ultimately admitted, reducing RLTC as a percentage of GMV, a metric that Defendants repeatedly emphasized as key to the Company's success, from a Class Period high of 5.9% to a low of 2.5% between the quarter ending June 30, 2021 and the second quarter of 2023.

70.     On May 25, 2022, Levchin attended the JP Morgan Global Technology, Media & Communications Conference.  At this event, Levchin was specifically asked by an analyst whether any forward flow partners could pull back, and he responded: "we watch the numbers like hawks to make sure that we are never on the wrong side of any deal – and I think in rougher or more complicated times, which is certainty where we are now.  These partnerships are tested, but people also flight to quality.  Like there's a real sense that I've got several conversations that I've had with our funding partners that they don't just love our assets that they always have, they expect us to be one of the partners that they rely on to place more capital."

71.     Similarly, on June 14, 2022, Linford attended a Fireside Chat hosted by Autonomous Research LLP.  This event took place less than eight months before Affirm suddenly announced poor financial results in February 2023 and conceded that a rise in funding costs due to increased interest rates would impair its performance.  At this event, Linford talked at length about how the Company had onboarded funding "all the way through May 2024," had a few deals with "episodic pricing renewals," but assured the market that "there's not a lot of short-term rate exposure to the business.  We have a lot of certainty in the next 6 or 12 months on where things would be."  He further stated that the Company had "thought about this a lot," was "very careful on protecting the profit in the loan," built funding capacity "for the future at all times," and minimized "volatility" in the macroeconomic environment because "there's a lot less short-term exposure."

72.    On August 25, 2022, the Company held an earnings conference call to discuss the financial results for the fourth quarter of 2022 where Linford continued to provide assurances about the Company's ability to mitigate the risk of a continued rise in interest rates on the grounds that 95% of forward flow capacity was already locked in and did not need to be renewed, and specifically represented that the risk of "higher cost of funds" or the chance of lower yields on loans sales would be "delayed," *i.e.*, the problems did not impact the Company in the short run.

**Confidential Witness Accounts Support an Inference of Scienter**

73.    CW1 worked at Affirm from March 2019 to August 2022 out of Affirm's New York office and remotely.  CW1 reported to the Company's Chief Capital Officers Geoffrey Kott and later Brooke Major-Reid ("Major-Reid").  CW1 first joined Affirm in March 2019 as an Associate in Capital Markets, and in March 2020, was promoted to Senior Associate in Capital Markets, then promoted again to Lead, Capital Strategy in October 2020, and then became the Manager in Capital Strategy in January 2022.

74.    CW1 worked with Affirm's Treasury department and helped manage the Company's relationships with originating banks.  CW1 had direct experience with transactions such as debt facilities, loans sales and asset-backed securities.  According to CW1, the Company delayed a $500 million revolving, asset-backed security in March 2022 for reasons purely related to the interest rate risk.  CW1 knew this because CW1 met with Major-Reid, and the syndicate desk of Barclays, which is an intermediary between the private and public side of the bank that facilitates sales of asset-backed securities.  At this meeting, CW1 asserts that the discussion focused on the cost of funding because of interest rate volatility.

75.    CW1 recalled that investors with larger orders reneged because the coupon rates offered were not high enough in light of the risk that interest rates would rise.  According to CW1, the message delivered by Affirm's counterparties was that the orders were only good if Affirm significantly increased its costs of funds to them.

76.    According to CW1, Linford knew about this meeting and was closely involved in the decision-making process because Major-Reid sent Linford "play-by-play" text messages about the

1   meeting, and she would have also updated Levchin.  CW1 also confirms that Linford has detailed

2   knowledge of these issues because Linford meets with Affirm's banking partners regularly.

3       77.    CW2 worked at Affirm from January 2020 to February 2023 as a Compliance Program

4   Manager and as a Compliance Manager, Financial Crimes.  CW2 reported to Chanell Bruno, the Senior

5   Compliance Manager and Head of Know Your Customer, Anti-Bribery and Financial Crimes Oversight

6   and Governance.  CW2 stated that Levchin and other senior leaders discussed the CFPB inquiry during

7   company-wide all-hands meetings.  CW2 also explained that Affirm kept information regarding the

8   specifics of the CFPB inquiry at a really high level of management.  CW2 further states that the CFPB

9   investigation was still considered an ongoing matter at Affirm when CW2 left the Company in February

10  2023.

11      78.    CW3 worked at Affirm from October 2021 to October 2022 as a Senior Associate in the

12  Capital Markets group.  CW3 was based in Affirm's New York office.  CW3 reported to the Vice

13  President and Global Head of Capital Markets Ryan Foss, who reported to Chief Capital Officer Major-

14  Reid.  CW3 worked on securitizations, including the $500 million sale of asset-backed securities that

15  Affirm delayed in March 2022.  CW3 stated that most of CW3's team did not believe the Individual

16  Defendants' public statements concerning the minimal impact from rising interest rates.

17      79.    CW3 also corroborated a key issue addressed in the CFPB's September 2022 Report,

18  confirming that Affirm delayed refunds for purchases subject to returns or disputes like the other four

19  BNPL providers.  Until 2022, Affirm did not issue refunds unless merchants approved them first after

20  an investigation.  After receiving customer complaints, Affirm changed its refund policy in 2022, and

21  paused additional interest in cases where a transaction was in dispute.  Moreover, according to CW3, it

22  was understood internally at the Company that the best case scenario for Affirm was increased regulatory

23  scrutiny as a result of the CFPB's ongoing investigation into BNPL providers.

24  **AFFIRM AND THE INDIVIDUAL DEFENDANTS MADE FALSE OR MISLEADING
    STATEMENTS DURING THE CLASS PERIOD**

25
    **Defendants' Misleading Statements About Affirm's Credit Offerings and Attempts to Minimize
26  the Risks of Regulatory Scrutiny Because of Consumer Harm**

27      80.    The Class Period begins on February 12, 2021, the day after Affirm held an earnings

28  conference call to discuss the Company's fiscal year 2021 second quarter results.  During the scripted

portion of the call, Defendant Levchin made the following misleading statements[8] regarding Affirm's BNPL offerings:

**Max Levchin**

*****

***Affirm was founded almost a decade ago with the mission to build honest financial products that improve lives***. We knew that consumers were tired of the constant penalties like late fees and  deferred interest from credit cards, and we knew that merchants needed new payment solutions that  could help them attract and retain customers while avoiding discounts and promotional gimmicks which can dilute their brands and their bottom lines.

***Since the beginning, we focused on building a new kind of payment network, the first to align its own success with the success of both consumers and merchants. Affirm [wins] when our consumers and our merchant partners win.***

*****

81.     The statements identified in Paragraph 80 were materially false and misleading when made because they omitted to disclose that (a) Affirm's BNPL offerings increased the risk of consumer harm because, among other things, Affirm (i) harvests consumer data, creates roadblocks towards a resolution of disputes with customers, overextends credit through loan stacking and sustained usage and fails to properly vet customers' ability to pay as credit card companies are required to do so under federal law, (ii) allows its platform to be used by predatory for-profit unaccredited "schools," (iii) uses deceptive devices like dark patterns that drive up repeat usage as well as loan stacking and (iii) profits from its BNPL offerings by preying on the working poor, and as a result (b) Affirm's BNPL offerings are not "honest," do not "improve lives," and the Company's economic interests are not "aligned" with the interests of consumers.

82.     On that same call, Defendant Levchin made the following misrepresentation about Affirm being unique in "speak[ing] to the end consumer truthfully" when asked what differentiates Affirm from its competitors:

**Q- Andrew Jeffrey**

Hi. Good afternoon. Appreciate you taking the question. Max, maybe I'll build a little bit off Brian's question from a competitive perspective. There are a number of players in the

---

[8] The statements cited herein are quoted verbatim from transcripts prepared by Bloomberg. Plaintiffs believe that certain statements contain grammatical and typographical errors, but the quoted statements are unaltered as alleged herein.

market, **can you elaborate on why you think Affirm wins?** And particularly, what differentiates Affirm from peers? I mean, you're not really doing Pay in 4, per se. Today it's a much more complex model. And I wonder if you could just speak a little bit about **why you think you have a competitive advantage?** And maybe why Affirm is uniquely positioned to take big share exclusivity with platforms like Shopify notwithstanding?

**A- Max Levchin**

**\*\*\*\*\***

The other one which I feel never gets enough fair play and so I'll just keep on repeating it. **We're the only ones in the space that actually speaks to the end consumer truthfully. We don't charge late fees. We don't do deferred interest. We don't do any other things that ultimately disburse somewhere between rolling their eyes at and just get very, very angry about it.** And consumer brand love is important to us and it's very important to merchants, but fundamentally what drives will be a transaction.

So we are very keen on continuing down that line as well because ultimately, merchants and merchant platforms want to partner with brands that add to their own brand love as opposed to potential embarrassment**. And that's something that we feel very strongly about and we continue to wish the industry would change and follow our lead. But for the moment, we are unique in that sense and we take great pride in that with continue winning deals because of that point of view.**

83.    The statements identified in Paragraph 82 were materially misleading when made because Levchin omitted to disclose that (a) Affirm's BNPL offerings increased the risk of consumer harm because, among other things, Affirm (i) harvests consumer data, creates roadblocks towards a resolution of disputes with customers, overextends credit through loan stacking and sustained usage and fails to properly vet customers' ability to pay as credit card companies are required to do so under federal law, (ii) allows its platform to be used by predatory for-profit unaccredited "schools," (iii) uses deceptive devices like dark patterns that drive up repeat usage as well as loan stacking and (iii) profits from its BNPL offerings by preying on the working poor, and as a result, Affirm (b) did not speak to customers truthfully, (c) consumer harm was and is not limited to late fees or deferred interest as the CFPB's findings make clear in the September 2022 Report, and (d) like all its competitors, Affirm's BNPL offerings carry serious risks of consumer harm, rendering Levchin's repetitive statements concerning the absence of late fees or deferred interest misleading.

84.    On March 1, 2021, Defendants Linford and Levchin spoke at a Virtual Morgan Stanley Technology, Media, and Telecom Conference. At this event, Levchin made the following misleading statements regarding the Company's "transparency," in response to an opening question about the basics of what Affirm offers to consumers and merchants:

**Q- James Faucette**
So without really any further ado, Max, why don't we start with you, for those maybe that are less than they are familiar with Affirm or at least the business intricacies themselves, can you talk a little bit about the main solutions Affirm offers both merchants and consumers?

**A- Max Levchin**

**\*\*\*\*\***

***And what if we built a company that provides the same point of sale financing solutions, but fundamentally aligns itself to the success of the borrower***, as well as the merchant and help merchants close more transactions, potentially higher ticket, ***while giving consumers total and full transparency to exactly what they're going to pay and whether there's any interest at all or not, they should know precisely what that number is in dollars, not some esoteric measures.***

That's what we built out. At this point, we are on 1000s of brands online and offline and have served multiple millions of consumers transacting. ***We have maintained the extraordinary high net promoter score primarily by just sticking to this idea of total transparency and extreme clarity in customer. We've never charged a penny of late fees.***

My favorite statistics, we don't do deferred interest, we don't do really anything consumers can't expect. ***We go to great extent to great pains to make sure that consumers love us and not just sort of like, "Oh, yes, that was nice," but actually think of us as a great financial partner to them.***

85.    The statements identified in Paragraph 84 were materially false and misleading when made because they omitted to disclose that (a) Affirm's BNPL offerings increased the risk of consumer harm because, among other things, Affirm (i) harvests consumer data, creates roadblocks towards a resolution of disputes with customers, overextends credit through loan stacking and sustained usage and fails to properly vet customers' ability to pay as credit card companies are required to do so under federal law, (ii) allows its platform to be used by predatory for-profit unaccredited "schools," (iii) uses deceptive devices like dark patterns that drive up repeat usage as well as loan stacking and (iii) profits from its BNPL offerings by preying on the working poor.  For these reasons, Affirm is not "fully transparent" or "aligned" with borrower "success" as Levchin incorrectly represented, and was not a "great financial partner" to the vulnerable consumers it purported to serve.  In addition, touting the net promoter score created an affirmative duty to disclose the adverse facts identified in this Paragraph.

86.    On May 10, 2021, Affirm held its earnings call to announce its second quarter fiscal year 2021 results.  On this conference call, Defendant Levchin bragged about Affirm's "core values" and that Defendants "put [the customer's] interest before our own":

**Max Levchin**

Welcome everyone and thanks for joining us on today's call. We were excited to update you on the performance of our business and the progress we achieved since our call in February. But before we go through the numbers, I would like to start by sharing a few stories from the past quarter to help demonstrate the power of Affirm.

***As many of you know, at Affirm, one of our core values is that people come first. That means that we constantly consider our impact on people's lives, and we strive to put their interest before our own.*** That's why we never charge late or hidden fees. It's also why we're always looking at what consumers have to say about us, and how we're helping them, get the things they want and need.

\*\*\*\*\*

87.    The statements identified in Paragraph 86 were materially false and misleading when made because Affirm did not put consumer interest before its own interest, and the statements omitted to disclose the facts identified in Paragraph 85.

88.    On May 11, 2021, Defendant Linford spoke at a MoffetNathanson Payments, Processors, and IT Services Summit.  In response to an analyst's question about regulatory oversight, Defendant Linford made the following false and misleading statement:

**Q- Analyst**

All right, well you mentioned in there a little bit -- some of -- I wanted to talk a little bit -- I guess, maybe follow on to the credit risk management is related to how you think about regulatory oversight. I know this is a controversy when it comes to this whole space because it's a little bit unclear country to country exactly how the regulators are going to lean in.

So I guess, one specific topic raised in a question here and also came up in our earlier session is just how you think about potential requirements to report to the bureaus. So I know right now some tranches, some portions, at least, of the NPL payments -- or that consumers are taking do not end up being reported into the bureau, so they don't show up on a typical credit. And so, like, how do you think about the impact of that on your business, like, if that became a requirement or not or what's your perspective on that dynamic?

**A- Michael Linford**

***Yes, I think the most important thing is that the playing field is level.*** So from our standpoint, in our higher average order value product we both furnish and benefit from the bureaus. We do it a little bit different.

It's important that -- a traditional FICO is not favorable to -- in some [ph] loans generally. And so there's some nuance around how that furnishing happens. But we actually think that the furnishing system is important and we think it's a good thing, we also think it's not entirely appropriate for certain transaction types, right. So it seems to us a little out of place to furnish on a $50 transaction.

*But the most important thing for us is just that the playing field is level and that the rules are understood. And that applies to the regulatory context as well. I think the thing that benefits us in that conversation is that we do put consumers first.*

\*\*\*\*\*

89.    The statements identified in Paragraph 88 were materially misleading when made because (a) the "playing field [was] not level," as CFPB Director Chopra made clear, but rather Affirm and its BNPL peers provided inferior consumer protections compared to some legacy payment options, and (b) Affirm did not "put consumers first," but instead manipulated them to generate sales for the merchant-partners for which it considered itself a "marketing tool."

90.    On September 9, 2021, Affirm held an earnings call to discuss its fiscal year 2021 fourth quarter results.  During the scripted portion of that call, Defendant Levchin made the following false and misleading statements about Affirm's supposedly more "honest financial product[]":

**Max Levchin**

Welcome everyone, and thank you for joining us on today's call. Before we get into the results, I want to start by talking about what we're actually building at Affirm. *Around 10 years ago, we founded Affirm with a simple mission, to deliver honest financial products that improve lives. We started by reinventing payment to make them transparent, simpler, smarter, and more delightful. Our core insight was that the generations coming of age after the financial crisis of 2008 were no longer willing to tolerate getting into permanent debt by putting it all on the card or getting burned by late fees and deferred interest.*

*These young consumers and many like-minded older ones grew fundamentally suspicious of credit and retreated into the simplicity of their debit cards. This created no less than a once-in-a-generation opportunity to transform credit. And thus, began the great unbundling of the credit card.* The credit card was the ultimate buying bundle, a single product allowing you to put purchases of all sizes together in one basket with the freedom to pay for them later. *Unfortunately, if you couldn't pay for them later and in full, endless debt became nearly inevitable and that credit card could quickly become the financial equivalent of a ball and chain. That where Affirm came in.*

*We deconstructed -- rather, we unbundled the credit card, starting with the largest purchases. We made these easier more transparent and helped consumers be smarter about buying now and paying later.* In order to do all of this, we built proprietary technology from the ground up and developed sophisticated capital markets expertise. *Our game plan was always simple, obsessed over consumer happiness and use superior tech to give more people confidence to buy without resorting to the kind of dirty tricks the credit card industry is infamous for, late fees, fine print, deferred interest, to name a few.*

\*\*\*\*\*

91.    The statements identified in Paragraph 90 were materially false and misleading when made because Affirm and other BNPL providers (a) also engage in "dirty tricks" like the use of dark

patterns to drive up debt, (b) offer credit products that provide less protection than those afforded to credit cardholders as Director Chopra explained in his public remarks, and (c) also carry risks of driving up "permanent debt" through loan stacking and sustained usage.

92.    On September 28, 2021, Affirm held an Investor Forum.  During the question and answer session, Defendant Levchin gave the following misleading statement about Affirm's relationships with regulators:

**Q- Jason Kupferberg**

Good afternoon, guys. Thanks for all the details today. We appreciate it. Wanted to see if you could spend a minute, just giving us your latest views on the regulatory backdrop as the buy-now-pay-later space continues to obviously expand in popularity. Certainly, there have been some media reports from time-to-time about some consumers getting themselves into a bit of trouble, which may certainly be a one-off situation. But, the fact that this may get more attention as the industry continues to experience significant growth. And I know, you've been proactive with the regulators in general. But we love to get your perspective and how that perspective may evolve as you take your business overseas?

**A- Max Levchin**

Great question. So first of all, for the avoidance of doubt, not only we have been -- have we been engaged with a variety of regulators over the years. We are a very regulated business. We see regulatory attention through our bank partners, we speak directly to state regulator. So, we have a full complement of regulatory relationships that we need to be very attentive to and are.

Two, I think I speak for the entire team, but I'm certainly personally generally fairly pro-regulation when it comes to these new financial products because in the business we're in, unless you see some degree of coordination among players, even violent competitors that want to edge each other out in the market*, you want to make sure that consumers and merchants aren't inadvertent victims there.* And so, what that means is you have to standardize around the way of communicating, what is and isn't offered in a product and the way you reported to authorities, to credit bureaus, if that's part of the offering, et cetera. And so generally speaking, I think regulatory attention is a positive thing so long as it is rooted in understanding of the product, understanding of what the intent is, et cetera. And so, all of that is why we engage with the regulators. That's why I spent several years on the CAB's Advisory Board specifically to make sure that we have a chance to communicate our value proposition. *We tend to think of ourselves as sort of the one honest actor in the space having chosen from the very beginning to charge no fees of any kind including not even late fees. The reason for it is as much about creating a unique brand and unique value proposition to the consumers, but also to frankly align our incentives, the consumers and the regulators.*

And ultimately when a regulator says, all right, so what percentage of your profits come from the fact that consumers just forgot to pay your bill is like zero. If someone forgets to pay their bill, my number one incentive to say, please pay your bill on time because I'm losing money as a result and there's nothing I can do about it other than remind you a few more times. And I think that direct connectivity with person's well-being and the regulatory intent has served us really, really well and grounded our regulatory conversations just the right way for many years now. I think the industry frankly could use some of that. *And so, I would love for my competitors, both tiny and huge to join the idea of no late fees, get*

***rid of that terrible thing called deferred interest once and for all, which, if there's one thing I'm passionate against, it's deferred interest and many other gimmicks that the industry is infamous for.*** So I partners of boxing, but it would be some welcome attention in those areas.

93.    The statements identified in Paragraph 92 were materially false and misleading when made because Affirm creates many "victims" as found by both the CFPB's September 2022 Report and the SBPC's Report, and deploys "many other gimmicks that the industry is infamous for" such as the use of dark patterns and virtual malls to drive up debt, and as a result, Affirm is "not the one honest actor in the space" with "incentives" "aligned" with either consumers or regulators.

94.    On November 16, 2021, Linford spoke at an RBC Global Technology, Internet, Media, and Telecom Conference.  In response to the opening question about the state of the BNPL industry, Linford made the following misleading statements concerning honesty and transparency:

**Q- Dan Perlin**

*****

And we'll just going to dive right into to run a few minutes slide here. What I thought I would ask you just quickly before we  get into all the juicy stuff is just, you know, the current environment in buy now, pay later, kind  of what you're seeing today versus maybe the past 12 months and how those trends have kind of evolved in the current environment?

**A- Michael Linford**

*****

We are uniquely positioned we think to win and the number one reason and one takeaway is because of technology that allows us to evaluate and price risk in a way that's differentiated both with respect to speed and accuracy allows us to serve more consumers and ultimately drive better outcomes. ***That also allows us to have a very honest and transparent and trust-based relationship with the consumer because we're really good at this stuff. We're able to not charge late fees and don't have to hide behind gimmicks and tricks in our financial products in order to make them work.***

95.    The statements identified in Paragraph 94 were materially false and misleading when made because (a) Linford's claims of honesty and transparency are undermined by "gimmicks" and "tricks" identified in both the CFPB's September 2022 Report as well as the SBPC Report, (b) Affirm did not have a "trust-based relationship" with customers but rather exploited them so it could better function as a "marketing tool" for its merchant-partners, and (c) although it avoided late fees in certain products, Affirm engaged in other predatory practices as outlined in Paragraphs 29 to 56, and as a result, Affirm was not "really good at this stuff."

96.     On February 10, 2022, Affirm held an earnings call to discuss its fiscal year 2022 second quarter results.  In response to an analyst's question, Levchin made the following misleading statements about the CFPB's announced investigation into the BNPL industry:

**Q- Andrew Bauch**

Hey guys. I wanted to ask a question about the CFPB, look at buy-now-pay-later. And from whatever you can share, is there anything you've garnered from those initial discussions that kind of give us a sense of how they're looking at the offering going forward?

**A- Max Levchin**

First of all, it's obviously not for us to comment on their work there. ***The thing that's been true for us over the last 10 years is that we had a very, very high moral ground approach to this entire business to the way we conduct ourselves to the way we treat consumers, the way we deal with disputes, et cetera, et cetera***.

*****

97.     The statements identified in Paragraph 96 were materially false and misleading when made because Affirm (a) deprived consumers of the freedom of agency by forcing them to pay for BNPL installments while disputes about returns with merchants remained pending as the CFPB's September 2022 Report found and as CW3 confirms in Paragraph 79, and as a result (b) Defendants did not demonstrate "a very, very high moral ground approach to this entire business."

98.     On May 25, 2022, Levchin spoke at a JP Morgan Global Technology, Media and Communications Conference.  In response to an opening question about why he founded the company, Levchin made the following misleading statements:

**Q- Reginald Smith**

Listen. So I wanted to start -- I think people have a sense of the story, but it's always good to hear like why you founded the company and how you are different than kind of traditional credit card companies. So I'll start there and let you kind of talk and...

**A- Max Levchin**

*****

Sure. So I think credit cards are the single best user interface ever created, like the -- just swiping a card, chipping it, whatever you do, is an amazing user interface. It has not been surpassed in my -- certainly, in my 30 years of doing payment products. The underlying financial product is just not good for consumers. It might be even bad it by and large, but I'll stop at consumer finance.

***People don't understand how they work for a lot of banks, present company excluded, of course. The fine print has become the business model. They literally hide various fees and tricks like deferred interest in the fine print, hoping the consumer will get tripped***

*up. So you're literally betting on your customers screwing up to make more money. I think that's just a bad thing for consumers.*

*The way disruption works is you find an opportunity where someone has made it their business to not do the right thing by their customer and you show up with a better product, but you also align yourself with that customer interest. So on the consumer side, it's very clear, you should just do better than what a lot of credit card products have done.*

\*\*\*\*\*

99.    The statements identified in Paragraph 98 were materially false and misleading when made because they omitted to disclose that Affirm (a) also bets on the consumer "screwing up" to make money as detailed in both the CFPB's September 2022 Report and the SBPC Report, (b) has interests that are misaligned with the interests of consumers, and (c) denied consumers even the level of protection afforded to credit cardholders as Director Chopra explained in his public remarks when the CFPB's September 2022 Report was released.

100.    On September 14, 2022, Levchin spoke at a Goldman Sachs Communacopia + Technology Conference.  In response to a question about the CFPB inquiry, Levchin made the following misleading statements about having "absolutely nothing to hide" and being "profoundly on the consumer['s] side:"

**Q- Michael Ng**

Right. I'm sure the innovation road map and the product road map certainly helps with that competitiveness to differentiate yourself among other BNPL providers. Can we talk a little bit about the regulatory environment? In the U.S., obviously there's a CFPB opening query around BNPL issues like credit reporting, data privacy, consumer merchant protections. Can you frame what the regulatory landscape looks like today and how Affirm is positioned to address them, perhaps even relative to some other providers?

**A- Max Levchin**

Obviously the CFPB query inquiry is ongoing, so too early to comment on something. We know not very much yet. We were highly engaged and excited, frankly, to educate the regulators about how we do business*. We count ourselves in -- among the fortunate few, where we literally have absolutely nothing to hide.* We respect consumer privacy to the extreme degree. We don't sell data. We are extremely careful to be more than just a little compliant with every applicable law, and then we take the extra mile to make sure we actually feel good about our decisions.

You've seen our products. We disclosed our entire fee schedule on a spreadsheet full of 0s, and I think that compares very favorably to the industry. *So on sort of do you have anything to hide? Have you done something untoward? The short answer is no. We're quite excited about the way we've been running our business since inception. We never had to clean up something that we weren't proud about.*

\*\*\*\*\*

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*In terms of the rest of the regulatory landscape, again I think it goes a really long way that the closer you look at Affirm, the more you realize that we are profoundly on the consumer side.* There's just not -- there's plenty of people that had a bad merchant experience.

Merchant didn't ship something, and merchant screwed up. *We stepped in and tried to help them out. But ultimately, if you look at the core of who we are and what we do for the end customer, be it the consumer or the merchant, but ultimately helping both, and we do it with great gusto for positive outcomes for all involved*.

101.    The statements identified in Paragraph 100 were materially false and misleading when made because they omitted to disclose that Affirm (a) hid numerous risks of consumer harm outlined in the CFPB's September 2022 Report, Director Chopra's public remarks and the SBPC Report, (b) did not step in and try to help customers resolve disputes during the Class Period as CW3 confirms, and as a result (c) the Company is not "profoundly on the consumer side."

**Defendants' Misleading Statements Related to the Risk of Rising Interest Rates on Affirm**

102.    On March 1, 2021, Linford spoke at the Virtual Morgan Stanley Technology, Media, and Telecom Conference.  In response to a question about the tightening credit market, Linford made the following misleading statements about Affirm's sensitivity to interest rate increases:

**Q- James Faucette**

Got it. And last topic then maybe we'll start with you, Michael, interest rates, there's been lots of conversation about where interest rates are going. Obviously, it's been reflected in part in Affirm's stock itself. We know that as you were -- as we were entering the lockdown from the pandemic, Affirm itself kind of tightened the credit box.

So, what is your sense of Affirm's sensitivity to interest rates and how does it affect your offerings whether it be 0% or fees you generation, like how are you thinking the changing rate environment.

**A- Michael Linford**

First and most importantly, we're risk managers at heart and that applies to how we think about credit but also how we think about interest rates*. And so, we tend to manage interest rate risk pretty carefully inside the business from a short-term standpoint. Our securitizations are fixed rate securitizations and forward flow relationships tend to have either some sort of a hedging applied to it or negotiated a process where we can manage any of the shocks that may happen. And so, we're less concerned about short term volatility in rates.*

*Longer term, we liked where our business was at pre-COVID, think about that kind of rate environment, business was very good, very healthy, margins were quite strong and we feel pretty good* about what that would look like if we envisioned a world that had substantially higher rates, you're talking 6%-7% benchmark rates. There would start to be an impact.

*****

103.    The statements identified in Paragraph 102 were materially false and misleading when made because (a) Affirm did not manage interest rate risk "carefully," given the Company's sudden disclosure of a severely negative impact because of increased interest rates within weeks of Linford's repeated misrepresentation that there was little to no short term risk, (b) the Company's forward flow arrangements were not "hedged" to absorb "any of the shocks that may happen," and (c) Affirm was not protected from past rate environments given that rates in 2006 and 2007 were even higher than they were at the end of the Class Period.

104.    On September 10, 2021, Defendant Linford spoke at a Deutsche Bank Technology Conference.  In response to an analyst's question about a tightening credit market, Linford represented that Affirm's funding sources were secure:

**Q- Bryan Keane**

Great. I know we only have a couple of minutes left. So maybe I'll just end on risk to the model, the common questions I get about rising rates or a more tight credit environment, how that impacts Affirm?

**A- Michael Linford**

Yes. I mean I think we get this question a lot. It may be difficult to see from the outside, but a firm or a company full really world-class risk managers. We -- it sits in our DNA and how we operate. If you look at how we behaved during the early onset of the pandemic and you saw the world changing underneath us, our speed and ability to operate really quickly ended up being a huge advantage. That's -- the most important thing now is that we can react very quickly. *If you think about like the mechanics of it, on the rate side, as I mentioned before, revolving securitizations have a fixed rate. Our warehouses are the really the only thing we have floating rate exposure to. If you look at, again in our financial supplement, you see that our warehouse funding has really declined over time. It's not a predominant way we fund the business today. It's the predominant way that we park assets until we eventually move them on to a securitization.*

*And so in that context, the rate risk for us is longer term. It's over years and not months.* That means that then the second order effects start to apply, how are we able to reprice any through a change in the rate environment, to merchants or consumers. We showed last year that the thing that we do for merchants is so valuable that when the environment changes to a less benign environment, the merchants pay for that. That's the thing that we lean on quite heavily in our thinking and planning around this.

*****

105.    The statements identified in Paragraph 104 were materially false and misleading when made because (a) Affirm was actually quite vulnerable from short-term, sharp increases in rates, as the end of the Class Period disclosures showed, and (b) Affirm's funding sources were much more sensitive to rate volatility than Linford represented them to be.

106.    On November 16, 2021, Linford made the following misleading statements about Affirm's funding sources and risks from rising interest rates at the RBC Global Technology, Internet, Media, and Telecom Conference:

**Q- Dan Perlin**

That's awesome. Yeah. So the message there is, if you've got plenty of runway to support the near-term and medium-term growth, even as you sit here today and in a rising rate environment, how do we think about the implications there, not only on the funding side, but maybe how does that interplay with merchant discount versus APR opportunities?

**A- Michael Linford**

Yeah. So this is -- there is lots of layers of complexity to this particular question. I think the first thing is to put some context to it. ***You know, I think people maybe thinking in hundreds of bps, not thousands of bps, in terms of rate movement. And that's important because our business is well suited to handle changes in our cost structure on that order of magnitude.***

*****

107.    The statements identified in Paragraph 106 were materially false and misleading when made because (a) Affirm was not "well suited to handle" rate increases of "hundreds of bps," (b) the Company's business was not "well suited to handle changes" in cost structure "on that order of magnitude," and (c) BNPL revenue did not, and could not, support Linford's countercyclical theory because Affirm had already started to shift its business to interest-bearing loans and traditional subprime lending activities before this misrepresentation was made.

108.    On February 10, 2022, Affirm held an earnings call to discuss its fiscal year 2022 second quarter results.  During this conference call, Levchin and Linford made the following misleading statements regarding Affirm's business behind the backdrop of a rising interest rate environment:

**Q- Andrew Bauch**

Helpful. Thank you. My follow-up would be, is there any kind of guidepost that you're going to give us from a macro perspective, what you're embedding in the outlook for unemployment, inflation and rates. And I appreciate the color on the interest rate moves to

the impact of the model, but just kind of thinking about what a baseline number that you're embedding in your assumption would be?

\*\*\*\*\*

**A- Max Levchin**

Sorry, I'll just comment (inaudible) the last one was yours. But -- and I'm sure we'll have macro views as well. ***But just the thing that I think people really misunderstand about our products, maybe because it is more popular outside of high finance perhaps, when the interest rates go up and the prices go up really, and prices go up, our product is more useful. If you try to make ends meet and you're trying to pay for a couch and your credit card is confusing you and the rates just went up and Affirm gives you clarity and a way to pay for things in a clear schedule and then you're done and there are no late fees.***

***And half the time, plus or minus, the seller will sponsor any pay your [ph] interest. Just (inaudible) experiments. If the card rate that you paid went up 5%, for example, how do you feel about the 0% rate that a seller at a homeware shop is offering you, powered by Affirm, it's 5% more compelling. And so as inflation happens, the product that we provide is actually more powerful, more useful, has significantly better bearing and sort of consumer demand side of it.*** On the flipside of course, the government addresses inflation raises rates, et cetera. I'll stop now and Michael can tell you what we've done about it, but these things get equal at that top line, this is generally a tailwind, not a headwind.

\*\*\*\*\*

**A- Michael Linford**

Yeah. Just with the total avoidance of doubt, all of our outlook reflects the forward curve. And so there is roughly 180 basis points of rate increases. We take that into all of our models when we give guidance. It's consistent with the market expectation of rate movement. ***And so talk about rising rates, that's not a problem for us at all, that's already reflected in the guidance.***

109.    The statements identified in Paragraph 108 were materially false and misleading when made because (a) rising rates were a problem for Affirm, (b) rising rates were not "already reflected in the guidance," (c) Affirm could not benefit from 0% offerings in a rising rate environment when its business had already started to shift towards interest-bearing loans, and (d) Levchin's attempt to contrast Affirm's offerings with credit cards was extremely misleading given that even credit card issuers are required to provide certain protections that Affirm does not.

110.    On March 18, 2022, Linford participated in a "CFO Fireside Chat" with analyst Ramsey El-Assal from Barclays.  In response to a specific question about Affirm's delayed ABS deal, Linford made the following false statements:

**Q- Ramsey El-Assal**

I want to -- I have another question on the outlook, actually. But first, I wanted to ask you about some news reports recently that Affirm temporarily put a refinancing of ABS, or an asset-backed securitization, on hold. Since then, we've also seen some other companies, I think Tesla and others delay in ABS as well. Can you talk about Affirm's funding model?

And I guess for listers, can you briefly touch on the difference between the debt you use to fund the loans you provide to consumers or funding debt and the company's own corporate debt? Even to make the question a little bit more complex, how do you plan to utilize each of the 3 different programs within your funding model going forward?

**A- Michael Linford**

*****

Well the ABS market is the most directly exposed to the conditions of the market. Those investors are positioned usually to price uncertainty in its premium and so a lot of companies like ours, right now, who decided that this is not the best time to price a deal or doing so because they don't need it. It's our view that companies who need to do a transaction right now are forcing it through at economics that probably means they're paying a premium for this volatility.

We don't feel like we need to because we had better funding opportunities away. What's really important, though, is we could have transacted, we believe, and could have done so at margins that were great for the business. But that would be silly to do in a world where we have better opportunities to fund the business with forward flow or bilateral agreement.

We remain very confident in the ABS market for us over the medium term, and we're committed to continuing to issue across all of our programs. ***When we talk to the ABS investors, it's quite stark difference between how an ABS investor, these people who buy these kind of securitizations, how they view our decision versus, I think some of the equity market reaction, and there's just the biggest connect. I think the right read of it is that companies who choose to defer a deal are doing so because they have strength, and that's exactly what happened with us.***

111.     The statements identified in Paragraph 110 were materially false when made because (a) as CW1 confirms, the ABS deal that Linford discussed was delayed not because of strength but solely because of interest rate risk and investors' demand for higher yields, (b) the statements omitted to disclose that the delayed deal was a red flag that made Linford aware that his statements had the danger of misleading investors, and (c) both equity investors and ABS investors were equally concerned about rising interest rates.

112.     On May 12, 2022, Affirm held an earnings call to discuss its fiscal year 2022 third quarter results.  In response to a specific analyst question about how Affirm managed risks from rising interest rates, Linford made the following misleading statements dismissing such concerns:

**Q- Moshe Orenbuch**

Got it. Thanks. And as a follow-up question, Michael. One of the questions that we get most often from investors is, in the face of a rising rate environment, obviously, you have

some products where the consumer is the primary one that's been charged and that's merchants -- charge to the merchant particularly the zero percent category. Could you talk a little bit about your plans as to how to kind of manage the rising interest rate environment for each of those products, and maybe what you've also done to-date if anything?

**A- Michael Linford**

Yes. We really haven't had to take any action today. If you look at the merchant fee rate slide in our supplement, you'll see again relatively constant merchant fees. We view that as a real mark of success in the face of pretty heavy competition we're able to maintain and even grow in some cases, the emergency side. And of course, as we talk a lot about on the APR side and the consumer side, those rates are strong enough to allow us to deliver really compelling unit economics, and that's the lens through which we look at, at this question. ***And it is true that as rates go up, there is pressure on the funding side of our business, but it is a mistake to think about that as a full flow through on a linear basis.***

***We have many different funding channels with staggered maturities and very different structures. And as I mentioned, for example, we just onboarded a new forward-flow partner, who's an insurance company, has a very different view of rates and how they think about that versus a access to quality assets over time. That allows us to manage it in the nearer term. I think in the very long run, so going out more than a year, you would expect us to need to start to take action, but that's more of a long-term thing than anything we deal with tactically in the near-term.***

113.     The statements identified in Paragraph 112 were materially false and misleading when made because they omitted to disclose that (a) Affirm's business was highly exposed to short-term risks from an increase in rates and, did in fact, suffer from a negative, short-term impact during the Class Period, (b) Affirm's funding sources were not immune to rate increases, and (c) Affirm's exposure to rising rates was increasing and was something that Affirm needed "to deal with tactically in the near-term."

114.     On May 25, 2022, Levchin spoke at the JP Morgan Global Technology, Media and Communications Conference.   In response to a question about funding in a rising interest rate environment, Levchin made the following misleading statements:

**Q- Reginald Smith**

Understood. So just thinking about your portfolio today and I don't have the stat in front of me of what proportion is held on balance sheet. The question is, do you anticipate that changing? Are you -- is your appetite to hold more, increasing?

 Then the second part of that question is with rates rising and there being presumably more options for your forward flow partners to invest in different things, has that changed their appetite or willingness or eagerness to use? Because my sense is that when rates were rock bottom that these folks have money to put to work and didn't have any place to put it and so...

**A- Max Levchin**

*****

*In terms of rates, we've been in business for a long time, and we ran the company just fine back when the rates were not a bottom, and we had 1 full relationships. We cultivated them and did really well for our partners back then, and we'll continue to do so now. Three, as we grow larger and become a more reliable simply through just having more and more quarters reported, partner on the debt side, the doors to deeper pools of capital that are less rate sensitive, but more -- had lots more capital to deploy are open to us.*

5 years ago, going to an insurance company or a pension fund, it was sort of like probably, we're probably going to get laughed out of the room, like we're just too new. And at the time, I was like, we're five years in, how can we be too new. *We're no start-up. So it's now over 10 years, and these doors are open to us, and we are adding insurance companies and pension funds.* I think those folks are certainly looking for yield.

But more than anything, I think they look for stability and great partnerships. That's what we have become known to bring.

115.    The statements identified in Paragraph 114 were materially misleading when made because Affirm's access "to deeper pools of capital that are less rate sensitive" could not, and did not, mitigate the risks of rising interest rates as Levchin misstated.  In addition, Levchin's statements were materially misleading because the Company's financial performance deteriorated during the Class Period despite benchmark rates being lower than in certain times during the preceding 10 years that Levchin referenced.

116.    On September 1, 2022, Linford spoke at the Deutsche Bank Technology Conference.  In response to a question about how Affirm's funding instruments were affected by rising interest rates, Linford made the following misleading statements:

**Q- Mark Keene**

Got it. And then the third one is, not a new one. But is your funding instruments, how to think about that in a rising rate environment, the forward flow, the securitization warehousing?

**A- Michael Linford**

Yes. I'm very proud of the work that our team did in helping forecast this back in February. At the Q2 earnings call in February, we dedicated a lot of airtime to thinking about how rates would flow through our business. I'm proud of it both because we were very accurate in that forecast. We feel very confident in our ability to look around the corners on things like that. And I'm proud of it because we did so on the heels of what was some of the biggest rate shocks in the past several decades. And what I'm proud to report is that our -- the guidance that we gave back in February still very much holds in thinking about the timing of flow through of rate impact on our business.

*And that is to say in the very near-term, the impact is very dampened.* Most of our funding is not floating rate. We can manage in the near-term through existing funding capacity. Our business model is a little bit different than maybe some other people, who do lending and

43

that is we go off and secure ways to fund the business either forward flow or debt, and then we originate loans, and we do it in that order. So, we're originating into more certain liabilities and I use the word liabilities very loosely here. I'm including any way to fund the business. We originate in two certain capitals and that's different than some folks, who originate and then find capital for those originations. And as a result, we don't think about slowing originations.

As you saw last quarter, we added $1.6 billion in funding capacity in Q4. That's on a dollar basis --- sorry on a balance basis, which on GMV basis is somewhere between 2x and 2.2x as much GMV capacity behind that. And so you get -- we go create that capacity and then we fund into it. *And because of that structural thing, we're able to be pretty thoughtful about what rates will do, because some rates will have impacts on us in the near-term and some won't. And yes, new funding capacity will be at a higher rate, but it's an average across the whole portfolio and we're still benefiting from the much more benign times, as we raise capital in 2020 and 2021.*

*And so, we have a lot of confidence on the timing and flow through. And we have a lot of confidence in our ability to keep executing in this market. And I think it's really important that investors pay attention to our ability to continue to raise capital to fund our business. We're very proud of the success that we've had in doing that. And the language we used on the call hopefully communicated or conveyed this, but we have a lot of confidence that, that hasn't the constraint in our business at all today.*

The conversations with forward flow partners today are very constructive. The thing about -- the way we think about writing the business is it all starts with creating assets that have value. If you create an asset that has value, you are confident that you're going to find people, who want to either fund that or monetize that themselves. And if you take care of that, then your investors are going to be there and want to support you by buying those assets.

*We don't see churn in our capital base. It's a pretty rare thing. I think the only time we've turned to capital partner has been by our choice. We just don't really see that. And our capital is truly committed and folks have a hard time with that. They're like that can't really be committed. What do you mean by that? And it's like no, no really. They commit to a dollar amount and we fund it on the forward flow side. And they're doing so, because they're trying to allocate capital to a strategy that we're able to fill and deliver really good yields against.*

*So, we feel really good about that. I think the rate conversation and the associated volatility in the market probably impacts our ABS program the most, where it's just -- it's the most efficient, when it's functioning. And it can also therefore be the most whipped around with any sort of macro context and then again that's not an Affirm story. I guess I think the ABS market is a heck of a lot bigger than us. And clearly the market has been impacted by the change in rates. But as we said a year ago, when we started really leaning into our ABS program and executing some really high quality deals, we got the question a lot then, how come you're still doing forward flow? The ABS market is so efficient. Why aren't you just doing ABS? And our answer then, is the same answer we give now, which is, we know that in order to build a durable and scalable capital program, we have to have multiple channels of diverse partners. And so in this environment, we're going to keep at the ABS market.*

We may do less marginally, but we're going to still be programmatic issuers. But we're also going to keep adding upward flow partners alongside of that, and that's going to be true really in any environment. The thing that might happen in these environments, as you might tilt the scales one way or the other a little bit. *But we're talking about on the margin impact as opposed to any sort of meaningful shift in the strategy.*

117.    The statements identified in Paragraph 116 were materially misleading when made because (a) red flags in Affirm's ABS business had already emerged long before Linford made these statements, (b) by delaying ABS issuance, Linford had engaged in a "meaningful shift in strategy" that substantially increased Affirm's exposure to higher rates and rate volatility, and (c) rates were already beginning to be a "constraint" on Affirm's business.

118.    On September 15, 2022, Defendant Linford spoke at the Autonomous Research Virtual Annual Future of Commerce Symposium.  In response to a question about the Company's RLTC metric, Defendant Linford made the following false and misleading statements about Affirm's ability to achieve strong profit margins in a high interest rate environment:

**Q- Robert Wildhack**

Got it. Okay. Let's actually jump right to profitability and talk a little bit about revenue less transaction costs, the outlook there for this coming fiscal year points to RLTC as a percentage of volume, like 3.7% at the midpoint. To start, what are the moving parts between that and the 4.3% you reported last year?

**A- Michael Linford**

Yes. I mean I think there's a bunch of moving parts, but maybe one of the easiest ones to really think through is just the mix of business. Our business is -- there's a hundred different ways that we can make our business more complicated. Some of these some very broad (inaudible) jokes to simplify it.

 And we really have two sets of products. We have this Split Pay and then we have everything else. You think about Split Pay driving low single-digit kind of 1%, 1% to 2% transaction margins. Then you have core business delivering something that can be as high as 5% or 6%. And as those two mix between the two, and we continue to grow Split Pay business, we will see that number naturally drift down a little bit.

That's in addition to the macro environment we're in. Obviously we are in the middle of a fundamental shift in both the consumer and the rate environment, both of which do show up in our transaction costs. So I think those two things are probably the two biggest things to think about when looking at that number.

We got asked the question a lot over the past year. We kept getting asked 3% to 4%. Aren't you going to be above that -- and I think I got -- it goes literally every quarter and I keep telling people now 3% to 4%, 3% to 4%. There will be quarters we're going to be higher and maybe or are going to be on the lower end of that.

***But we look at the total ability to generate revenue and the cost of scale in this business and feel really good about that range, and we're at the high end of that range and which means that we have a lot of room to continue to absorb more macro headwind. We have a lot of room to continue to mix in this Split Pay and still be safely in that range.***

*****

119.    The statements identified in Paragraph 118 were materially misleading when made because Affirm (a) did not "have a lot of room to continue to absorb more macro headwind," (b) the ability to generate revenue at the cost of scale was already impaired because of macroeconomic headwinds, including funding cost pressure due to rising interest rates, and (c) 0% loans could not mitigate the risks given the actual state of Affirm's affairs and its reliance on traditional lending based on interest-bearing loans, loan sales and securitizations.

120.    The conversation continued and Linford was specifically asked about the possibility of whether RLTC as a percentage of GMV could decline to 3%, and he made the following materially misleading statements in response:

**Q- Robert Wildhack**

Yes. Yes. You make a good point though, declining from 4.3% to 3.7%. As rates ratchet higher, and there's a lot more concern around consumer finances, broadly speaking. The long-term guidance there is, again between 3% and 4%. So in light of everything that's happening this year, you're still at the high end of that long-term range. What would have to happen for that number to be 3%?

**A- Michael Linford**

Yes. I think we have to see a substantially higher mix in Split Pay in our business, or a rate environment that's, again moves very rapidly. Although we talked about this a lot. ***The rate environment moving on us inside the year really doesn't impact us. So that's more of a long-term statement, meaning at some point, rates do impact us, but not usually in the short term. So that's happening in this fiscal year. It really would have to be a mix of business driven.***

121.    The statements identified in Paragraph 120 were materially false when made because (a) Linford's representation that there would be no short-term impact from rate increases was not true, particularly because RLTC as a percentage of GMV was markedly below even 3% within months of when this false statement was made, and as a result (b) Linford's assurance that the impact from rates "inside the year" does not have an effect on Affirm was also false.

122.    As the conference proceeded, Linford's misrepresentations became more extreme, and he affirmatively stated that short-term risks from a rise in interest rates were "non-existent":

**Q- Robert Wildhack**

Yes. Let's move to funding costs now. In August, on the same earnings call we were referring to a minute ago, you mentioned that a 100 basis point move higher in rates beyond

46

the current forward curve would weigh on your revenue less transaction cost as a percentage of volume by 10 to 20 basis points. In February of this year, that same language pointed to a 40 basis point headwind RLTC as a percentage of GMV. So what changed in the last six months?

**A- Michael Linford**

Yes. Thank you. I want to clarify because the way to think about it is was going to tell you for the next time period what the impact is going to be, and so in February fiscal '23 was further away. So in February, we were talking about the impact in the near term as being 10 to 20 bps in the longer term and very long-term meeting beyond fiscal '23, then is being in 40.

***So the way to think about it is the total impact in the very long run is something on the order of 40 basis points, and there are step down the closer you get. The impact on rates to our business tomorrow is almost nonexistent. The impact on rates six months from now is controlled***. The impact of rates a year from now is controlled, but still pretty high, as you saw on the 10 to 20 basis point number we guided to, the impact of rates on the very long term is less controlled.

And this is an important point where I think we do have an exposure to rates. It's a very real cost in our business either in our funding cost or it goes up in the yields that we're able to sell loans at -- and I think we're not denying that, and I hope everyone understands what we're meaning to say that. It just doesn't flow through as quickly as people think.

And what that does for us is that gives us time and time is a super valuable asset for us because our asset turns over so fast, we can replace the economic content with either more revenue sources or other cost mitigates that allow us to still deliver our unit economics in a higher rate environment.

***If we were subject to the rates impacting us day to day you'd see a very different posture from us or we wouldn't be as confident in our ability to absorb and react to the higher cost markets, the higher cost environment. But because we do have that shockers over built into our capital strategy, we're able to look ahead and say okay we see some cost headwinds coming, but we can absorb it and plan around it.***

123.    The statements identified in Paragraph 122 were materially misleading when made because (a) Affirm's near-term rate exposure was more than 10 to 20 bps, (b) Affirm's exposure beyond February 2023 to higher rates was more than 40 bps, (c) the impact of rising rates was not then "controlled" at Affirm because of "shock" absorbers, and as a result, (d) Linford's assurance that the short-term impact from rates on Affirm's business was "non-existent" was false.

124.    Later in the conference, Linford affirmatively misrepresented that the market should not worry about an increase in funding costs because Affirm "managed that aggressively," funding costs do not rise "overnight" given all the firm commitments, and Affirm plans well in advance to ensure funding capacity "in a pretty thoughtful way":

**Q- Robert Wildhack**

Yes. And as I think about the forward flow agreements in the warehouse lines, -- could you just talk about how the maturities and renewals are staggered? ***Should we be worried about a "cliff" when funding costs take a material step up?***

**A- Michael Linford**

***No, you shouldn't because we manage that pretty aggressively. So one of the reasons why it's so little of the funding capacity comes up this year is because we've been thoughtful about running ahead and renewing and extending and upsizing where we can. I think that may not always be the case, but much like with rates, these things don't happen to us overnight.***

***So we're able to plan ahead in a pretty thoughtful way to make sure that we've got the capacity that we need.*** Therefore, staggered renewals are pretty important to us. So we don't like to put a lot of expiring capacity into one bucket.

And that's important because, look, there will be partners of ours who, for reasons not at all related to Affirm, they have to change their view of this particular asset. That's okay. We don't ever want to be in a situation where one partner matters so much to us that they're doing something bad for them as a result. That means that you got to add more, you got to add diversity and you got to add staggered renewals so that no one's getting caught in any window, but it's bad for everybody.

125.    The statements identified in Paragraph 124 were materially misleading when made because (a) red flags about rising yields and funding costs had already emerged, and (b) within months of this statement, the Company disclosed that increased funding costs would negatively impact its performance and outlook rendering false Linford's statements that "these things don't happen overnight," and "we're able to plan ahead in a pretty thoughtful way to make sure that we've got the capacity we need."

126.    On September 27, 2022, Linford participated in an "Affirm Shareholder Fireside Chat." In response to a retail investor's question about then rising interest rates, Linford continued to minimize rate volatility with false claims of "built-in" "shock absorbers" and limited risk in the short-term even as the temporal proximity to extremely adverse news from his inconsistent representations began to shrink:

**Q- Moderator**

We have a question from a retail investor, Jorge R, who wants to know how Affirm's path to profitability will be impacted by rising interest rates alongside high inflation.

**A- Michael Linford**

Yes. I think, again, it's really important to remember that we believe our product is more valuable in these environments. It is the case that higher rates increase our costs. That they either increase our cost of funding or put pressure on the gain on sale lines in the P&L, and

48

we talked about that. Frankly going back to February and in our Q2 last year earning call, we talked about how the rising rate environment would impact us, but it would flow through on a slower timeline than I think most folks have been thinking about.

The way we approach capital in the business is we go off and try to secure funding for loans before they're originated on our platform. And that gives us disadvantage [sic] of where originated into fairly certain cost and/or revenue profiles. ***And so we're not quite as subject to the shocks. And make no mistake, the current rate environment certainly since beginning of this calendar year has been one of a rapid increase. You saw the Fed move in the market, expectations of rates continue to rise on a really quick basis.***

***And yet, our business model has built-in some shock absorbers to that, where it doesn't flow through immediately, and that allows us to be pretty planful around how we make our investments. While we're going to be prudent with our investments, we're still going to be investing and have been for this fiscal year as we think there's a lot of opportunity ahead. We think we're well-positioned to manage the credit side of that as I talked about before and we have continued to repeat our commitment to get to profitability on an adjusted operating income basis by the end of this year, despite the rate environment being as volatile as it is.***

127.    The statements identified in Paragraph 126 were materially misleading when made because Affirm was, in fact, subject to rate shocks, did not have "built in shock absorbers" to minimize the effect of rate increases, and was not positioned to "manage risks" in a volatile rate environment.  In addition, the temporal proximity between these misrepresentations and Affirm's ultimate disclosure of rising funding costs due to increased interest rates that would lead to poor financial results enhances an inference of fraud.

128.    Also on that September 27, 2022 Fireside Chat, an analyst asked Defendant Linford how Affirm passes on increased funding costs to consumers.  In response, Defendant Linford made the following false and misleading statements:

**Q- Jason Kupferberg**

Just coming back to the higher interest rate environment and you talked about, obviously some of the implications for funding costs at Affirm. How does Affirm then think about the notion of potentially passing some of those higher funding costs on to consumers in the form of higher interest rates on your interest-bearing loan products. And maybe give a little context for those who may be less familiar just around what sort of rates your interest-bearing loan products have and how those as compared with traditional credit cards?

**A- Michael Linford**

Yes. So our products have APRs that range from 0% and when we say zero, it's a true zero. So unlike some other tricky financial products out there that kind of have a got you somewhere in there, our products when they're 0% they're true zero, consumers never pay anything. All the way up to 36% when you calculate it on an APR basis. But it's important to think about our consumer and how they think about that. APRs matter a whole lot for consumers when you're thinking about revolving on a piece of debt. And so they're thinking about how the carrying cost of that obligation, our products because they're all closed end

49

and capped have a different way consumers think about it. They think about it in dollar terms and so there's a lot less sensitivity when you take a six-month loan a few points at APR tend to not be the highest point of sensitivity to the consumer. And so we feel like we do have that lever available to us. But some of my best mentors and advisors will tell you, it's important not to use leverage just because you have it. *And I don't think we intend to pass along all the costs on to the consumer. We have other things that we can do.*

As I mentioned before, we have a lot of product differentiation. So one of the things you can do to manage the funding cost in a loan is to shorten its duration. You have to be careful with that because you want to also make sure you don't stretch the consumer too far, because a short duration loan has a higher payment. But that's a -- we have a lot more complexity to how we tackle the problem and simply funding costs are up, so you got to charge somebody more money. *We can find ways to create these transactions. It's a lot of value to the consumer, without necessarily passing it along. And yet, we do think we have that lever and we're not afraid to demand that we get the compensated in the revenue lines for the products that we have. And so when we add value for the merchant or add value for the consumer, we do expect to earn the kind of revenue that we need to support the transactions. And so you'll see us continue to experiment there, but the fact that we have the levers, one of the reasons we have so much confidence in our ability to deliver our unit economics in the long run.*

129.    The statements identified in Paragraph 128 were materially misleading when made because Affirm did not have "levers" in place to forgo cost-shifting, and its business had already deteriorated to the point where the Company could not "deliver [its] unit economics" without passing rate increases on to the consumer.

130.    In a shareholder letter released on November 8, 2022 in connection with the financial results for the first quarter of 2023 that ended on September 30, 2022, the Company claimed that "our long-term model of 3-4% as a percentage of GMV is unchanged, and we expect to be at the high end of this range in the second half of FY '23."  The letter also asserted that "our sensitivity to additional interest rate increases has ***decreased***," providing a range of potential impacts on RLTC that were lower than those provided in February 2022.

131.    These statements in Paragraph 130 above were materially false and misleading when made because (a) there were serious risks of an increase in rate sensitivity, and (b) that increase put the long-term goal of attaining 3-4% RLTC as a percentage of GMV in jeopardy particularly in light of the inconsistent information that became public weeks after these statements were made, and the admissions that were made after the Class Period.

132.    On December 6, 2022, Linford participated in another Affirm Shareholder "Fireside Chat."  In response to an analyst question about the impact of higher interest rates, Linford made the following misleading statements about the Company's rate exposure:

**Q- Dan Perlin**

Got it. And if you kind of reflect back on the last 12 months, maybe a little longer that what do you think you didn't think about, say, pre-COVID about the business or even during COVID like how prior -- are you surprised by the impact of the higher rates on the business? Is this something you kind of anticipated like this is an unprecedented time, I guess, between COVID and (inaudible) I just point your when you go back home, how do you think about this every day?

**A- Michael Linford**

*****

I think that specifically with respect to rate, I feel really, really good about how well we predicted what the rates will do to our business back in February, which is way before the rate curve started moving as much as it did. We gave the market a framework for how to think about the impact of rates on our business in our February earnings call. And we've come in a little bit better in the framework we've given folks, but it's been a really good way to think about it. ***In the super near term, there's less impact because we have less exposure to floating rate debt.***

*** But in the longer term, we have some gross exposure that it's our job to mitigate. And I feel really proud about our ability to manage and navigate through that.*** And yet, the challenges are by no means the highest. We still have a lot of work to do continue to navigate what are, like you say, unprecedented economic types. [sic]

133.    The statements identified in Paragraph 132 were materially misleading when made because (a) Affirm was not then mitigating interest rate risk and did not then have the ability to "manage and navigate through that" without decimating its margins, and as a result (b) Linford already knew of a high risk that rising interest rates would impact Affirm "in the super near term," and Defendants contradicted Linford's misrepresentations identified in Paragraph 132 nine weeks after they were made.

## **ADDITIONAL ALLEGATIONS OF SCIENTER**

**Core Operations**

134.    Affirm is a subprime lender that derives all of its revenue from lending related activities and the misrepresentations alleged here concerning the nature of Affirm's business, and regulatory and interest rate risks all relate to the origination, sale and marketing of loans.  As such, the core operations doctrine can be invoked to support scienter.  In addition, Defendants have been fixated on BNPL lending in their public statements to investors, and repeatedly touts them as its flagship offering, even though

1    they represent under half of the Company's loan volume. The Company further claims that transparency

2    in its product offerings and the avoidance of harm to consumers are its core principles.

3          135.    The core operations inference also applies to the misrepresentations about interest rates

4    as managing interest risk was essential to **all** facets of Affirm's business. At bottom, the Company is a

5    subprime lender that sells and packages loans, profits from interest and/or merchant fees and servicing

6    fees associated with loans, and there can be no doubt that interest rates impact all aspects of its business,

7    and did ultimately impact the Company's bottom line as alleged elsewhere herein.

8    **Temporal Proximity of Misrepresentations to Admissions and Adverse News Enhances Scienter**

9          136.    By November 2022, the Federal Fund Rate had increased substantially to 3.75%-4.00%.

10   Nevertheless, Defendants continued to mislead investors about the Company's purported protection

11   shielding its business model from the impact of rate hikes. *See* Paragraphs 130 to 133. In fact, in

12   November 2022, the Company claimed that sensitivity to rates had **decreased**. *See* Paragraph 130. For

13   over the next two months, Linford continued to downplay the risk of interest rate increases as a long-

14   term issue with little to no impact in the short term.

15         137.    Weeks later, on February 8, 2023, Affirm announced poor financial results for the second

16   fiscal quarter of 2023 that ended on December 31, 2022. In a shareholder letter released in connection

17   with the quarter, the Company admitted that RLTC declined to 2.5% as a percentage of GMV on average

18   between October 1, 2022 and December 31, 2022 because of the ballooning balance of loans held for

19   investment on its balance sheet, credit losses, and higher interest rates and spreads remained a

20   "headwind" for that metric in the **short-term**, but would allegedly "attenuate" as the Company "exits"

21   fiscal year 2023 (which ends on June 30, 2023). Additional admissions were made conceding that

22   "increased funding costs" would have to be passed on to the consumer by charging interest of up to

23   36%, a usurious rate in many states. Linford further admitted on a conference call held on the same day

24   to discuss the financial results that RLTC guidance was "worse" because of "high yield pressure with

25   respect to our forward flow partners," and that "the rising rate environment has put the yield threshold

26   higher for all of these programs."

27         138.    A strong inference of scienter is raised by the temporal proximity of the admissions and

28   adverse facts identified in Paragraph 137, and the misleading impression given to investors in November

2022 as identified in Paragraph 136, as well as Linford's materially misleading statements made on December 6, 2022.

## LOSS CAUSATION

**The Truth About Regulatory Risks Begins to Emerge**

139.    The truth about Affirm's predatory BNPL practices and the regulatory risk those practices exposed was disclosed to investors in a series of partial disclosures.  On each occasion prior to the final exposure, losses were stemmed because the partial disclosures did not reveal the full truth to investors, allowing a degree of artificial inflation to be maintained.

140.    On December 16, 2021, the CFPB announced that it had launched an inquiry into Affirm's BNPL payment service, along with four other companies offering BNPL because it was concerned that BNPL lenders encouraged the accumulation of debt, improperly harvested borrower data and engaged in regulatory arbitrage.

141.    On this news, Affirm's stock price fell $11.74 per share, or 10.58%, to close at $99.24 per share on December 16, 2021.  It continued to fall over the next two trading days, ultimately closing at $97.37 on December 20, 2021.

142.    On March 3, 2022, the SBPC released its Report warning students about risky new loans offered by BNPL lenders like Affirm for dubious for-profit, unaccredited educational institutions.

143.    On this news, Affirm's stock price fell by over 8.38% from its previous day closing price of $39.10 to close at $35.82 on March 4, 2022.  The Company's stock price declined again on the next trading day to close at $33.56 on March 7, 2022.

144.    On September 15, 2022, the CFPB released its detailed study of the BNPL industry and Director Chopra's public statement was also released.  As detailed herein in Paragraphs 29 through 41, the CFPB Report confirmed that serious risks of consumer harm do, in fact, exist in the BNPL industry, and many of the identified risks equally apply to Affirm, including but not limited to loan stacking, sustained usage, a failure to properly assess borrowers' ability to accumulate debt, deceptive advertising through the use of dark patterns, and a business model that fundamentally rests on repeat usage to drive up debt for the working poor.  Director Chopra's remarks confirmed the serious nature of the CFPB's concerns.

145.    Analysts acknowledged the significance of the September 2022 Report. A Jefferies analyst expressed concerns on the same day about Affirm's ability to be profitable following regulation: "Regulation will likely increase expenses and reduce volumes as operators will likely have to tighten their credit underwriting and report to credit agencies." A September 15, 2022 Wedbush Securities report also observed that "industry regulation could potentially slow new product development and could potentially lead to a tightening credit box, thus potentially leading to lower GMV growth than otherwise would be the case."

146.    Upon the release of the September 2022 Report, the Company's stock price declined by 8.34% over the next two trading days, closing at $24.33 on September 14, 2022, then $23.99 on September 15, 2022, and then $22.30 on September 16, 2022, as the market continued to absorb the news.

**The Truth About the Company's Concealed Exposure to Rising Interest Rates Begins to Emerge Through a Series of Partial Disclosures**

147.    Just as with Affirm's BNPL practices, the truth about its exposure to rising interest rates was dribbled out to investors in a series of partial disclosures, allowing some inflation to remain until the final disclosure.

148.    On February 10, 2022, Affirm announced its earnings for its fiscal year 2022 second quarter results. The Company's quarterly loss of $0.57 per share was far worse than analyst expectations of $0.37 per share, and gross margins also declined. RLTC as a percentage of GMV declined year-over-year from 4.6% to 4.1%. The market reacted negatively, and concerns began to emerge about the Company's future because of macroeconomic conditions. For example, an analyst at Jefferies observed that rising interest rates would negatively impact margins "as well as increase funding costs."

149.    On this news, the Company's share price plummeted from an intra-day high of $83.57 per share on February 10, 2022, to close at $46.55 per share on February 11, 2022, or approximately 44%. The price continued to drop on the next trading day as the market absorbed the news, closing at $43.70 on February 14, 2022.

150.    On March 11, 2022, after the close of trading, Bloomberg News reported that Affirm had halted the issuance of the $500 million asset-back security, which CW1 confirmed was due to higher

yields demanded by potential buyers of the AAA tranche.  The market reacted negatively; for example, a March 14, 2022 analyst report by Stephens Inc. said "[f]unding constrictions are the cause of many fintech failures.  Spreads are bound to get wider for any consumer lender .... It implies to us that Net Transaction Profit Margins are below 3%-4% guidance on the ABS issuance. Further, if funding pullback persists, GMV will have to slow too…. Friday afternoon's news makes us more nervous."

151.    On this news, the stock plummeted over 15% from $30.86 at close on Friday, March 11, 2022, to close at $26.22 on Monday, March 14, 2022—the next trading day.

152.    On August 25, 2022, Affirm announced its earnings for its fiscal year 2022 fourth quarter results.  The Company issued fiscal year 2023 revenue guidance of $1.63 billion to $1.73 billion, lower than the $1.90 billion consensus of analysts.  An August 26, 2022 Wedbush analyst report noted that RLTC as a percentage of GMV was expected to be ~3.7%, which "continues a downtrend from recent periods."  The Wedbush report observed that "operating margins could be pressured by increasing funding costs driven by both rising market interest rates and widening risk premiums required by credit buyers and ABS investors."  An analyst report by Stephens, Inc. highlighted additional concerns about delinquencies: "[d]elinquencies rose q/q in F4Q22 and continued to accelerate through F1Q23-to-date (July/ August).  Annualized Net Charge-Offs rose 160bps q/q to 11.6%, the fifth straight quarter of 100+bps q/q increases.  We think volumes and margins will be constrained further by credit performance."

153.    On this news, Affirm's stock price decreased from $31.23 at the close of trading on August 25, 2022, to close at 24.57 on August 26, 2022—a 21.32% drop in one day.  The market continued to absorb the news over the next several trading days—dropping each trading day for the next six trading days to close at $22.30 on September 6, 2022.

154.    On November 4, 2022, after the close of trading, Bloomberg News published a story reporting that Affirm had pulled another ABS deal due to investor demands for higher yields.  A November 4, 2022 Wedbush analyst report observed that "[w]e believe the delay could be related to the original timing of deal coinciding with the Fed's updated outlook on interest rates that came out on Wednesday, and we wouldn't be surprised if ABS buyers in this deal are seeking higher yields to compensate for the Fed potentially taking its terminal rate higher than previously expected."  A

November 6, 2022 Jefferies report estimated that there could be "reduced options and higher funding costs for some period of time."

155.     On this news, the Company's stock price declined from $16.12 at close on November 4, 2022 to $15.63 at close on November 7, 2022—a decline of 3.04%.

156.     On November 8, 2022, Affirm announced its earnings for its fiscal year 2023 first quarter results. Expected fiscal year 2023 revenue was $1.60 billion to $1.675 billion compared to a previous range of $1.63 billion to $1.73 billion, which was again below consensus estimates.  Affirm began to attribute the lower forecasts partially to the impact of higher interest rates on its funding costs even as Linford continued to minimize and misrepresent the issue as a short-term problem until, at least, December 2022.

157.     The market again reacted negatively.  Stephens Inc. lowered its price target from $18.00 to $15.00, stating "Credit deteriorated further as 30d+ delinquencies were 3.8% (+123bps y/y; +42bps q/q) and continue to accelerate.… Funding also continues to worry us. A recent Bloomberg article pointed to another pulled ABS deal by Affirm."

158.     On this news, Affirm's stock price declined from $15.64 at close on November 8, 2022 to close at $12.10 on November 9, 2022, a decline of 22.64%.

159.     On February 8, 2023, Affirm announced its earnings for its fiscal year 2023 second quarter results.  The results were again disappointing; the Company reported quarterly revenue that was $16.33 million lower than analyst expectations, and RLTC as a percentage of GMV came in at 2.5%— below the Company's guidance for the quarter.

160.     GMV also fell below expectations.  The Company also announced that it would be cutting 19%, or nearly 500 people, of its workforce because of poor financial results.

161.     Multiple analysts, including RBC and Morgan Stanley announced that they were cutting the Company's price target.  RBC attributed the downgrade to a decline in RLTC.  A February 10, 2023 Morgan Stanley report similarly attributed its downgrade of Affirm's to the Company's failure "to built in interest rate and pricing flexibility to handle credit cycle dynamics.  Not doing so has in the near-term impaired business economics (which we measure with RLTC)."

162.    On this news, Affirm's stock price again plummeted by 21.84% over the next two days—from a previous day closing price of $16.02 on February 8, 2023 to close at $13.29 on February 9, 2023. The stock price continued to decline the next day as the market absorbed the news—closing at $12.52 on February 10, 2023.

163.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## POST-CLASS PERIOD ADMISSIONS

164.    On February 8, 2023, Affirm announced poor financial results for the second quarter of 2023. In a letter to shareholders from Levchin and Linford released on the same day, the Defendants admitted that "on a year-over-year basis, higher benchmark interest rates and spreads remain a significant headwind to RLTC as a percentage of GMV, and we expect this to continue through the remainder of FY'23." For this quarter, RLTC as a percentage of GMV shrunk from a Class Period high of nearly 6% to a low of 2.5%. Defendants further stated that in an attempt to offset "higher funding costs," the Company would pass through interest rate increases to consumers by charging an exorbitant rate of up to 36%. On a conference call held on the same day to discuss the financial results for the second quarter of 2023, Levchin conceded that revenue and RLTC were both below expectations, and the Company would now increasingly rely on interest-bearing loans to generate additional revenue.

165.    At the same conference call, Linford was asked by an analyst to expound on why the Company cut revenue guidance for FY 2023 deeper than it cut transaction costs, and Linford conceded that the decision was driven by "a lot of pressure on the yields that we need to generate for our capital partners." He also conceded that RLTC guidance was "worse" because of "high yield pressure with respect to our forward flow partners," and that "the rising rate environment has put the yield threshold higher for all of these programs."

166.    Additional admissions were made after the Class Period ended. On March 15, 2023, Linford attended the Wolfe FinTech Forum where he made statements that are inconsistent with his extremely confident assurances that there was little to no short-term risk from a rate hike throughout the Class Period. At this event, Linford falsely claimed that the Federal Reserve's rate increases were "truly

1    unprecedented." They were not. Indeed, the Federal Reserve announced that there would be, at least,

2    six more increases when it started raising rates in March 2022. Regardless, at this event, Linford finally

3    gave up and admitted that "it's hard to see through [and] look round corners. The future has got so much

4    uncertainty in it."

5          167.    On March 21, 2023, Rob O'Hare, Affirm's Senior Vice President of Finance, attended

6    the Bank of America Electronic Payments Symposium where he admitted that the yields demanded by

7    the Company's forward flow partners "*were increasing throughout the year*" because of rising interest

8    rates in 2022. Notably, the CFPB's September 2022 Report also confirmed that an increase in funding

9    costs for the industry had already begun to reduce margins in the beginning of 2022.

10                        **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

11         168.    Plaintiffs bring this Action as a class action pursuant to Federal Rule of Civil Procedure

12   23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Affirm

13   securities between February 12, 2021 and February 8, 2023, both dates inclusive (the "Class"), seeking

14   to pursue remedies under Section 10(b) and 20(a) of the Exchange Act. Excluded from the Class are:

15   the Defendants; the officers and directors of Affirm during the Class Period; any entity in which any of

16   the Defendants have or had a controlling interest; and the affiliates, immediate family members, legal

17   representatives, heirs, successors or assigns of any of the above.

18         169.    The members of the Class are so numerous that joinder of all members is impracticable.

19   Throughout the Class Period, Affirm securities were actively traded on the NASDAQ. While the exact

20   number of Class members is unknown to Plaintiffs at this time and can be ascertained only through

21   appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.

22   According to Affirm's Form 10-K filed on August 29, 2022, Affirm had 270 holders of record, which

23   usually represent a far larger number of shareholders since the vast majority of investors hold shares in

24   "street name." Record owners and other members of the Class may be identified from records

25   maintained by Affirm or its transfer agent and may be notified of the pendency of this Action by mail,

26   using the form of notice similar to that customarily used in securities class actions.

27

28

170.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

171.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

172.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether Affirm and the Individual Defendants made false or misleading statements or failed to disclose material information that rendered their Class Period statements false or misleading;
- whether certain Individual Defendants are control persons of Affirm for purposes of Section 20(a) of the Exchange Act;
- whether Affirm and the Individual Defendants made the false or misleading statements or omissions with scienter;
- whether the federal securities laws were violated by Defendants' statements as alleged herein;
- whether the prices of Affirm's securities during the Class Period were artificially inflated or maintained because of the Defendants' misconduct complained of herein; and
- whether the Class has sustained damages and, if so, what is the proper measure of damages.

173.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this Action as a class action.

174.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made false or misleading statements in public or failed to disclose material facts, the omission of which rendered their public statements misleading, during the Class Period;
- the omissions and misrepresentations were material;
- Affirm's common stock traded in an efficient market;
- the Company's common stock was liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by numerous analysts;

- the false and misleading statements and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and
- Plaintiffs and other Class members purchased or otherwise acquired Affirm's common stock between the time that the Defendants failed to disclose or misrepresented material facts, and the time that the true facts began to be disclosed or materialized, without knowledge of the specific, omitted or misrepresented facts.

175.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

176.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against Defendants Affirm, Levchin and Linford for Violations of Section 10(b) and Rule 10b-5(b))

177.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

178.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

179.    During the Class Period, Defendants made various untrue statements of material fact about their BNPL practices and exposure to rising interest rates, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase and sale of securities.  Such statements were intended to, and throughout the Class Period, did: (i) deceive the investing public, including the Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Affirm common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Affirm common stock at artificially inflated prices.

180.    Specifically, Affirm and the Individual Defendants made material misrepresentations and omitted to disclose material information that rendered their statements misleading as particularized in Paragraphs 80 to 133.

181.    The Individual Defendants either had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive the Plaintiffs and the other members of the Class, or acted with reckless disregard for the truth by refusing to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Affirm and the Individual Defendants. In addition to the facts alleged herein demonstrating a strong inference of scienter, certain information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control.  As the senior managers of Affirm, the Individual Defendants had knowledge of the details of Affirm's internal affairs that were inconsistent with their public statements.

182.    As officers and directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information regarding the increased risks of regulatory scrutiny and an increase in interest rates as well as the true nature of Affirm's BNPL offerings and their risk of harm to consumers.  As a result of the dissemination of the aforementioned false and misleading statements, the market price of Affirm common stock was artificially inflated throughout the Class Period.

183.    While ignorant of the adverse facts concerning Affirm's BNPL operations and its exposure to rising interest rates and regulatory scrutiny because of the identifiable harm to consumers from Affirm's credit products, which were concealed by the misrepresentations and omissions alleged herein, Plaintiffs and the other members of the Class purchased or otherwise acquired Affirm common stock at artificially inflated prices and relied upon the integrity of the market price for Affirm's common stock or upon statements disseminated by Defendants, and were damaged thereby.

184.    During the Class Period, Affirm's common stock was traded on an active and efficient market.  Plaintiffs and the other members of the Class, directly relying on the materially false and misleading statements described herein, or relying upon the integrity of the market, purchased or otherwise acquired shares of Affirm at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock or would not have purchased or otherwise acquired it at the

inflated prices that were paid.  At the time of the purchases or acquisitions by Plaintiffs and the Class, the true value of Affirm's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Affirm's common stock declined sharply upon the public disclosure of the facts and/or materialization of the concealed risks, injuring Plaintiffs and other Class members.

185.    By reason of the conduct alleged herein, Affirm and the Individual Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

186.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases of the Company's common stock during the Class Period when the risk of Defendants' wrongdoing materialized or upon the disclosure thereof, causing the price of Affirm common stock to decline. Affirm and the Individual Defendants are thus liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

## COUNT II

### (Against Defendants Levchin and Linford for
### Violations of Section 20(a) of the Exchange Act)

187.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

188.    During the Class Period, Levchin and Linford dominated the operation and management of Affirm, directly managed its communications with investors, and conducted and participated in the conduct of Affirm's business affairs.  Because of their activities as the public face of Affirm to investors, their senior positions as CEO and CFO respectively, and their own statements of knowledge concerning interest rate risks, funding costs, and the CFPB investigation, they were responsible for Affirm's public statements about the misrepresented material.

189.    As the most senior officers and/or directors of a publicly owned company, Levchin and Linford had a duty to disseminate accurate and truthful information about the specified risks to Affirm's business as well as risks that emanate from Affirm's credit offerings as alleged herein.

190.    Because of their positions of control and authority as senior officers, their repeated communications with investors, and their own statements conceding knowledge of interest rate risks, funding costs, and the CFPB investigation, Levchin and Linford were able to, and did, control the Company's statements, which Affirm disseminated in the marketplace with their assistance during the Class Period.  Levchin and Linford exercised their power and authority to cause Affirm to engage in the wrongful acts complained of herein.  Levchin and Linford, therefore, were "controlling persons" of Affirm within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged, which artificially inflated or maintained the market price of Affirm's common stock.

191.    As such, Levchin and Linford exercised control over the general operations of Affirm and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiffs, and the other members of the Class, complain.

192.    By reason of the above conduct, Levchin and Linford are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Affirm.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant Action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: May 5, 2023                                    Respectfully submitted,

                                                                **POMERANTZ LLP**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:  /s/ *Omar Jafri*

Omar Jafri
Brian P. O'Connell (SBN 314318)
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: ojafri@pomlaw.com
          boconnell@pomlaw.com

*Lead Counsel for Plaintiffs*
*and the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN,
LLC**
Peretz Bronstein
60 E. 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

*Additional Counsel for Plaintiffs*

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS