**POMERANTZ LLP**
Omar Jafri (admitted *pro hac vice*)
Brian O'Connell (SBN: 314318)
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 881-4850
Email: ojafri@pomlaw.com
        boconnell@pomlaw.com

*Lead Counsel for Lead Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE AFFIRM HOLDINGS, INC. SECURITIES LITIGATION | Case No. 3:22-cv-07770-AMO <br><br> <u>CLASS ACTION</u> <br><br> **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ..................................................................................... i

NATURE OF THE ACTION ............................................................................. 1

JURISDICTION AND VENUE ......................................................................... 4

PARTIES ............................................................................................................. 5

SUBSTANTIVE ALLEGATIONS .................................................................... 6

    Background .................................................................................................... 6

    The Interplay Between Affirm's Funding Sources and Interest Rates ......... 7

    Defendants' Own Statements Show Acute Awareness Of Interest Rate Risks ......... 9

    Confidential Witness Accounts Support an Inference of Scienter ............... 11

AFFIRM AND THE INDIVIDUAL DEFENDANTS MADE FALSE OR MISLEADING STATEMENTS DURING THE CLASS PERIOD ............................ 13

ADDITIONAL ALLEGATIONS OF SCIENTER ......................................... 26

    Core Operations ......................................................................................... 26

    Temporal Proximity of Misrepresentations to Admissions and Adverse News Enhances Scienter .......................................................................... 26

LOSS CAUSATION ........................................................................................ 27

POST-CLASS PERIOD ADMISSIONS ......................................................... 30

PLAINTIFFS' CLASS ACTION ALLEGATIONS ....................................... 31

COUNT I .......................................................................................................... 33

COUNT II ........................................................................................................ 36

PRAYER FOR RELIEF ................................................................................... 37

DEMAND FOR TRIAL BY JURY ................................................................. 37

Lead Plaintiff Mark Kusnier and additional Plaintiff Chris Meinsen (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Second Amended Complaint for Violations of the federal securities laws (hereafter the "Complaint") against Defendants Affirm Holdings, Inc. ("Affirm" or the "Company"), Max Levchin ("Levchin"), and Michael Linford ("Linford") (collectively, "Defendants"), allege the following, based upon personal knowledge as to Plaintiffs and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public filings, conference calls Defendants held with analysts and investors, any public announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, articles about Defendants and their industry in financial publications or other news outlets, regulatory publications, interviews with knowledgeable former employees of the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a Class consisting of all persons who purchased or otherwise acquired Affirm's common stock between November 16, 2021 and February 8, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Affirm is a subprime lender that earns income from interest-bearing loans that charge up to 36%, sells loans through forward flow arrangements, and pools loans into asset-backed securities (hereafter "ABS") purchased by corporations, hedge funds and similar organizations. The Company generated most of its revenue from these activities during the Class Period. Affirm also offers an alternative form of credit known as buy-now, pay-later ("BNPL") that allows a borrower to split a retail transaction into smaller, interest-free installments and pay the full price over a short period of time after goods or services are purchased.

3.      During the Class Period, Defendants made false and misleading statements about a critical issue that touched almost every aspect of Affirm's business. Starting in the spring of 2021, high level officials in the federal government publicly signaled that the Federal Reserve's Federal Funds Rate ("Federal Funds Rate") would increase to contain an overheating economy. By the end of 2022, the Federal Funds Rate increased substantially from nearly 0% to over 4% as the government sought to tamp down a high rate of inflation. Analysts repeatedly posed pointed questions to Affirm and the Individual Defendants about whether Affirm's business model was protected from or vulnerable to rising interest rates, and they were not truthful in response. Throughout the Class Period, Defendants falsely claimed to have carefully studied the impact of rates, that the business was not vulnerable to rate changes in the short term, and that they had "levers" and "controls" to drive performance as rates increased.

4.      In the beginning of the Class Period, Defendant Linford, the Company's Chief Financial Officer ("CFO"), claimed to understand the significance of rising interest rates with an extremely high degree of specificity, but downplayed the risk to investors, stating that Defendants had stress tested the Company's revenue model, and Affirm was well-positioned "to succeed in any rate environment that we've seen in the past 20 years." The "rate environments" that Linford mentioned over the past Federal Funds Rates over the last 20 years had ranged from zero to 5.25%. Linford stated that there would be little to no impact on a key profitability metric called revenue less transaction costs (hereafter "RLTC"),[1] even if the benchmark rates increased to 650 basis points, or 6.5%. Linford and the Company's founder and Chief Executive Officer ("CEO"), Levchin, continued to make false and misleading statements throughout the Class Period asserting that Affirm had reliable, diversified sources of funding with locked in commitments, and artificially minimized the very real risk to the Company from increased interest rates. Defendants made these false statements even as interest rates rapidly rose in 2022, and after funding partners demanded more money because of a fear of rising interest rates. Defendants' statements were so misleading that they were disbelieved by their own employees in the Capital Markets group, the department responsible for securing funding for the Company, according to Confidential

---

[1] As used herein, RLTC refers to RLTC as a percentage of the Company's gross merchandise value ("GMV"), which is industry jargon for the total dollar amount generated from originating loans.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Witness ("CW") 2. Key to Linford's scienter, or awareness of facts inconsistent with his public statements, is CW3's account. CW3 served as a high-level officer in the Capital Markets group and reported directly to the Chief Capital Officer. CW3 confirms that, in ***late 2021 and early 2022***, Linford was warned repeatedly in emails and on internal text messaging platforms, concerning the negative, short-term risk from rising interest rates to Affirm, but Linford disregarded the warnings. CW3 confirms further that Linford was told in late 2021 and early 2022 that rising interest rates negatively impacted both forward flow arrangements and ABS, two of Affirm's crucial sources of funding.

5.    Despite this knowledge, Linford continued to downplay the risks of increased interest rates through the end of 2022, even as Affirm's stock price repeatedly declined after missing analyst expectations, raising pointed questions about the impact of rising interest rates on Affirm's business. This attempt to counter negative information in the market was supported by Levchin's claim that he watched "the numbers like a hawk" to ensure that Affirm was never on the wrong side of a deal, and Linford's claim that there could be no short-term risk whatsoever because Affirm's funding sources were locked up through the middle of 2024.

6.    In February 2023, weeks after Linford's final misrepresentations to investors downplaying the risks from increased interest rates, the Company announced disastrous financial results, missing revenue targets. Even worse, RLTC plummeted to half of its Class Period high as transaction costs from credit losses ballooned and the quantity of loans on the Company's balance sheet substantially increased. Defendants conceded that higher interest rates and spreads remained a "headwind" for RLTC in the ***short-term*** because funding costs increased, but to minimize the damage to Affirm's stock price, they falsely claimed that the headwind would "attenuate" as the Company "exit[ed]" fiscal year 2023. Defendants also announced that they would shift the increased cost of funding onto customers by charging exorbitant interest rates of up to 36%, revealing to investors that Affirm's business model was not, in fact, protected from rising rates. On this news, the Company's stock price again plunged by over 20% over the next few trading days.

7.      After the Class Period ended, a high-level executive at Affirm publicly admitted that the yields demanded by the Company's funding partners "**were increasing throughout**"[2] 2022 because interest rates rose.  This is a key admission about what could only be known in the past; not an opinion offered after the fact in hindsight.  Even Linford ultimately admitted defeat when he conceded what he knew all along: "it's hard to see through [and] look round corners.  The future has got so much uncertainty in it."

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities upon the partial disclosures and/or materialization of the concealed risks thereof, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  In addition, Affirm's principal place of business is located in this District, the Individual Defendants reside in this District, and a substantial part of the events or omissions that give rise to the claims alleged in this Action occurred in this District.

11.      In connection with the statements and acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities markets.

---

[2] All emphases are added and internal quotations are omitted throughout this Complaint unless otherwise indicated.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**PARTIES**

12.     Lead Plaintiff Mark Kusnier, as set forth in his previously-filed declaration (ECF Nos. 1-1, 1-2), purchased the Company's securities at artificially inflated prices during the Class Period, and was damaged as a result of the federal securities law violations alleged herein.

13.     Additional named Plaintiff Chris Meinsen also purchased the Company's securities at artificially inflated prices during the Class Period, and was damaged as a result of the federal securities law violations alleged herein.  *See* ECF No. 42-2.

14.     Defendant Affirm is incorporated under the laws of Delaware with its principal place of business located in San Francisco, California.  The Company's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "AFRM."

15.     The Company was founded by Defendant Levchin, who served as the Chairman of the Company's Board of Directors and CEO at all relevant times during the Class Period.

16.     Defendant Linford served as the Company's CFO at all relevant times during the Class Period.

17.     Defendants Levchin and Linford are sometimes referred to herein as the "Individual Defendants."

18.     The Individual Defendants possessed the power and authority to control the contents of Affirm's SEC filings, press releases, and other communications with investors throughout the Class Period.  The Individual Defendants knew about Affirm's public statements alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions within Affirm, and access to material information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from investors, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the misleading statements and omissions alleged herein.

**SUBSTANTIVE ALLEGATIONS**

**Background**

19.    Affirm is a subprime lender that derives most of its revenue from interest earned on loans that it originates or purchases from its bank partners, fees and gains from reselling loans either through securitizations or directly to third party buyers like insurance companies or hedge funds, loan servicing fees, and interchange fees earned from debit cards.[3]  According to the Company's Annual Report filed with the SEC on Form 10-K for the fiscal year that ended on June 30, 2022, ("2022 Form 10-K"), over 65% of the Company's revenue was generated from these aforementioned sources and their share of total revenues has grown even further since that time.  The remaining amount came from merchant network revenue or fees that Affirm charges merchants for transactions processed through the Company's platform.

20.    The Company also earns a minority of its revenue from BNPL products it labels "Split Pay" and "Core 0%" loans.  In Fiscal Years 2021 and 2022, these transactions have barely been over 20% of total GMV.  While certain BNPL products charge no interest, the average percentage rate of interest across the portfolio of Affirm's loan products was in the high 20s at the end of the Class Period, a fact that Linford admitted at a Shareholder Fireside Chat held on December 6, 2022.  That puts Affirm's average charged rate as *higher* than credit cards, which according to Forbes Advisor's weekly credit card interest rates report had an average rate of 24.25% in Spring 2023.

21.    The majority of the Company's overall loan volume remains interest-bearing, a fact acknowledged by Libor Michalek, ("Michalek"), the Company's President of Technology, Risk and Operations, at the Morgan Stanley Technology & Telecom Conference held on March 7, 2023.  At this same conference, Michalek explained that it was important for the Company to charge interest up to 36% given the Company's reliance on interest-bearing loans.  In the last few years, most of Affirm's loans were originated through Cross River Bank in New Jersey, but the Company has now shifted originations to other bank partners located in other states because interest rates over 30% are considered

---

[3] A subprime lender is a credit provider that specializes in borrowers with low or "subprime" credit ratings.  Because these borrowers represent a higher risk of default, subprime loans are associated with relatively high rates of interest.  *See*, *e.g.*, https://www.investopedia.com/terms/s/subprimelender.asp.

criminal usury in New Jersey.  It is worth noting that on March 8, 2023, Cross River Bank stipulated to a Consent Order with the Federal Deposit Insurance Corporation in connection with the violations of fair lending laws and discriminatory underwriting practices.

**The Interplay Between Affirm's Funding Sources and Interest Rates**

22.    Affirm has three funding sources.  First, it has warehouse lending facilities with certain banks providing it capital to originate or purchase loans.  These are subject to floating interest rates.  Affirm's warehouse facilities mature between 2023 and 2029, and allow borrowings up to 12 months before the maturity date.  Second, Affirm uses forward flow arrangements to sell loans to wholesale buyers such as pension funds, insurance companies and hedge funds.  These arrangements allow Affirm to offload the economic interest in the loan to third parties, but the Company continues to service the loans and earns revenue from this activity.  Third, Affirm bundles and resells loans through ABS.  As the servicer of these trusts, Affirm has the "power to direct the activities that most significantly affect" their economic performance.  2022 Form 10-K at 128.  During the Class Period, more than a third of Affirm's loan portfolio was funded by securitizations.

23.    From the beginning of the Class Period, central banks and market commentators discussed the end of the zero-rate regime that had been present for most of the prior decade.  Between March 2022 and March 2023, central banks around the world raised interest rates significantly in an attempt to tame inflation.  In the United States, the Federal Reserve raised the Federal Funds Rate from a target range of 0.25%-0.5% to 4.75%-5.00%.[4]  These rate hikes adversely impacted all of Affirm's funding sources, even though Linford repeatedly denied or downplayed the risks.  Unable to favorably sell or securitize loans as it had in the past, Affirm more than doubled the amount of loans retained on its balance sheet.  The total amount of loans that Affirm retained on its balance sheet has increased from $1.76 billion in the second quarter of 2021 to $3.47 billion in the second quarter of 2023.

24.    Warehouse facilities with floating rates became more expensive and yields that investors demanded for ABS over the benchmark rate began to increase.  This was evident in the securitizations that Affirm arranged during the Class Period.  Between February 2021 and May 2022, the opening

---

[4] The Federal Reserve's Open Markets Committee sets the Federal Funds Rate, also known as the federal funds target rate, as a range between an upper and lower rate limit, in .25% ranges.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

coupon rate Affirm paid for its most senior tranche for an ABS rose from 0.88% to 4.30%, and increased to 6.61% in January 2023 for its most senior tranche.

25.     The loans underlying these securities as well as other loans that Affirm sold through forward flow arrangements also became riskier because delinquency rates doubled from low delinquencies during the pandemic.  In forward flow arrangements, Affirm's counterparties bought loans that Affirm underwrote, and received principal and interest payments but also assumed credit risk.  Forward flow arrangements were one of Affirm's key sources of funding as Linford acknowledged repeatedly throughout the Class Period, and yields that forward flow partners demanded also increased sharply with rising interest rates throughout the Class Period as several Affirm executives ultimately admitted.

26.     Data collected by Morningstar, Inc., an investment research and management firm, shows that the weighted average credit score of borrowers for Affirm's securitizations shifted from near-prime in 2021 to near sub-prime in 2022.  According to a survey conducted by the Consumer Financial Protection Bureau ("CFPB") in March 2023, credit scores between 580 and 669 are considered subprime and credit scores between 669 and 739 are considered near-prime.  According to the Morningstar reports, weighted average credit scores of borrowers of the underlying loans in Affirm's shorter term securitizations declined from 686 to 690 in August 2020 and February 2021 to a range between 668 and 674 in 2022 and early 2023.  These reports are not available to ordinary investors upon reasonable inquiry.  Additional red flags also emerged in the Class Period.  In early 2022, Affirm delayed a securitization solely because investors raised serious concerns about rising interest rates as described by CW1 in detail in Paragraphs 35 through 38.  On November 4, 2022, Bloomberg reported that Affirm abandoned a $350 million bond plan because investors demanded much higher yields than Affirm intended to pay.  According to Morningstar, the underlying assets pooled for the deal were BNPL loans.

27.     According to CW3, between late 2021 and early 2022, Linford was told repeatedly by other Affirm executives that higher yields demanded by investors would negatively impact Affirm's cost of funding and lending margin as fully described in Paragraph 40.

**Defendants' Own Statements Show Acute Awareness Of Interest Rate Risks**

28.     Defendants' own statements concede their Class Period knowledge of the misrepresented and concealed facts, raising a strong inference of scienter.  Throughout the Class Period, Defendants touted their knowledge and awareness of interest rate risks or reckless disregard for the risk of rising interest rates and their negative impact on the Company's funding costs in SEC filings as well as commentary during public events.

29.     Linford, in particular, spoke with a great degree of specificity on this topic throughout the Class Period.  For example, Linford assuaged investors' rate fears just after United States Secretary of the Treasury Janet Yellen warned in early 2021 that the Federal Funds Rate would soon need to increase.  On May 11, 2021, Linford attended the MoffettNathanson Payments, Processors, and IT Services Summit.  At this conference call, Linford was specifically asked about "comments out of the Fed, Yellen, et cetera" concerning how the rising rate environment would affect Affirm's business, and Linford responded that Affirm had stress tested its revenue model and, based on the results of those tests, the Company was "well positioned to succeed in any rate environment that we've seen over the past 20 years."  He further stated that:

> We believe there's a real misconception about interest rates in Affirm out there right now. ***We believe that we're really well positioned to succeed in any rate environment that we've seen over the past 20 years.***
>
> There -- *we have gone back and stress tested our model, business model, revenue model, the level of what we call contribution profit or revenue less transaction cost, we've gone back 20 years of rates and stimulated it through our business and we're good, which means we can get it for like 650 basis points of rates.*
>
> And like while we believe that like everybody that rates won't stay at zero forever and that we are going to have to start reacting to a higher rate environment, we  think the first derivative, i.e., the change in rates it just doesn't impact us.  *Seventy-five percent of our portfolio is funded with fixed rate or no polluting -- no interest rate exposure at all and the 25% that's funded with interest rates, but that we're in complete control over.*
>
> ***So, in the short-term kind of first derivatives shocks doesn't worry us at all.  And longer-term we can go back over two decades and still be good with respect to our unit economics and that's before we pull any of our cost or revenue levers, which are huge.*** So, on the revenue side, look, the higher the break the more valuable a 0% offer is.  It's just definitional, right?  If you're a consumer -- if you're a consumer and rates are 0, a 0% offer is less compelling as when the rates are at 3%, 4% or 5%.So we know that the product is more valuable and how we monetize it is a thing that we can do either through the merchant, which we tested during COVID where we had to tighten credit and our product was valuable enough that merchants chose to continue to pay us more merchant fees to support the same level of approvals.  *And we think the same will hold out in a higher rate environment.*

9

30.    The Federal Funds Rate was over 5% between 2006 and 2007.  It did not cross over 5% during the Class Period.  It has not come close to "650 basis points."[5]   Given Linford's affirmative representations about stress test results over a 20-year period, and his repeated assurances throughout the Class Period that there would be little to no short-term impact on Affirm from an increase in interest rates, Affirm's funding costs should not have unexpectedly increased, as the Company ultimately admitted they would when it announced disastrous financial results for the second quarter of 2023 on February 8, 2023.  There are only two possible inferences to be made based on Linford's guarantee based on the stress tests results: either (1) he lied about conducting the stress tests or (2) he knew from their results that Affirm could not withstand an increase in rates to 4% or more, and recklessly ignored the prospect of misleading investors by withholding that crucial information.  Baseless assertions that the stress tests were correct at the time they were conducted are utterly illogical.  Either the business could survive rate hikes of over 4% or it could not.  The passage of time cannot change that result.  Even more importantly, Linford and the Company have never publicly stated that the stress tests were not conducted or that their results were faulty.  Linford's and the Company's conspicuous silence on this topic further enhances an inference of fraud.

31.    Funding costs increased within weeks of Linford's misrepresentation that the short term risk was minimal, as detailed herein in Paragraphs 41 through 74, Paragraphs 76 through 79, and Paragraphs 97 through 101 because of an increase in interest rates as Defendants ultimately admitted, reducing RLTC as a percentage of GMV, a metric that Defendants repeatedly emphasized as key to the Company's success, from a Class Period high of 5.9% to a low of 2.5% between the quarter ending June 30, 2021 and the second quarter of 2023.

32.    On May 25, 2022, Levchin attended the JP Morgan Global Technology, Media & Communications Conference.  At this event, Levchin was specifically asked by an analyst whether any forward flow partners could pull back, and he responded: "we watch the numbers like hawks to make sure that we are never on the wrong side of any deal – and I think in rougher or more complicated times,

---

[5] "Basis point" refers to 1/100th of a percent. 650 basis points as used above refers to 6.5%.  *See* https://www.investopedia.com/terms/b/basispoint.asp.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

which is certainty where we are now.  These partnerships are tested, but people also flight to quality.  Like there's a real sense that I've got several conversations that I've had with our funding partners that they don't just love our assets that they always have, they expect us to be one of the partners that they rely on to place more capital."

33.    Similarly, on June 14, 2022, Linford attended a Fireside Chat hosted by Autonomous Research LLP.  This event took place less than eight months before Affirm suddenly announced poor financial results in February 2023 and conceded that a rise in funding costs due to increased interest rates would impair its performance.  *At this event, Linford talked at length about how the Company had onboarded funding "all the way through May 2024," had a few deals with "episodic pricing renewals," but assured the market that "there's not a lot of short-term rate exposure to the business. We have a lot of certainty in the next 6 or 12 months on where things would be."*  This is again an instance where both things cannot be true.  Either Affirm had onboarded funding "all the way through May 2024," and no negative impact from interest rate hikes could occur during the Class Period or it had not.  Regardless, this statement shows that Linford knew about the status of deals and whether or not funding had been onboarded to absorb any macroeconomic shocks during the Class Period.  Linford further stated that the Company had "thought about this a lot," was "very careful on protecting the profit in the loan," built funding capacity "for the future at all times," and minimized "volatility" in the macroeconomic environment because "there's a lot less short-term exposure."

34.    On August 25, 2022, the Company held an earnings conference call to discuss the financial results for the fourth quarter of 2022 where Linford continued to provide assurances about the Company's ability to mitigate the risk of a continued rise in interest rates on the grounds that *95% of forward flow capacity was already locked in and did not need to be renewed*, and specifically represented that the risk of "higher cost of funds" or the chance of lower yields on loan sales would be "delayed," *i.e.*, the problems did not impact the Company in the short run.

**Confidential Witness Accounts Support an Inference of Scienter**

35.    CW1 worked at Affirm from March 2019 to August 2022 out of Affirm's New York office and remotely.  CW1 reported to the Company's Chief Capital Officers Geoffrey Kott and later Brooke Major-Reid ("Major-Reid").  CW1 first joined Affirm in March 2019 as an Associate in Capital

Markets, and in March 2020, was promoted to Senior Associate in Capital Markets, then promoted again to Lead, Capital Strategy in October 2020, and then became the Manager in Capital Strategy in January 2022.

36. CW1 worked with Affirm's Treasury department and helped manage the Company's relationships with originating banks. CW1 had direct experience with transactions such as debt facilities, loan sales and ABS. According to CW1, the Company delayed a $500 million revolving, ABS in March 2022 for reasons purely related to the interest rate risk. CW1 knew this because CW1 met with Major-Reid, and the syndicate desk of Barclays, which is an intermediary between the private and public side of the bank that facilitates sales of ABS. At this meeting, CW1 asserts that the discussion focused on the cost of funding because of interest rate volatility.

37. CW1 recalled that investors with larger orders reneged because the coupon rates offered were not high enough in light of the risk that interest rates would rise. According to CW1, the message delivered by Affirm's counterparties was that the orders were only good if Affirm significantly increased its costs of funds to them.

38. According to CW1, Linford knew about this meeting and was closely involved in the decision-making process because Major-Reid sent Linford "play-by-play" text messages about the meeting, and she would have also updated Levchin. CW1 also confirms that Linford has detailed knowledge of these issues because Linford meets with Affirm's banking partners regularly.

39. CW2 worked at Affirm from October 2021 to October 2022 as a Senior Associate in the Capital Markets group. CW2 was based in Affirm's New York office. CW2 reported to the Vice President and Global Head of Capital Markets Ryan Foss, who reported to Chief Capital Officer Major-Reid. CW2 worked on securitizations, including the $500 million sale of ABS that Affirm delayed in March 2022. CW2 stated that most of CW2's team did not believe the Individual Defendants' public statements concerning the minimal impact from rising interest rates.

40. CW3 was employed at Affirm from July 2019 to April 2023 first as a Director and Senior Director of Capital Markets and then as Vice President - Head of Capital Markets. A senior officer at the Company, CW3 reported directly to Chief Capital Officer Major-Reid. CW3 structured billions of committed capital for Affirm across corporate debt, ABS, warehouse facilities and off balance-sheet

arrangements.  CW3 launched Affirm's ABS business, scaling it to over $3 billion in the first two years. CW3 states that starting in late 2021 and "repeatedly" between January 2022 and the middle of 2022, Linford was warned by several high-level executives, including CW3, of the serious risk from rising interest rates to Affirm's cost of funding and lending margin.  Specifically, CW3 confirms that, between late 2021 and the middle of 2022, Linford was told of the increased risks from rising interest rates to Affirm's ABS business and its forward flow arrangements.  CW3 confirms further that Linford disregarded the warnings, and Affirm's bottom line deteriorated as a result.  CW3 asserts that Linford was provided with these warnings in writing, including in emails and through internal messaging applications at the Company.  Contrary to Linford's numerous false representations to investors, CW3 states that Affirm was severely impacted by rising interest rates in the short-term because it increased the Company's cost of funding and its lending margin.

## AFFIRM AND THE INDIVIDUAL DEFENDANTS MADE FALSE OR MISLEADING STATEMENTS DURING THE CLASS PERIOD

41.    On November 16, 2021, Linford made the following misleading statements about Affirm's funding sources and risks from rising interest rates at the RBC Global Technology, Internet, Media, and Telecom Conference:

**Q- Dan Perlin**

That's awesome. Yeah. So the message there is, if you've got plenty of runway to support the near-term and medium-term growth, even as you sit here today and in a rising rate environment, how do we think about the implications there, not only on the funding side, but maybe how does that interplay with merchant discount versus APR opportunities?

**A- Michael Linford**

Yeah. So this is -- there is lots of layers of complexity to this particular question. I think the first thing is to put some context to it. ***You know, I think people maybe thinking in hundreds of bps, not thousands of bps, in terms of rate movement. And that's important because our business is well suited to handle changes in our cost structure on that order of magnitude.***[6]

*****

---

[6] To avoid continued mischaracterization of the Complaint, Plaintiffs stress that, in this section discussing the statements,  the false or misleading aspects of the statements alleged herein are bolded and italicized.  The remaining text, however, is included to provide full context, so that the statements can be understood properly by an objective reader.

42.    The statements identified in Paragraph 41 were materially false and misleading when made because (a) Affirm was not "well suited to handle" rate increases of "hundreds of bps," (b) and the Company's business was not "well suited to handle changes" in cost structure "on that order of magnitude," but was then already exposed to the risk of rising interests in both the short-term and the long-term.

43.    The statements identified in Paragraph 41 were knowingly or recklessly false when made because:

      A.    The stress tests Linford claimed to have conducted, before this statement was made and as described in Paragraph 29, informed him about the exact exposure to Affirm's revenue model, including RLTC;

      B.    Linford was told in late 2021 that rising interest rates would adversely affect Affirm's cost of funding and lending margin;

      C.    Linford himself claimed to have studied the issue carefully, and repeatedly touted his knowledge and awareness of risks from rising interest rates both before and during the Class Period as fully explained in Paragraphs 28 through 34;

      D.    Affirm's own employees in the Capital Markets group did not believe Linford's false statements; and

      E.    It would be absurd to presume a lack of awareness of facts that rendered the statements misleading given that interest rates touched every aspect of Affirm's business.

44.    On February 10, 2022, Affirm held an earnings call to discuss its fiscal year 2022 second quarter results.   During this conference call, Linford made the following misleading statements regarding Affirm's business behind the backdrop of a rising interest rate environment:

**Q- Andrew Bauch**

Helpful. Thank you. My follow-up would be, is there any kind of guidepost that you're going to give us from a macro perspective, what you're embedding in the outlook for unemployment, inflation and rates. And I appreciate the color on the interest rate moves to the impact of the model, but just kind of thinking about what a baseline number that you're embedding in your assumption would be?

14

*****

*****

**A- Michael Linford**

Yeah. Just with the total avoidance of doubt, all of our outlook reflects the forward curve. And so there is roughly 180 basis points of rate increases. We take that into all of our models when we give guidance. It's consistent with the market expectation of rate movement. ***And so talk about rising rates, that's not a problem for us at all, that's already reflected in the guidance.***

45.     The statements identified in Paragraph 44 were materially false and misleading when made because (a) rising rates were a problem for Affirm, and (b) rising rates were not "already reflected in the guidance."

46.     The statements identified in Paragraph 44 were knowingly or recklessly false when made because:

A.     The stress tests Linford claimed to have conducted, before this statement was made and as described in Paragraph 29, informed him about the exact exposure to Affirm's revenue model, including RLTC;

B.     Linford was told in late 2021 and in early 2022 that rising interest rates would adversely affect Affirm's cost of funding and lending margin;

C.     Linford himself claimed to have studied the issue carefully, and repeatedly touted his knowledge and awareness of risks from rising interest rates both before and during the Class Period as fully explained in Paragraphs 28 through 34;

D.     Affirm's own employees in the Capital Markets group did not believe Linford's false statements;

E.     Rob O'Hare, Affirm's Senior Vice President of Finance, ("O'Hare") admitted that yields demanded by forward flow partners rose throughout 2022, (*see* Paragraph 100), a period that logically covers the time when this false statement was made;

F.   Major-Reid admitted that both forward flow arrangements and ABS were susceptible to headwinds and shocks at the time this false statement was made; and

G.   It would be absurd to presume a lack of awareness of facts that rendered the statements misleading given that interest rates touched every aspect of Affirm's business.

47.   On March 18, 2022, Linford participated in a "CFO Fireside Chat" with analyst Ramsey El-Assal from Barclays.  In response to a specific question about Affirm's delayed ABS deal, Linford made the following false statements:

**Q- Ramsey El-Assal**

I want to -- I have another question on the outlook, actually. But first, I wanted to ask you about some news reports recently that Affirm temporarily put a refinancing of ABS, or an asset-backed securitization, on hold. Since then, we've also seen some other companies, I think Tesla and others delay in ABS as well. Can you talk about Affirm's funding model?

**A- Michael Linford**

*****

Well the ABS market is the most directly exposed to the conditions of the market. Those investors are positioned usually to price uncertainty in its premium and so a lot of companies like ours, right now, who decided that this is not the best time to price a deal or doing so because they don't need it. It's our view that companies who need to do a transaction right now are forcing it through at economics that probably means they're paying a premium for this volatility.

*We don't feel like we need to because we had better funding opportunities away. What's really important, though, is we could have transacted, we believe, and could have done so at margins that were great for the business. But that would be silly to do in a world where we have better opportunities to fund the business with forward flow or bilateral agreement.*

We remain very confident in the ABS market for us over the medium term, and we're committed to continuing to issue across all of our programs*. When we talk to the ABS investors, it's quite stark difference between how an ABS investor, these people who buy these kind of securitizations, how they view our decision versus, I think some of the equity market reaction, and there's just the biggest connect. I think the right read of it is that companies who choose to defer a deal are doing so because they have strength, and that's exactly what happened with us.*

48.   The statements identified in Paragraph 47 were materially false when made because (a) as CW1 confirms, the ABS deal that Linford discussed was delayed not because of strength but solely because of interest rate risk and investors' demand for higher yields, (b) the statements omitted to

disclose that the delayed deal was a red flag that made Linford aware that his statements had the danger of misleading investors, (c) both equity investors and ABS investors were equally concerned about rising interest rates, and (d) Linford's claim that there were better opportunities with forward flow partners as a substitute for ABS was false given that those opportunities were deeply impacted by rising interest rates.

49.    The statements identified in Paragraph 47 were knowingly or recklessly false when made because:

A.    The stress tests Linford claimed to have conducted, before this statement was made and as described in Paragraph 29, informed him about the exact exposure to Affirm's revenue model, including RLTC;

B.    Linford was told in late 2021 and in early 2022 that rising interest rates would adversely affect Affirm's cost of funding and lending margin;

C.    Linford was sent play-by-play text messages about the ABS deal discussed in Paragraph 38, and knew that the deal failed solely because ABS investors demanded higher yields due to rising interest rates;

D.    Linford himself claimed to have studied the issue carefully, and repeatedly touted his knowledge and awareness of risks from rising interest rates both before and during the Class Period as fully explained in Paragraphs 28 through 34;

E.    Affirm's own employees in the Capital Markets group did not believe Linford's false statements;

F.    O'Hare admitted that yields demanded by forward flow partners rose throughout 2022, (*see* Paragraph 100), a period that logically covers the time when this false statement was made;

G.    Major-Reid admitted that both forward flow arrangements and ABS were susceptible to headwinds and shocks at the time this false statement was made; and

H.    It would be absurd to presume a lack of awareness of facts that rendered the statements misleading given that interest rates touched every aspect of Affirm's business.

50.    On May 12, 2022, Affirm held an earnings call to discuss its fiscal year 2022 third quarter results.  In response to a specific analyst question about how Affirm managed risks from rising interest rates, Linford made the following misleading statements dismissing such concerns:

**Q- Moshe Orenbuch**

Got it. Thanks. And as a follow-up question, Michael. One of the questions that we get most often from investors is, in the face of a rising rate environment, obviously, you have some products where the consumer is the primary one that's been charged and that's merchants -- charge to the merchant particularly the zero percent category. Could you talk a little bit about your plans as to how to kind of manage the rising interest rate environment for each of those products, and maybe what you've also done to-date if anything?

**A- Michael Linford**

Yes. We really haven't had to take any action today. If you look at the merchant fee rate slide in our supplement, you'll see again relatively constant merchant fees. We view that as a real mark of success in the face of pretty heavy competition we're able to maintain and even grow in some cases, the emergency side. And of course, as we talk a lot about on the APR side and the consumer side, those rates are strong enough to allow us to deliver really compelling unit economics, and that's the lens through which we look at, at this question. And it is true that as rates go up, there is pressure on the funding side of our business*, **but it is a mistake to think about that as a full flow through on a linear basis.***

We have many different funding channels with staggered maturities and very different structures. And as I mentioned, for example, we just onboarded a new forward-flow partner, who's an insurance company, has a very different view of rates and how they think about that versus a access to quality assets over time. ***That allows us to manage it in the nearer term. I think in the very long run, so going out more than a year, you would expect us to need to start to take action, but that's more of a long-term thing than anything we deal with tactically in the near-term.***

51.    The statements identified in Paragraph 50 were materially false and misleading when made because they omitted to disclose that (a) Affirm's business was highly exposed to short-term risks from an increase in rates and, did in fact, suffer from a negative, short-term impact during the Class Period, (b) Affirm's funding sources were not immune to rate increases, and (c) Affirm's exposure to rising rates was increasing and was something that Affirm needed "to deal with tactically in the near-term."

52.    The statements identified in Paragraph 50 were knowingly or recklessly false when made for the same reasons identified in Paragraph 46.

53.    On May 25, 2022, Levchin spoke at the JP Morgan Global Technology, Media and Communications Conference.    In response to a question about funding in a rising interest rate environment, Levchin made the following misleading statements:

**Q- Reginald Smith**

Understood. So just thinking about your portfolio today and I don't have the stat in front of me of what proportion is held on balance sheet. The question is, do you anticipate that changing? Are you -- is your appetite to hold more, increasing?

Then the second part of that question is with rates rising and there being presumably more options for your forward flow partners to invest in different things, has that changed their appetite or willingness or eagerness to use? Because my sense is that when rates were rock bottom that these folks have money to put to work and didn't have any place to put it and so...

**A- Max Levchin**

*****

In terms of rates, we've been in business for a long time, and we ran the company just fine back when the rates were not a bottom, and we had 1 full relationships [sic]. We cultivated them and did really well for our partners back then, ***and we'll continue to do so now.*** Three, as we grow larger and become a more reliable simply through just having more and more quarters reported, partner on the debt side, ***the doors to deeper pools of capital that are less rate sensitive, but more -- had lots more capital to deploy are open to us.***

5 years ago, going to an insurance company or a pension fund, it was sort of like probably, we're probably going to get laughed out of the room, like we're just too new. And at the time, I was like, we're five years in, how can we be too new. We're no start-up. So it's now over 10 years, ***and these doors are open to us***, and we are adding insurance companies and pension funds. I think those folks are certainly looking for yield.

***But more than anything, I think they look for stability and great partnerships. That's what we have become known to bring.***

54.    The statements identified in Paragraph 53 were materially misleading when made because Affirm's access "to deeper pools of capital that are less rate sensitive" could not, and did not, mitigate the risks of rising interest rates as Levchin misstated.    In addition, Levchin's statements were materially misleading because the Company's financial performance deteriorated during the Class Period despite benchmark rates being lower than in certain times during the preceding 10 years that Levchin referenced.

55.    The statements identified in Paragraph 53 were knowingly or recklessly false when made for the same reasons identified in Paragraph 46.    In addition, the statements identified in Paragraph 53 were knowingly or recklessly false when made for the following reasons:

    A.     On the same day, Levchin told investors that he personally spoke with the Company's forward flow partners, and watched "the numbers like a hawk" for forward flow deals; and

    B.     Levchin's own statements of knowledge combined with shared responsibility with Linford in managing Affirm's business are sufficient to infer that Linford shared critical information concerning interest rate risks with Levchin.

56.    On September 15, 2022, Defendant Linford spoke at the Autonomous Research Virtual Annual Future of Commerce Symposium.  In response to a question about the Company's RLTC metric, Defendant Linford made the following false and misleading statements about Affirm's ability to achieve strong profit margins in a high interest rate environment:

**Q- Robert Wildhack**

Got it. Okay. Let's actually jump right to profitability and talk a little bit about revenue less transaction costs, the outlook there for this coming fiscal year points to RLTC as a percentage of volume, like 3.7% at the midpoint. To start, what are the moving parts between that and the 4.3% you reported last year?

**A- Michael Linford**

Yes. I mean I think there's a bunch of moving parts, but maybe one of the easiest ones to really think through is just the mix of business. Our business is -- there's a hundred different ways that we can make our business more complicated. Some of these some very broad (inaudible) jokes to simplify it.

And we really have two sets of products. We have this Split Pay and then we have everything else. You think about Split Pay driving low single-digit kind of 1%, 1% to 2% transaction margins. Then you have core business delivering something that can be as high as 5% or 6%. And as those two mix between the two, and we continue to grow Split Pay business, we will see that number naturally drift down a little bit.

That's in addition to the macro environment we're in. Obviously we are in the middle of a fundamental shift in both the consumer and the rate environment, both of which do show up in our transaction costs. So I think those two things are probably the two biggest things to think about when looking at that number.

We got asked the question a lot over the past year. We kept getting asked 3% to 4%. Aren't you going to be above that -- and I think I got -- it goes literally every quarter and I keep telling people now 3% to 4%, 3% to 4%. There will be quarters we're going to be higher and maybe or are going to be on the lower end of that.

***But we look at the total ability to generate revenue and the cost of scale in this business and feel really good about that range, and we're at the high end of that range and which means that we have a lot of room to continue to absorb more macro headwind. We have a lot of room to continue to mix in this Split Pay and still be safely in that range.***

*****

57.     The statements identified in Paragraph 56 were materially misleading when made because Affirm (a) did not "have a lot of room to continue to absorb more macro headwind," (b) the ability to generate revenue at the cost of scale was already impaired because of macroeconomic headwinds, including funding cost pressure due to rising interest rates, and (c) 0% loans could not mitigate the risks given the actual state of Affirm's affairs and its reliance on traditional lending based on interest-bearing loans, loan sales and securitizations.

58.     The statements identified in Paragraph 56 were knowingly or recklessly false when made for the same reasons identified in Paragraph 46.  In addition, the statements identified in Paragraph 56 were knowingly or recklessly false when made for the following reasons:

> A.     The temporal proximity of Linford's false statements identified in Paragraph 56 to adverse, inconsistent news announced on February 8, 2023 is probative of scienter as fully described in Paragraphs 76 through 79;

> B.      Defendants' numerous inconsistent statements concerning the effect of interest rate hikes after the truth began to emerge, as fully described in Paragraphs 97 through 101 contribute to an inference of fraud; and

> C.     Affirm conceded that higher interest rates negatively impacted its business when the truth began to emerge, and Linford admitted both that RLTC guidance was "worse" because of high yield pressure from forward flow partners, and that there was a lot of uncertainty because of the rate environment.

59.     The conversation continued and Linford was specifically asked about the possibility of whether RLTC as a percentage of GMV could decline to 3%, and he made the following materially misleading statements in response:

**Q- Robert Wildhack**

Yes. Yes. You make a good point though, declining from 4.3% to 3.7%. As rates ratchet higher, and there's a lot more concern around consumer finances, broadly speaking. The long-term guidance there is, again between 3% and 4%. So in light of everything that's happening this year, you're still at the high end of that long-term range. What would have to happen for that number to be 3%?

**A- Michael Linford**

Yes. I think we have to see a substantially higher mix in Split Pay in our business, or a rate environment that's, again moves very rapidly. Although we talked about this a lot. ***The rate environment moving on us inside the year really doesn't impact us. So that's more of a long-term statement, meaning at some point, rates do impact us, but not usually in the short term.*** So that's happening in this fiscal year. It really would have to be a mix of business driven.

60.    The statements identified in Paragraph 59 were materially false when made because (a) Linford's representation that there would be no short-term impact from rate increases was not true, particularly because RLTC as a percentage of GMV was markedly below even 3% within months of when this false statement was made, and as a result (b) Linford's assurance that the impact from rates "inside the year" does not have an effect on Affirm was also false.

61.    The statements identified in Paragraph 59 were knowingly or recklessly misleading when made for the same reasons identified in Paragraph 58.

62.    As the conference proceeded, Linford's misrepresentations became more extreme, and he affirmatively stated that short-term risks from a rise in interest rates were "non-existent":

**Q- Robert Wildhack**

Yes. Let's move to funding costs now. In August, on the same earnings call we were referring to a minute ago, you mentioned that a 100 basis point move higher in rates beyond the current forward curve would weigh on your revenue less transaction cost as a percentage of volume by 10 to 20 basis points. In February of this year, that same language pointed to a 40 basis point headwind RLTC as a percentage of GMV. So what changed in the last six months?

**A- Michael Linford**

Yes. Thank you. I want to clarify because the way to think about it is was going to tell you for the next time period what the impact is going to be, and so in February fiscal '23 was further away. So in February, we were talking about the impact in the near term as being 10 to 20 bps in the longer term and very long-term meeting beyond fiscal '23, then is being in 40.

***So the way to think about it is the total impact in the very long run is something on the order of 40 basis points, and there are step down the closer you get. The impact on rates to our business tomorrow is almost nonexistent. The impact on rates six months from now is controlled. The impact of rates a year from now is controlled, but still pretty high, as you saw on the 10 to 20 basis point number we guided to, the impact of rates on the very long term is less controlled.***

And this is an important point where I think we do have an exposure to rates. It's a very real cost in our business either in our funding cost or it goes up in the yields that we're able to sell loans at -- and I think we're not denying that, and I hope everyone understands what we're meaning to say that. ***It just doesn't flow through as quickly as people think.***

And what that does for us is that gives us time and time is a super valuable asset for us because our asset turns over so fast, we can replace the economic content with either more revenue sources or other cost mitigates that allow us to still deliver our unit economics in a higher rate environment.

***If we were subject to the rates impacting us day to day you'd see a very different posture from us or we wouldn't be as confident in our ability to absorb and react to the higher cost markets, the higher cost environment. But because we do have that shockers over built into our capital strategy, we're able to look ahead and say okay we see some cost headwinds coming, but we can absorb it and plan around it.***

63.    The statements identified in Paragraph 62 were materially misleading when made because (a) Affirm's near-term rate exposure was more than 10 to 20 bps, (b) Affirm's exposure beyond February 2023 to higher rates was more than 40 bps, (c) the impact of rising rates was not then "controlled" at Affirm because of "shock" absorbers, and as a result, (d) Linford's assurance that the short-term impact from rates on Affirm's business was "non-existent" was false.

64.    The statements identified in Paragraph 62 were knowingly or recklessly misleading when made for the same reasons identified in Paragraph 58.

65.    Later in the conference, Linford affirmatively misrepresented that the market should not worry about an increase in funding costs because Affirm "managed that aggressively," funding costs do not rise "overnight" given all the firm commitments, and Affirm plans well in advance to ensure funding capacity "in a pretty thoughtful way":

**Q- Robert Wildhack**

Yes. And as I think about the forward flow agreements in the warehouse lines, -- could you just talk about how the maturities and renewals are staggered? Should we be worried about a "cliff" when funding costs take a material step up?

**A- Michael Linford**

***No, you shouldn't because we manage that pretty aggressively. So one of the reasons why it's so little of the funding capacity comes up this year is because we've been thoughtful about running ahead and renewing and extending and upsizing where we can. I think that may not always be the case, but much like with rates, these things don't happen to us overnight.***

***So we're able to plan ahead in a pretty thoughtful way to make sure that we've got the capacity that we need.*** Therefore, staggered renewals are pretty important to us. So we don't like to put a lot of expiring capacity into one bucket.

And that's important because, look, there will be partners of ours who, for reasons not at all related to Affirm, they have to change their view of this particular asset. That's okay. We don't ever want to be a situation where one partner matters so much to us that they're doing something bad for them as a result. That means that you got to add more, you got to

add diversity and you got to add staggered renewals so that no one's getting caught in any window, but it's bad for everybody.

66. The statements identified in Paragraph 65 were materially misleading when made because (a) red flags about rising yields and funding costs had already emerged, and (b) within months of this statement, the Company disclosed that increased funding costs would negatively impact its performance and outlook rendering false Linford's statements that "these things don't happen overnight," and "we're able to plan ahead in a pretty thoughtful way to make sure that we've got the capacity we need."

67. The statements identified in Paragraph 65 were knowingly or recklessly misleading when made for the same reasons identified in Paragraph 58.

68. On September 27, 2022, Linford participated in an "Affirm Shareholder Fireside Chat." In response to a retail investor's question about then rising interest rates, Linford continued to minimize rate volatility with false claims of "built-in" "shock absorbers" and limited risk in the short-term even as the temporal proximity to extremely adverse news from his inconsistent representations began to shrink:

**Q- Moderator**

We have a question from a retail investor, Jorge R, who wants to know how Affirm's path to profitability will be impacted by rising interest rates alongside high inflation.

**A- Michael Linford**

Yes. I think, again, it's really important to remember that we believe our product is more valuable in these environments. It is the case that higher rates increase our costs. That they either increase our cost of funding or put pressure on the gain on sale lines in the P&L, and we talked about that. Frankly going back to February and in our Q2 last year earning call, we talked about how the rising rate environment would impact us***, but it would flow through on a slower timeline than I think most folks have been thinking about.***

The way we approach capital in the business is we go off and try to secure funding for loans before they're originated on our platform. And that gives us disadvantage [sic] of where originated into fairly certain cost and/or revenue profiles. ***And so we're not quite as subject to the shocks.*** And make no mistake, the current rate environment certainly since beginning of this calendar year has been one of a rapid increase. You saw the Fed move in the market, expectations of rates continue to rise on a really quick basis.

***And yet, our business model has built-in some shock absorbers to that, where it doesn't flow through immediately, and that allows us to be pretty planful around how we make our investments.*** While we're going to be prudent with our investments, we're still going to be investing and have been for this fiscal year as we think there's a lot of opportunity ahead. ***We think we're well-positioned to manage the credit side of that as I talked about***

***before and we have continued to repeat our commitment to get to profitability on an adjusted operating income basis by the end of this year, despite the rate environment being as volatile as it is.***

69.    The statements identified in Paragraph 68 were materially misleading when made because Affirm was, in fact, subject to rate shocks, did not have "built in shock absorbers" to minimize the effect of rate increases, and was not positioned to manage risks in a volatile rate environment.  In addition, the temporal proximity between these misrepresentations and Affirm's ultimate disclosure of rising funding costs due to increased interest rates that would lead to poor financial results enhances an inference of fraud.

70.    The statements identified in Paragraph 68 were knowingly or recklessly misleading when made for the same reasons identified in Paragraph 58.

71.    On December 6, 2022, Linford participated in another Affirm Shareholder "Fireside Chat."  In response to an analyst question about the impact of higher interest rates, Linford made the following misleading statements about the Company's rate exposure:

**Q- Dan Perlin**

Got it. And if you kind of reflect back on the last 12 months, maybe a little longer that what do you think you didn't think about, say, pre-COVID about the business or even during COVID like how prior -- are you surprised by the impact of the higher rates on the business? Is this something you kind of anticipated like this is an unprecedented time, I guess, between COVID and (inaudible) I just point your when you go back home, how do you think about this every day?

**A- Michael Linford**

*****

I think that specifically with respect to rate, I feel really, really good about how well we predicted what the rates will do to our business back in February, which is way before the rate curve started moving as much as it did. We gave the market a framework for how to think about the impact of rates on our business in our February earnings call. And we've come in a little bit better in the framework we've given folks, but it's been a really good way to think about it. ***In the super near term, there's less impact because we have less exposure to floating rate debt.***

***But in the longer term, we have some gross exposure that it's our job to mitigate. And I feel really proud about our ability to manage and navigate through that.*** And yet, the challenges are by no means the highest. We still have a lot of work to do continue to navigate what are, like you say, unprecedented economic types. [sic]

72.    The statements identified in Paragraph 71 were materially misleading when made because (a) Affirm was not then mitigating interest rate risk and did not then have the ability to "manage

and navigate through that" without decimating its margins, and as a result (b) Linford already knew of a high risk that rising interest rates would impact Affirm "in the super near term," and Defendants contradicted Linford's misrepresentations identified in Paragraph 71 nine weeks after they were made.

73.    The statements identified in Paragraph 71 were knowingly or recklessly misleading when made for the same reasons identified in Paragraph 58.

74.    In addition, the statements identified in Paragraph 71 were knowingly or recklessly false when made for the following reasons:

       A.    Defendants contradicted Linford's misrepresentations identified in Paragraph 71 nine weeks after they were made; and

       B.     By this point, Affirm's second quarter of 2023, which ended on December 31, 2022, was almost over, raising a strong inference that Linford was already aware of the disastrous Q2 2023 financial results announced on February 3, 2023.

## ADDITIONAL ALLEGATIONS OF SCIENTER

**Core Operations**

75.    Affirm is a subprime lender that derives all of its revenue from lending related activities, sells and packages loans, profits from interest and/or merchant fees and servicing fees associated with loans, and its funding sources are heavily sensitive to changes in interest rates.  As such, the core operations doctrine can be invoked to support scienter because managing interest rate risks touches on all facets of Affirm's business and rising interest rates did ultimately impact the Company's bottom line as alleged elsewhere herein.

**Temporal Proximity of Misrepresentations to Admissions and Adverse News Enhances Scienter**

76.    By November 2022, the Federal Fund Rate had increased substantially to 3.75%-4.00%. Nevertheless, Defendants continued to mislead investors about the Company's purported protection shielding its business model from the impact of rate hikes.  *See* Paragraphs 71 to 74.  In fact, in a shareholder letter released on November 8, 2022 in connection with the financial results for the first quarter of 2023 that ended on September 30, 2022, the Company claimed that "our long-term model of 3-4% as a percentage of GMV is unchanged, and we expect to be at the high end of this range in the second half of FY '23."  The letter also asserted that "our sensitivity to additional interest rate increases

has *decreased*," providing a range of potential impacts on RLTC that were lower than those provided in February 2022.  For over the next two months, Linford continued to downplay the risk of interest rate increases as a long-term issue with little to no impact in the short run.

77.     Weeks later, on February 8, 2023, Affirm announced poor financial results for the second fiscal quarter of 2023 that ended on December 31, 2022.  In a shareholder letter released in connection with the quarter, the Company admitted that RLTC declined to 2.5% as a percentage of GMV on average between October 1, 2022 and December 31, 2022 because of the ballooning balance of loans held for investment on its balance sheet, credit losses, and higher interest rates and spreads remained a "headwind" for that metric in the *short-term*, but would allegedly "attenuate" as the Company "exits" fiscal year 2023 (which ends on June 30, 2023).  Additional admissions were made conceding that "increased funding costs" would have to be passed on to the consumer by charging interest of up to 36%, a usurious rate in many states.  Linford further admitted on a conference call held on the same day to discuss the financial results that RLTC guidance was "worse" because of "high yield pressure with respect to our forward flow partners," and that "the rising rate environment has put the yield threshold higher for all of these programs."

78.     The contradictions continued within a few months when the Company basically admitted that the negative impact from higher interest rates could not be attenuated.  In a May 9, 2023, shareholder letter that discussed Affirm's poor financial results for the third quarter of 2023 that ended on March 31, 2023, Affirm claimed that higher funding costs would remain a headwind "for the next few quarters," and higher benchmark interest rates and credit spreads would continue to be a "headwind" for RLTC as a percentage of GMV.

79.     A strong inference of scienter is raised by the temporal proximity of the admissions, inconsistencies, and adverse facts identified in Paragraphs 76 through 77, and the misleading impression given to investors in late 2022 as identified in Paragraph 76, as well as Linford's materially misleading statements made on December 6, 2022.

**LOSS CAUSATION**

80.     The truth about Affirm's exposure to rising interest rates was dribbled out to investors in a series of partial disclosures, allowing some inflation to remain until the final disclosure.

81.    On February 10, 2022, Affirm announced its earnings for its fiscal year 2022 second quarter results. The Company's quarterly loss of $0.57 per share was far worse than analyst expectations of $0.37 per share, and gross margins also declined. RLTC as a percentage of GMV declined year-over-year from 4.6% to 4.1%. The market reacted negatively, and concerns began to emerge about the Company's future because of macroeconomic conditions. For example, an analyst at Jefferies observed that rising interest rates would negatively impact margins "as well as increase funding costs."

82.    On this news, the Company's share price plummeted from an intra-day high of $83.57 per share on February 10, 2022, to close at $46.55 per share on February 11, 2022, or approximately 44%. The price continued to drop on the next trading day as the market absorbed the news, closing at $43.70 on February 14, 2022.

83.    On March 11, 2022, after the close of trading, Bloomberg News reported that Affirm had halted the issuance of the $500 million ABS, which CW1 confirmed was due to higher yields demanded by potential buyers of the AAA tranche. The market reacted negatively; for example, a March 14, 2022 analyst report by Stephens Inc. said "[f]unding constrictions are the cause of many fintech failures. Spreads are bound to get wider for any consumer lender .... It implies to us that Net Transaction Profit Margins are below 3%-4% guidance on the ABS issuance. Further, if funding pullback persists, GMV will have to slow too…. Friday afternoon's news makes us more nervous."

84.    On this news, the stock plummeted over 15% from $30.86 at close on Friday, March 11, 2022, to close at $26.22 on Monday, March 14, 2022—the next trading day.

85.    On August 25, 2022, Affirm announced its earnings for its fiscal year 2022 fourth quarter results. The Company issued fiscal year 2023 revenue guidance of $1.63 billion to $1.73 billion, lower than the $1.90 billion consensus of analysts. An August 26, 2022 Wedbush analyst report noted that RLTC as a percentage of GMV was expected to be ~3.7%, which "continues a downtrend from recent periods." The Wedbush report observed that "operating margins could be pressured by increasing funding costs driven by both rising market interest rates and widening risk premiums required by credit buyers and ABS investors." An analyst report by Stephens, Inc. highlighted additional concerns about delinquencies: "[d]elinquencies rose q/q in F4Q22 and continued to accelerate through F1Q23-to-date (July/ August). Annualized Net Charge-Offs rose 160bps q/q to 11.6%, the fifth straight quarter of

100+bps q/q increases.  We think volumes and margins will be constrained further by credit performance."

86.    On this news, Affirm's stock price decreased from $31.23 at the close of trading on August 25, 2022, to close at $24.57 on August 26, 2022—a 21.32% drop in one day.  The market continued to absorb the news over the next several trading days—dropping each trading day for the next six trading days to close at $22.30 on September 6, 2022.

87.    On November 4, 2022, after the close of trading, Bloomberg News published a story reporting that Affirm had pulled another ABS deal due to investor demands for higher yields.  A November 4, 2022 Wedbush analyst report observed that "[w]e believe the delay could be related to the original timing of deal coinciding with the Fed's updated outlook on interest rates that came out on Wednesday, and we wouldn't be surprised if ABS buyers in this deal are seeking higher yields to compensate for the Fed potentially taking its terminal rate higher than previously expected." A November 6, 2022 Jefferies report estimated that there could be "reduced options and higher funding costs for some period of time."

88.    On this news, the Company's stock price declined from $16.12 at close on November 4, 2022 to $15.63 at close on November 7, 2022—a decline of 3.04%.

89.    On November 8, 2022, Affirm announced its earnings for its fiscal year 2023 first quarter results. Expected fiscal year 2023 revenue was $1.60 billion to $1.675 billion compared to a previous range of $1.63 billion to $1.73 billion, which was again below consensus estimates.  Affirm began to attribute the lower forecasts partially to the impact of higher interest rates on its funding costs even as Linford continued to minimize and misrepresent the issue as a short-term problem until, at least, December 2022.

90.    The market again reacted negatively.  Stephens Inc. lowered its price target from $18.00 to $15.00, stating "Credit deteriorated further as 30d+ delinquencies were 3.8% (+123bps y/y; +42bps q/q) and continue to accelerate.… Funding also continues to worry us. A recent Bloomberg article pointed to another pulled ABS deal by Affirm."

91.    On this news, Affirm's stock price declined from $15.64 at close on November 8, 2022 to close at $12.10 on November 9, 2022, a decline of 22.64%.

92.     On February 8, 2023, Affirm announced its earnings for its fiscal year 2023 second quarter results.  The results were again disappointing; the Company reported quarterly revenue that was $16.33 million lower than analyst expectations, and RLTC as a percentage of GMV came in at 2.5%—below the Company's guidance for the quarter.

93.     GMV also fell below expectations.  The Company also announced that it would be cutting 19%, or nearly 500 people, of its workforce because of poor financial results.

94.     Multiple analysts, including RBC and Morgan Stanley announced that they were cutting the Company's price target.  RBC attributed the downgrade to a decline in RLTC.  A February 10, 2023 Morgan Stanley report similarly attributed its downgrade of Affirm to the Company's failure "to built in interest rate and pricing flexibility to handle credit cycle dynamics.  Not doing so has in the near-term impaired business economics (which we measure with RLTC)."

95.     On this news, Affirm's stock price again plummeted by 21.84% over the next two days—from a previous day closing price of $16.02 on February 8, 2023 to close at $13.29 on February 9, 2023. The stock price continued to decline the next day as the market absorbed the news—closing at $12.52 on February 10, 2023.

96.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**POST-CLASS PERIOD ADMISSIONS**

97.     On February 8, 2023, Affirm announced poor financial results for the second quarter of 2023.  In a letter to shareholders from Levchin and Linford released on the same day, the Defendants admitted that "on a year-over-year basis, higher benchmark interest rates and spreads remain a significant headwind to RLTC as a percentage of GMV, and we expect this to continue through the remainder of FY'23."  For this quarter, RLTC as a percentage of GMV shrunk from a Class Period high of nearly 6% to a low of 2.5%.  Defendants further stated that in an attempt to offset "higher funding costs," the Company would pass through interest rate increases to consumers by charging an exorbitant rate of up to 36%.  On a conference call held on the same day to discuss the financial results for the

second quarter of 2023, Levchin conceded that revenue and RLTC were both below expectations, and the Company would now increasingly rely on interest-bearing loans to generate additional revenue.

98.    At the same conference call, Linford was asked by an analyst to expound on why the Company cut revenue guidance for FY 2023 deeper than it cut transaction costs, and Linford conceded that the decision was driven by "a lot of pressure on the yields that we need to generate for our capital partners."  He also conceded that RLTC guidance was "worse" because of "high yield pressure with respect to our forward flow partners," and that "the rising rate environment has put the yield threshold higher for all of these programs."

99.    Additional admissions were made after the Class Period ended.  On March 15, 2023, Linford attended the Wolfe FinTech Forum where he made statements that were inconsistent with his extremely confident assurances that there was little to no short-term risk from a rate hike throughout the Class Period.  At this event, Linford falsely claimed that the Federal Reserve's rate increases were "truly unprecedented."  They were not.  Indeed, the Federal Reserve announced that there would be at least six more increases when it started raising rates in March 2022.  Regardless, at this event, Linford finally gave up and admitted that "it's hard to see through [and] look round corners.  The future has got so much uncertainty in it."

100.    On March 21, 2023, O'Hare, attended the Bank of America Electronic Payments Symposium where he admitted that the yields demanded by the Company's forward flow partners "***were increasing throughout the year***" because of rising interest rates in 2022.  Notably, a CFPB report from September 2022 also confirmed that an increase in funding costs for the industry had already begun to reduce margins in the beginning of 2022.

101.    In an investor forum held on November 14, 2023, Chief Capital Officer Major-Reid similarly admitted that "ABS and forward flow are ***very susceptible*** to market headwinds and shocks, as much like we saw over the last 12 to 18 months," directly contradicting Linford's false statements from "the last 12 to 18 months" or from within the Class Period.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

102.    Plaintiffs bring this Action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Affirm

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

securities between November 16, 2021 and February 8, 2023, both dates inclusive (the "Class"), seeking to pursue remedies under Section 10(b) and 20(a) of the Exchange Act. Excluded from the Class are: the Defendants; the officers and directors of Affirm during the Class Period; any entity in which any of the Defendants have or had a controlling interest; and the affiliates, immediate family members, legal representatives, heirs, successors or assigns of any of the above.

103. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Affirm securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. According to Affirm's Form 10-K filed on August 29, 2022, Affirm had 270 holders of record, which usually represent a far larger number of shareholders since the vast majority of investors hold shares in "street name." Record owners and other members of the Class may be identified from records maintained by Affirm or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

104. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

105. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

106. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether Affirm and the Individual Defendants made false or misleading statements or failed to disclose material information that rendered their Class Period statements false or misleading;
- whether certain Individual Defendants are control persons of Affirm for purposes of Section 20(a) of the Exchange Act;
- whether Affirm and the Individual Defendants made the false or misleading statements or omissions with scienter;
- whether the federal securities laws were violated by Defendants' statements as alleged herein;

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- whether the prices of Affirm's securities during the Class Period were artificially inflated or maintained because of the Defendants' misconduct complained of herein; and
- whether the Class has sustained damages and, if so, what is the proper measure of damages.

107.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this Action as a class action.

108.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made false or misleading statements in public or failed to disclose material facts, the omission of which rendered their public statements misleading, during the Class Period;
- the omissions and misrepresentations were material;
- Affirm's common stock traded in an efficient market;
- the Company's common stock was liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by numerous analysts;
- the false and misleading statements and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and
- Plaintiffs and other Class members purchased or otherwise acquired Affirm's common stock between the time that the Defendants failed to disclose or misrepresented material facts, and the time that the true facts began to be disclosed or materialized, without knowledge of the specific, omitted or misrepresented facts.

109.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

110.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Against Defendants Affirm, Levchin and Linford for
Violations of Section 10(b) and Rule 10b-5(b))**

111.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

112.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

113.    During the Class Period, Defendants made various untrue statements of material fact about Affirm's exposure to rising interest rates, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase and sale of securities.  Such statements were intended to, and throughout the Class Period, did: (i) deceive the investing public, including the Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Affirm common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Affirm common stock at artificially inflated prices.

114.    Specifically, Affirm and the Individual Defendants made material misrepresentations and omitted to disclose material information that rendered their statements misleading as particularized in Paragraphs 41 to 74.

115.    The Individual Defendants either had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive the Plaintiffs and the other members of the Class, or acted with reckless disregard for the truth by refusing to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Affirm and the Individual Defendants. In addition to the facts alleged herein demonstrating a strong inference of scienter, certain information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control.  As the senior managers of Affirm, the Individual Defendants had knowledge of the details of Affirm's internal affairs that were inconsistent with their public statements.

116.    As officers and directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information regarding the increased risks of rising interests and their negative impact on Affirm's bottom line.  As a result of the dissemination of the

aforementioned false and misleading statements, the market price of Affirm common stock was artificially inflated throughout the Class Period.

117. While ignorant of the adverse facts concerning Affirm's exposure to rising interest rates, which were concealed by the misrepresentations and omissions alleged herein, Plaintiffs and the other members of the Class purchased or otherwise acquired Affirm common stock at artificially inflated prices and relied upon the integrity of the market price for Affirm's common stock or upon statements disseminated by Defendants, and were damaged thereby.

118. During the Class Period, Affirm's common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, directly relying on the materially false and misleading statements described herein, or relying upon the integrity of the market, purchased or otherwise acquired shares of Affirm at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock or would not have purchased or otherwise acquired it at the inflated prices that were paid. At the time of the purchases or acquisitions by Plaintiffs and the Class, the true value of Affirm's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Affirm's common stock declined sharply upon the public disclosure of the facts and/or materialization of the concealed risks, injuring Plaintiffs and other Class members.

119. By reason of the conduct alleged herein, Affirm and the Individual Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

120. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases of the Company's common stock during the Class Period when the risk of Defendants' wrongdoing materialized or upon the disclosure thereof, causing the price of Affirm common stock to decline. Affirm and the Individual Defendants are thus liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

## COUNT II

### (Against Defendants Levchin and Linford for
### Violations of Section 20(a) of the Exchange Act)

121.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

122.    During the Class Period, Levchin and Linford dominated the operation and management of Affirm, directly managed its communications with investors, and conducted and participated in the conduct of Affirm's business affairs.  Because of their activities as the public face of Affirm to investors, their senior positions as CEO and CFO respectively, and their own statements of knowledge concerning interest rate risks and funding costs, they were responsible for Affirm's public statements about the misrepresented material.

123.    As the most senior officers and/or directors of a publicly owned company, Levchin and Linford had a duty to disseminate accurate and truthful information about the specified risks to Affirm's business as alleged herein.

124.    Because of their positions of control and authority as senior officers, their repeated communications with investors, and their own statements conceding knowledge of interest rate risks and funding costs, Levchin and Linford were able to, and did, control the Company's statements, which Affirm disseminated in the marketplace with their assistance during the Class Period.  Levchin and Linford exercised their power and authority to cause Affirm to engage in the wrongful acts complained of herein.  Levchin and Linford, therefore, were "controlling persons" of Affirm within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged, which artificially inflated or maintained the market price of Affirm's common stock.

125.    As such, Levchin and Linford exercised control over the general operations of Affirm and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiffs, and the other members of the Class, complain.

126.    By reason of the above conduct, Levchin and Linford are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Affirm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.     Determining that the instant Action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  January 19, 2024

Respectfully submitted,

**POMERANTZ LLP**

By:  /s/ *Omar Jafri*

Omar Jafri
Brian P. O'Connell (SBN 314318)
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: ojafri@pomlaw.com
            boconnell@pomlaw.com

*Lead Counsel for Plaintiffs*
*and the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 E. 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

*Additional Counsel for Plaintiffs*

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS