UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE AFFIRM HOLDINGS, INC. SECURITIES LITIGATION | Case No. 22-cv-07770-AMO<br><br>**ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT WITH LEAVE TO AMEND AND DENYING AS MOOT REQUEST FOR JUDICIAL NOTICE**<br><br>Re: Dkt. Nos. 72, 75 |

This is a putative class action brought on behalf of all persons who purchased or otherwise acquired common stock in Affirm Holdings, Inc. ("Affirm" or the "Company") between November 16, 2021 and February 8, 2023 (the "Class Period"). Lead Plaintiff Mark Kusnier asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder. Affirm, its Chief Executive Officer and Chairman Max Levchin, and its Chief Financial Officer Michael Linford (together, "Defendants") move to dismiss the operative second amended complaint and seek judicial notice of seven documents. The motion is suitable for disposition without hearing pursuant to Civil Local Rule 7-1(b). Accordingly, the hearing currently set for August 29, 2024 is **VACATED**. Having considered the parties' papers and the relevant legal authority, the Court **GRANTS** the motion to dismiss with **LEAVE TO AMEND** and **DENIES AS MOOT** the accompanying request for judicial notice, for the reasons set forth below.

///

///

///

///

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## I.    BACKGROUND

### A.    Factual Background[1]

Affirm "is a credit provider that specializes in borrowers with low or 'subprime' credit ratings."  ECF 72 ¶ 19 n.3.  The Company generates most of its revenue from three sources: "[1] interest earned on loans that it originates or purchases from its bank partners, [2] fees and gains from reselling loans either through securitizations or directly to third party buyers like insurance companies or hedge funds, [and 3] loan servicing fees, and interchange fees earned from debit cards."  *Id.* ¶ 19.  Affirm generates additional revenue from "fees that [it] charges merchants for transactions processed through the [its] platform."  *Id.*  A small portion of Affirm's revenue also comes from its buy-now, pay-later ("BNPL") products called "Split Pay" and "Core 0%" loans.  *Id.* ¶¶ 2, 19.  This "alternative form of credit . . . allows a borrower to split a retail transaction into smaller, interest-free installments and pay the full price over a short period of time after goods or services are purchased."  *Id.* ¶ 2.

Affirm's business relies on three funding sources.  *Id.* ¶ 22.  First, the Company "has warehouse lending facilities with certain banks providing it capital to originate or purchase loans."  *Id.*  These warehouse facilities are subject to floating interest rates and mature between 2023 and 2029, with borrowing allowed up to 12 months prior to the maturity date.  *Id.*  Second, "Affirm uses forward flow arrangements to sell loans to wholesale buyers such as pension funds, insurance companies and hedge funds."  *Id.*  Through these arrangements, Affirm can "offload the economic interest in the loan to third parties," but still "continue[] to service the loans and earn[] revenue from this activity."  *Id.*  Third, Affirm "bundles and resells loans through" asset-backed securities. *Id.*  "As the servicer of these trusts, Affirm has the 'power to direct the activities that most significantly affect' their economic performance."  *Id.* (citing 2022 Form 10-K at 128).

///

---

[1] This background is based on the well-pleaded allegations in the second amended complaint, which are taken as true and viewed in the light most favorable to Kusnier for the purpose of the instant motion.  *In re: CCIV / Lucid Motors Sec. Litig.*, --- F.4th ----, ----, 2024 WL 3710186, at *2 (9th Cir. Aug. 8, 2024).

United States District Court
Northern District of California

Interest rate hikes implemented between March 2022 and March 2023 negatively impacted Affirm's funding sources. *Id.* ¶ 23. Its warehouse facilities, which had floating rates, "became more expensive." *Id.* ¶ 24. The "yields that investors demanded for [asset-based securities] over the benchmark rate [also] began to increase." *Id.* ¶ 24. "Between February 2021 and May 2022, the opening coupon rate Affirm paid for its most senior tranche for an [asset-backed security] rose from 0.88% to 4.30%, and increased to 6.61% in January 2023 for its most senior tranche." *Id.* Partners also demanded higher yields from Affirm's forward flow arrangements, which had "bec[o]me riskier" as "delinquency rates doubled . . . during the pandemic." *Id.* ¶ 25. The amount of loans Affirm retained on its balance sheet grew from $1.76 billion in the second quarter of 2021 to $3.47 billion in the second quarter of 2023 because Affirm could not "favorably sell or securitize loans as it had in the past." *Id.* ¶ 23. According to Morningstar, Inc., "the weighted average credit score of borrowers for Affirm's securitizations shifted from near-prime in 2021 to near sub-prime in 2022." *Id.* ¶ 26.

"Affirm's stock price repeatedly declined after missing analyst expectations." *Id.* ¶ 5. On February 10, 2022, Affirm announced earnings for the second quarter of 2022, reporting a decline in RLTC[2] as a percentage of GMV from 4.6% to 4.1%, a loss of $0.57 per share (in excess of analysts' estimated loss of $0.37 per share), and a decline in gross margins. *Id.* ¶ 81. As a result, Affirm's share price dropped "from an intra-day high of $83.57 per share on February 10, 2022, to close at $46.55 per share on February 11, 2022, or approximately 44%[,]" and it "continued to drop on the next trading day as the market absorbed the news, closing at $43.70 on February 14, 2022." *Id.* ¶ 82. On March 11, 2022, after reports that Affirm delayed a $500 million asset-backed securitization, Affirm's stock price dropped "over 15% from $30.86 at close on Friday, March 11, 2022, to close at $26.22 on Monday, March 14, 2022 – the next trading day." *Id.* ¶¶ 83-84. On August 25, 2022, Affirm announced earnings for the fourth quarter of 2022, "issu[ing]

---

[2] Revenue less transaction costs ("RLTC") "refers to RLTC as a percentage of the Company's gross merchandise value ('GMV'), which is industry jargon for the total dollar amount generated from originating loans." ECF 72 ¶ 4 n.1

fiscal year 2023 revenue guidance of $1.63 billion to $1.73 billion, lower than the $1.90 billion consensus of analysts." *Id.* ¶ 85. The Company's stock price dropped "from $31.23 at the close of trading on August 25, 2022, to close at $24.57 on August 26, 2022" and continued to fall "each trading day for the next six trading days to close at $22.30 on September 6, 2022." *Id.* ¶ 86. On November 4, 2022, after reports that Affirm "pulled another ABS deal due to investor demands for higher yields," "the Company's stock price declined from $16.12 at close on November 4, 2022 to $15.63 at close on November 7, 2022 – a decline of 3.04%." *Id.* ¶¶ 87-88. On November 8, 2022, Affirm announced earnings for the first quarter of 2023. *Id.* ¶ 89. "Expected fiscal year 2023 revenue was $1.60 billion to $1.675 billion compared to a previous range of $1.63 billion to $1.73 billion, which was again below consensus estimates." *Id.* Affirm's stock price fell "from $15.64 at close on November 8, 2022 to close at $12.10 on November 9, 2022, a decline of 22.64%." *Id.* ¶ 91. On February 8, 2023, Affirm announced earnings for the second quarter of 2023, reporting "quarterly revenue that was $16.33 million lower than analyst expectations, and RLTC as a percentage of GMV came in at 2.5% – below the Company's guidance for the quarter." *Id.* ¶ 92. Affirm also indicated that it would be cutting 19% of its workforce, roughly 500 people, "because of poor financial results." *Id.* ¶ 93. On this news, Affirm's stock price dropped "by 21.84% over the next two days – from a previous day closing price of $16.02 on February 8, 2023 to close at $13.29 on February 9, 2023" and "continued to decline the next day as the market absorbed the news – closing at $12.52 on February 10, 2023." *Id.* ¶ 94.

### B.    Procedural Background

Mark Kusnier filed his initial complaint on December 8, 2022. ECF 1. On March 7, 2023, the Court appointed Mark Kusnier as Lead Plaintiff[3] and approved the selection of Pomerantz LLP as Lead Counsel. ECF 32.[4] Kusnier filed an amended complaint on May 5, 2023. ECF 42.

---

[3] The operative complaint names a second plaintiff, Chris Meinsen, though Kusnier is the only Lead Plaintiff appointed by the Court. *See* ECF 32.

[4] Two shareholder derivative suits – *Quiroga v. Levchin*, No. 23-1492 (N.D. Cal. Mar. 29, 2023) and *Jeffries v. Levchin*, No. 23-2552 (N.D. Cal. May 24, 2023) – have been related to this case. ECF 41, 60. Those actions are stayed pending resolution of this case. *See Quiroga*, ECF 10; *Jeffries*, ECF 20.

1   Following full briefing and a hearing on Defendants' motion to dismiss, on December 20, 2023,

2   the Court dismissed the amended complaint with leave to amend.  ECF 49, 53, 54, 67.  Kusnier

3   timely filed the operative second amended complaint on January 19, 2024.  ECF 72.  Defendants

4   filed the instant motion to dismiss, with an accompanying request for judicial notice, on February

5   2, 2024.  ECF 74, 75.  Kusnier filed an opposition to the motion to dismiss and a response to

6   Defendants' request for judicial notice on March 1, 2024.  ECF 79, 80.  Defendants filed a reply in

7   support of the motion and a separate reply in support of the request for judicial notice on March

8   22, 2024.  ECF 81, 82.

9   **II.     LEGAL STANDARD**

10          Federal Rule of Civil Procedure 8 requires a complaint to include "a short and plain

11   statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

12   complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

13   Procedure 12(b)(6).

14          To overcome a Rule 12(b)(6) motion to dismiss, the factual allegations in the plaintiff's

15   complaint " 'must . . . suggest that the claim has at least a plausible chance of success.' "  *Levitt v.*

16   *Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *In re Century Aluminum Co. Sec. Litig.*,

17   729 F.3d 1104, 1107 (9th Cir. 2013) (alterations in original)).  In ruling on a Rule 12(b)(6) motion,

18   courts "accept factual allegations in the complaint as true and construe the pleadings in the light

19   most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d

20   1025, 1031 (9th Cir. 2008) (citation omitted).

21          "[A]llegations in a complaint . . . may not simply recite the elements of a cause of action,

22   but must contain sufficient allegations of underlying facts to give fair notice and to enable the

23   opposing party to defend itself effectively."  *Levitt*, 765 F.3d at 1135 (quoting *Starr v. Baca*, 652

24   F.3d 1202, 1216 (9th Cir. 2011)).  The court may dismiss a claim "where there is either a lack of a

25   cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal claim."

26   *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 850 (9th Cir. 2011) (citing *Johnson v. Riverside*

27   *Healthcare Sys., LP,* 534 F.3d 1116, 1121 (9th Cir. 2008)).  "[T]he non-conclusory 'factual

28   content' and reasonable inferences from that content must be plausibly suggestive of a claim

United States District Court
Northern District of California

United States District Court
Northern District of California

1   entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

2        For claims sounding in fraud or mistake, a plaintiff must "state with particularity the

3   circumstances regarding the fraud or mistake." Fed. R. Civ. P. 9(b).  A plaintiff must set forth

4   " 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp.*

5   *USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir.

6   1997)).

7        A claim for violations of Section 10(b) and Rule 10b-5 "must meet both the heightened

8   pleading requirements for fraud claims under Fed. R. Civ. P. 9(b) . . . and the exacting pleading

9   requirements . . . of the Private Securities Litigation Reform Act ('PSLRA') . . . ." *In re Quality*

10  *Systems, Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (citing *Tellabs, Inc. v. Makor Issues*

11  *& Rights, Ltd.*, 551 U.S. 308, 313 (2007)).  In assessing whether a securities fraud claim meets this

12  heightened pleading standard, "courts must consider the complaint in its entirety, as well as other

13  sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

14  documents incorporated into the complaint by reference, and matters of which a court may take

15  judicial notice." *Tellabs*, 551 U.S. at 322-23 (citations omitted).

16  **III.    DISCUSSION**

17        Defendants move to dismiss both claims Kusnier asserts in his second amended complaint.

18  Because the Section 20(a) is derivative, the Court addresses the claim asserted under Section 10(b)

19  and Rule 10b-5 first.[5]

20             **1.    <u>Section 10(b) and Rule 10b-5</u>**

21        "To recover damages for violations of [S]ection 10(b) and Rule 10b-5, a plaintiff must

22  prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

23  between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon

24  the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v.*

25  *Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (internal quotations and citations omitted); *see*

26  *also In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1190-91 (9th Cir. 2024).

27

28  ―――――――――――――――

[5] The Court's ruling on the motion to dismiss does not rely on any of the materials referenced in Defendants' request for judicial notice.  The request is thus **DENIED AS MOOT.**

Kusnier alleges that the following 11 statements, made in response to queries from analysts at various events, were false or misleading. ECF 72 ¶¶ 41-71. At the RBC Global Technology, Internet, Media, and Telecom Conference held November 16, 2021, an analyst asked:

> That's awesome. Yeah. So the message there is, if you've got plenty of runway to support the near-term and medium-term growth, even as you sit here today and in a rising rate environment, how do we think about the implications there, not only on the funding side, but maybe how does that interplay with merchant discount versus APR opportunities?

*Id.* ¶ 41. Linford responded as follows ("Statement 1"):

> Yeah. So this is -- there is lots of layers of complexity to this particular question. I think the first thing is to put some context to it. **You know, I think people maybe thinking in hundreds of bps, not thousands of bps, in terms of rate movement. And that's important because our business is well suited to handle changes in our cost structure on that order of magnitude.**
>
> \*\*\*\*\*

*Id.*[6]

During an earnings call held February 10, 2022, an analyst asked:

> Helpful. Thank you. My follow-up would be, is there any kind of guidepost that you're going to give us from a macro perspective, what you're embedding in the outlook for unemployment, inflation and rates. And I appreciate the color on the interest rate moves to the impact of the model, but just kind of thinking about what a baseline number that you're embedding in your assumption would be?
>
> \*\*\*\*\*
>
> \*\*\*\*\*

*Id.* ¶ 44. Linford responded with the following ("Statement 2"):

> Yeah. Just with the total avoidance of doubt, all of our outlook reflects the forward curve. And so there is roughly 180 basis points

---

[6] Kusnier uses bold and italic font to identify "the false or misleading aspects of the statements" and provides the remaining text for "full context." ECF 72 ¶ 41 n.6. The Court has re-produced the statements at issue here consistent with Kusnier's presentation in the operative complaint, including the asterisks used throughout.

of rate increases.  We take that into all of our models when we give guidance.  It's consistent with the market expectation of rate movement.  **And so talk about rising rates, that's not a problem for us at all, that's already reflected in the guidance.**

*Id.*

During a CFO fireside chat held March 18, 2022, an analyst asked:

I want to -- I have another question on the outlook, actually.  But first, I wanted to ask you about some news reports recently that Affirm temporarily put a refinancing of ABS, or an asset-backed securitization, on hold.  Since then, we've also seen some other companies, I think Tesla and others delay in ABS as well.  Can you talk about Affirm's funding model?

*Id.* ¶ 47.  In response, Linford made the following statement ("Statement 3"):

Well the ABS market is the most directly exposed to the conditions of the market.  Those investors are positioned usually to price uncertainty in its premium and so a lot of companies like ours, right now, who decided that this is not the best time to price a deal or doing so because they don't need it.  It's our view that companies who need to do a transaction right now are forcing it through at economics that probably means they're paying a premium for this volatility.

***We don't feel like we need to because we had better funding opportunities away.  What's really important, though, is we could have transacted, we believe, and could have done so at margins that were great for the business.  But that would be silly to do in a world where we have better opportunities to fund the business with forward flow or bilateral agreement.***

We remain very confident in the ABS market for us over the medium term, and we're committed to continuing to issue across all of our programs.  ***When we talk to the ABS investors, it's quite stark difference between how an ABS investor, these people who buy these kind of securitizations, how they view our decision versus, I think some of the equity market reaction, and there's just the biggest connect.  I think the right read of it is that companies who choose to defer a deal are doing so because they have strength, and that's exactly what happened with us.***

*Id.*

During an earnings call held May 12, 2022, an analyst asked:

Got it.  Thanks.  And as a follow-up question, Michael.  One of the questions that we get most often from investors is, in the face of a rising rate environment, obviously, you have some products where the consumer is the primary one that's been charged and that's merchants -- charge to the merchant particularly the zero percent category.  Could you talk a little bit about your plans as to how to

1          kind of manage the rising interest rate environment for each of those products, and maybe what you've also done to-date if anything?

2   *Id.* ¶ 50.  Linford responded as follows ("Statement 4"):

3          Yes.  We really haven't had to take any action today.  If you look at the merchant fee rate slide in our supplement, you'll see again relatively constant merchant fees.  We view that as a real mark of success in the face of pretty heavy competition we're able to maintain and even grow in some cases, the emergency side.  And of course, as we talk a lot about on the APR side and the consumer side, those rates are strong enough to allow us to deliver really compelling unit economics, and that's the lens through which we look at, at this question.  And it is true that as rates go up, there is pressure on the funding side of our business, ***but it is a mistake to think about that as a full flow through on a linear basis.***

          We have many different funding channels with staggered maturities and very different structures.  And as I mentioned, for example, we just onboarded a new forward-flow partner, who's an insurance company, has a very different view of rates and how they think about that versus a access to quality assets over time.  ***That allows us to manage it in the nearer term.  I think in the very long run, so going out more than a year, you would expect us to need to start to take action, but that's more of a long-term thing than anything we deal with tactically in the near-term.***

14   *Id.*

15        At the JP Morgan Global Technology, Media, and Communications Conference held May 25, 2022, an analyst stated:

          Understood.  So just thinking about your portfolio today and I don't have the stat in front of me of what proportion is held on balance sheet.  The question is, do you anticipate that changing?  Are you -- is your appetite to hold more, increasing?

          Then the second part of that question is with rates rising and there being presumably more options for your forward flow partners to invest in different things, has that changed their appetite or willingness or eagerness to use?  Because my sense is that when rates were rock bottom that these folks had money to put to work and didn't have any place to put it and so...

23   *Id.* ¶ 53.  Levchin responded as follows ("Statement 5"):

24          \*\*\*\*\*

          In terms of rates, we've been in business for a long time, and we ran the company just fine back when the rates were not a bottom, and we had 1 full relationships [sic].  We cultivated them and did really well for our partners back then, ***and we'll continue to do so now.***  Three, as we grow larger and become a more reliable simply through just having more and more quarters reported, partner on the debt side, ***the doors to deeper pools of capital that are less rate***

9

**sensitive, but more -- had lots more capital to deploy are open to us.**

5 years ago, going to an insurance company or a pension fund, it was sort of like probably, we're probably going to get laughed out of the room, like we're just too new.  And at the time, I was like, we're five years in, how can we be too new.  We're no start-up.  So it's now over 10 years, and **these doors are open to us**, and we are adding insurance companies and pension funds.  I think those folks are certainly looking for yield.

**But more than anything, I think they look for stability and great partnerships.  That's what we have become known to bring.**

*Id.*

At the Autonomous Research Virtual Annual Future of Commerce Symposium, held on September 15, 2022, an analyst asked:

Got it.  Okay.  Let's actually jump right to profitability and talk a little bit about revenue less transaction costs, the outlook there for this coming fiscal year points to RLTC as a percentage of volume, like 3.7% at the midpoint.  To start, what are the moving parts between that and the 4.3% you reported last year?

*Id.* ¶ 56.  Linford's response was as follows ("Statement 6"):

Yes.  I mean I think there's a bunch of moving parts, but maybe one of the easiest ones to really think through is just the mix of business.  Our business is – there's a hundred different ways that we can make our business more complicated.  Some of these some very broad (inaudible) jokes to simplify it.

And we really have two sets of products.  We have this Split Pay and then we have everything else.  You think about Split Pay driving low single-digit kind of 1%, 1% to 2% transaction margins.  Then you have core business delivering something that can be as high as 5% or 6%.  And as those two mix between the two, and we continue to grow Split Pay business, we will see that number naturally drift down a little bit.

That's in addition to the macro environment we're in.  Obviously we are in the middle of a fundamental shift in both the consumer and the rate environment, both of which do show up in our transaction costs.  So I think those two things are probably the two biggest things to think about when looking at that number.

We got asked the question a lot over the past year.  We kept getting asked 3% to 4%.  Aren't you going to be above that -- and I think I got -- it goes literally every quarter and I keep telling people now 3% to 4%, 3% to 4%.  There will be quarters we're going to be higher and maybe or are going to be on the lower end of that.

**But we look at the total ability to generate revenue and the cost of**

United States District Court
Northern District of California

United States District Court
Northern District of California

> ***scale in this business and feel really good about that range, and we're at the high end of that range and which means that we have a lot of room to continue to absorb more macro headwind. We have a lot of room to continue to mix in this Split Pay and still be safely in that range.***
>
> *****

*Id.* The same analyst also asked:

> Yes.  Yes.  You make a good point though, declining from 4.3% to 3.7%.  As rates ratchet higher, and there's a lot more concern around consumer finances, broadly speaking.  The long-term guidance there is, again between 3% and 4%.  So in light of everything that's happening this year, you're still at the high end of that long-term range.  What would have to happen for that number to be 3%?

*Id.* ¶ 59.  In response, Linford made the following statement ("Statement 7"):

> Yes.  I think we have to see a substantially higher mix in Split Pay in our business, or a rate environment that's, again moves very rapidly.  Although we talked about this a lot.  ***The rate environment moving on us inside the year really doesn't impact us.  So that's more of a long-term statement, meaning at some point, rates do impact us, but not usually in the short term.***  So that's happening in this fiscal year.  It really would have to be a mix of business driven.

*Id.* As the conference continued, the same analyst posed another question:

> Yes.  Let's move to funding costs now.  In August, on the same earnings call we were referring to a minute ago, you mentioned that a 100 basis point move higher in rates beyond the current forward curve would weigh on your revenue less transaction cost as a percentage of volume by 10 to 20 basis points.  In February of this year, that same language pointed to a 40 basis point headwind RLTC as a percentage of GMV.  So what changed in the last six months?

*Id.* ¶ 62.  Linford responded with the following statement ("Statement 7"):

> Yes.  Thank you.  I want to clarify because the way to think about it is was going to tell you for the next time period what the impact is going to be, and so in February fiscal '23 was further away.  So in February, we were talking about the impact in the near term as being 10 to 20 bps in the longer term and very long-term meeting beyond fiscal '23, then is being in 40.
>
> ***So the way to think about it is the total impact in the very long run is something on the order of 40 basis points, and there are step down the closer you get.  The impact on rates to our business tomorrow is almost nonexistent.  The impact on rates six months from now is controlled.  The impact of rates a year from now is controlled, but still pretty high, as you saw on the 10 to 20 basis***

*point number we guided to, the impact of rates on the very long term is less controlled.*

And this is an important point where I think we do have an exposure to rates. It's a very real cost in our business either in our funding cost or it goes up in the yields that we're able to sell loans at -- and I think we're not denying that, and I hope everyone understands what We're meaning to say that. ***It just doesn't flow through as quickly as people think.***

And what that does for us is that gives us time and time is a super valuable asset for us because our asset turns over so fast, we can replace the economic content with either more revenue sources or other cost mitigates that allow us to still deliver our unit economics in a higher rate environment.

***If we were subject to the rates impacting us day to day you'd see a very different posture from us or we wouldn't be as confident in our ability to absorb and react to the higher cost markets, the higher cost environment. But because we do have that shockers over built into our capital strategy, we're able to look ahead and say okay we see some cost headwinds coming, but we can absorb it and plan around it.***

*Id.* The same analyst also asked:

Yes. And as I think about the forward flow agreements in the warehouse lines, -- could you just talk about how the maturities and renewals are staggered? Should we be worried about a "cliff" when funding costs take a material step up?

*Id.* ¶ 65. Linford responded as follows ("Statement 9"):

***No, you shouldn't because we manage that pretty aggressively. So one of the reasons why it's so little of the funding capacity comes up this year is because we've been thoughtful about running ahead and renewing and extending and upsizing where we can. I think that may not always be the case, but much like with rates, these things don't happen to us overnight.***

***So we're able to plan ahead in a pretty thoughtful way to make sure that we've got the capacity that we need.*** Therefore, staggered renewals are pretty important to us. So we don't like to put a lot of expiring capacity into one bucket.

And that's important because, look, there will be partners of ours who, for reasons not at all related to Affirm, they have to change their view of this particular asset. That's okay. We don't ever want to be a situation where one partner matters so much to us that they're doing something bad for them as a result. That means that you got to add more, you got to add diversity and you got to add staggered renewals so that no one's getting caught in any window, but it's bad for everybody.

United States District Court
Northern District of California

12

1   *Id.* ¶ 65.

2   During an Affirm Shareholder Fireside Chat held September 27, 2022, the moderator

3   stated:  "[w]e have a question from a retail investor, Jorge R, who wants to know how Affirm's

4   path to profitability will be impacted by rising interest rates alongside high inflation."  *Id.* ¶ 68.  In

5   response, Linford made the following statement ("Statement 10"):

> Yes.  I think, again, it's really important to remember that we
> believe our product is more valuable in these environments.  It is the
> case that higher rates increase our costs.  That they either increase
> our cost of funding or put pressure on the gain on sale lines in the
> P&L, and we talked about that.  Frankly going back to February and
> in our Q2 last year earning call, we talked about how the rising rate
> environment would impact us, *but it would flow through on a*
> *slower timeline than I think most folks have been thinking about.*
>
> The way we approach capital in the business is we go off and try to
> secure funding for loans before they're originated on our platform.
> And that gives us disadvantage [sic] of where originated into fairly
> certain cost and/or revenue profiles.  *And so we're not quite as*
> *subject to the shocks.*  And make no mistake, the current rate
> environment certainly since beginning of this calendar year has been
> one of a rapid increase.  You saw the Fed move in the market,
> expectations of rates continue to rise on a really quick basis.
>
> *And yet, our business model has built-in some shock absorbers to*
> *that, where it doesn't flow through immediately, and that allows us*
> *to be pretty planful around how we make our investments.*  While
> we're going to be prudent with our investments, we're still going to
> be investing and have been for this fiscal year as we think there's a
> lot of opportunity ahead.  *We think we're well-positioned to*
> *manage the credit side of that as I talked about before and we have*
> *continued to repeat our commitment to get to profitability on an*
> *adjusted operating income basis by the end of this year, despite the*
> *rate environment being as volatile as it is.*

21   *Id.*

22   During another Affirm Shareholder Fireside Chat held December 6, 2022, an analyst

23   asked:

> Got it.  And if you kind of reflect back on the last 12 months, maybe
> a little longer that what do you think you didn't think about, say,
> pre-COVID about the business or even during COVID like how
> prior -- are you surprised by the impact of the higher rates on the
> business?  Is this something you kind of anticipated like this is an
> unprecedented time, I guess, between COVID and (inaudible) I just
> point your when you go back home, how do you think about this
> every day?

*Id.* ¶ 71.  Linford responded with the following statement ("Statement 11"):

> I think that specifically with respect to rate, I feel really, really good about how well we predicted what the rates will do to our business back in February, which is way before the rate curve started moving as much as it did.  We gave the market a framework for how to think about the impact of rates on our business in our February earnings call.  And we've come in a little bit better in the framework we've given folks, but it's been a really good way to think about it.  ***In the super near term, there's less impact because we have less exposure to floating rate debt.***
>
> ***But in the longer term, we have some gross exposure that it's our job to mitigate.  And I feel really proud about our ability to manage and navigate through that.***  And yet, the challenges are by no means the highest.  We still have a lot of work to do continue to navigate what are, like you say, unprecedented economic types. [sic]

*Id.*

Defendants argue that these statements do not support a plausible claim under Section 10(b) and Rule 10b-5.  ECF 74 at 12-29.  They contend that Kusnier has not adequately alleged falsity, that the statements fall under the PSLRA's safe harbor, and that some of the statements are non-actionable opinions.  *Id.*  Defendants also argue that Kusnier's allegations of scienter are insufficient.  *Id.* at 20-25.  Because the failure to adequately plead facts giving rise to the strong inference of scienter required under the PSLRA alone warrants dismissal, the Court addresses that issue below without reaching the other grounds on which Defendants base their motion.

To plead scienter, a complaint "must 'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors."  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (quoting 15 U.S.C. § 78u-4(b)(2)).  "A 'strong inference' exists 'if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.' "  *Glazer Cap. Mgmt., L.P., v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (quoting *Tellabs*, 551 U.S. at 324).  In evaluating whether that standard is met, the court first "determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter."  *Id.* (internal quotations and citation omitted).  "[S]econd, if no individual allegations are sufficient, [the court] conducts a 'holistic'

United States District Court
Northern District of California

1    review to determine whether the allegations combine to give rise to a strong inference of scienter."

2    *Id.* (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009)).

3           At either stage of review, Kusnier's allegations do not give rise to the strong inference of

4    scienter required under the PSLRA.  His theory has five components.  ECF 80 at 24-30.  First, he

5    contends that Defendants' statements are themselves indicative of scienter.  *Id.* at 24-25.  Second,

6    Kusnier invokes the core operations doctrine.  *Id.* at 26.  Third, he relies on statements of

7    confidential witnesses to show that Linford and Levchin possessed information that contradicted

8    the substance of their statements.  *Id.* at 26-27.  Fourth, Kusnier emphasizes the temporal

9    proximity between certain statements and events.  *Id.* at 27-29.  Fifth, Kusnier points to

10   admissions made after the class period.  *Id.* at 29-30.  As discussed below, whether taken

11   individually or holistically, Kusnier's allegations do not give rise to a cogent inference of scienter

12   that is at least as compelling as any opposing inference.

13                        i.      Statements Raising an Inference of Actual Knowledge

14          Kusnier's contention that Defendants' statements themselves raise an inference of actual

15   knowledge of falsity is unavailing.  The statements Kusnier points to in his opposition are not the

16   11 statements identified as the basis for his claims.  *See* ECF 80 at 25-26 (citing ECF 72 ¶¶ 29-30,

17   32, 33-34).   Kusnier has thus made no showing that the 11 statements at issue are themselves

18   indicative of scienter, and the Court declines to allow Kusnier to use his opposition brief as an

19   opportunity to re-frame his claims.  *See Petrie v. Elec. Game Card Inc.,* No. SACV 10-00252

20   DOC (RNBx), 2011 WL 165402, at *4 n.2 (C.D. Cal. Jan. 12, 2011) (citation omitted) ("[I]t is

21   axiomatic that the complaint may not be amended by briefs in opposition to a motion to

22   dismiss.").

23                        ii.     Core Operations

24          The core operations doctrine also does not advance Kusnier's theory.  "The 'core

25   operations' doctrine allows the knowledge of certain facts that are critical to a business's 'core

26   operations' to be attributed to a company's key officers."  *Webb v. Solarcity Corp.*, 884 F.3d 844,

27   854 (9th Cir. 2018).  The cases in which the doctrine "has supported a strong inference of scienter

28   typically involve specific admissions from top executives that they are involved in every detail of

United States District Court
Northern District of California

15

1    the company, or where the nature of the relevant fact is of such prominence that it would be

2    absurd to suggest that management was without knowledge of the matter[.]"  *See Espy v. J2*

3    *Global, Inc.*, 99 F.4th 527, 539 (9th Cir. 2024).

4         Kusnier's cursory allegations support no such inference here.   He alleges:

> Affirm is a subprime lender that derives all of its revenue from
> lending related activities, sells and packages loans, profits from
> interest and/or merchant fees and servicing fees associated with
> loans, and its funding sources are heavily sensitive to changes in
> interest rates.  As such, the core operations doctrine can be invoked
> to support scienter because managing interest rate risks touches on
> all facets of Affirm's business and rising interest rates did ultimately
> impact the Company's bottom line as alleged elsewhere herein.

10   ECF 72 ¶ 75.  In his opposition, Kusnier asserts that "[i]t would be absurd to assume that

11   Defendants were unaware of the risks from rising interest rates, particularly when Levchin and

12   Linford both made statements to suggest that they closely monitored any changes and had thought

13   a lot about their impact on the Company."  ECF 80 at 26.  Those statements, however, are not

14   among the 11 Kusnier has identified as being at issue here.  *See id.* (referencing allegations from

15   paragraphs 29-30 and 32-34 of the operative complaint).  Without further factual allegations

16   supporting Kusnier's assertions of absurdity, his resort to the core operations theory does not

17   support a viable theory of scienter.  *See Espy*, 99 F.4th at 539 (finding allegations that executive

18   "signed off on every acquisition, received detailed reports, or were 'obsessed with numbers,' d[id]

19   not compel a strong inference that they had knowledge of the alleged omitted information")

20   (internal quotations and citations omitted).

21                                          iii.       Confidential Witnesses

22         Kusnier's reliance on statements of confidential witnesses fares no better.  Information

23   provided by former employees must "pass two hurdles" to establish scienter.  *Zucco*, 552 F.3d at

24   995.  "First, the confidential witnesses whose statements are introduced to establish scienter must

25   be described with sufficient particularity to establish their reliability and personal knowledge. . . .

26   Second, those statements which are reported by confidential witnesses with sufficient reliability

27   and personal knowledge must themselves be indicative of scienter."  *Id.* (citation omitted).

28   ///

United States District Court
Northern District of California

1    Assuming, without deciding, that Kusnier's three confidential witnesses clear the first

2 hurdle, they do not pass the second.  The first confidential witness ("CW1") reported that Affirm

3 delayed a $500 million asset-backed securitization "for reasons purely related to the interest rate

4 risk."  ECF 72 ¶ 36.  According to CW1, "investors with larger orders reneged because the coupon

5 rates offered were not high enough in light of the risk that interest rates would rise."  *Id.* ¶ 37.

6 Linford was aware of this and "was closely involved in the decision-making process because

7 Major-Reid[7] sent Linford 'play-by-play' text messages about the meeting, and she would have

8 also updated Levchin."  *Id.* ¶ 38.  Linford also "ha[d] detailed knowledge of these issues because

9 Linford me[t] with Affirm's banking partners regularly."  *Id.*  The statements that CW1 claims

10 were relayed to Linford, at some unspecified time and under unknown circumstances, do not

11 constitute statements which are themselves indicative of scienter.  *See Zucco*, 552 F.3d at 998

12 (finding conclusory allegations that executive must " 'have known what was going on with respect

13 to the [c]ompany's inventory account manipulation' " without facts "establish[ing] that the

14 witness reporting them has reliable personal knowledge of the defendants' mental state").

15    So too with the statement from confidential witness 2 ("CW2").  CW2 "stated that most of

16 [his] team did not believe the [Linford and Levchin's] public statements concerning the minimal

17 impact from rising interest rates."  *Id.* ¶ 39.  Kusnier does not tie the subjective beliefs of CW2's

18 team to Linford and Levchin's mental states.  Without it, CW2's statement does not support a

19 strong inference of scienter.  *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021)

20 (declining to credit, in assessing falsity, former employees' statement that production goals were

21 impossible to achieve where the "[p]laintiffs had failed to plead facts showing that [the]

22 defendants adopted the conservative timeline for production on which these employees'

23 pessimism was based.").

24    Nor do the statements from a third confidential witness ("CW3") indicate intent to defraud.

25 CW3 reported "that starting in late 2021 and 'repeatedly' between January 2022 and the middle of

26 2022, Linford was warned by several high-level executives, including CW3, of the serious risk

27

28 [7] Brooke Major-Reid is a Chief Capital Officer at Affirm, to whom CW 1 reported.  ECF 72 ¶ 35.

from rising interest rates to Affirm's cost of funding and lending margin." ECF 72 ¶ 40. "[B]etween late 2021 and the middle of 2022, Linford was told of the increased risks from rising interest rates to Affirm's ABS business and its forward flow arrangements." *Id.* According to CW3, "Linford disregarded the warnings," relayed "in emails and through internal messaging applications at the Company[,]" and Affirm's bottom line deteriorated as a result. *Id.* In CW3's view, "Affirm was severely impacted by rising interest rates in the short-term because it increased the Company's cost of funding and its lending margin." *Id.* CW3's account demonstrates that "there was some disagreement within the corporation," but stops short of establishing scienter without further facts showing that Linford acknowledged or admitted the increased risks. *See Wochos*, 985 F.3d at 1194; *see also Zucco*, 552 F.3d at 999 (finding confidential witness account insufficient to support the required strong inference of scienter where it established disagreement and questioning about accounting practice but failed to establish that external auditors counseled against it or that management admitted or was aware that it was improper).

iv.   Temporal Proximity

Kusnier's reliance on the temporal proximity between certain statements[8] and events also does not support a viable theory of scienter. "Close temporal proximity between allegedly false statements and the disclosure of information contradicting those statements may bolster an inference of scienter. . . . However, timing alone, absent a showing of knowing falsity, is insufficient to support scienter." *Jaszczyszyn v. SunPower Corp.*, No. 22-CV-00956-AMO, 2024 WL 3463348, at *13 (N.D. Cal. July 17, 2024); *see also In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 2857397, at *25 (N.D. Cal. June 2, 2020) ("Temporal proximity between an allegedly false statements and a disclosure of the truth may bolster an inference of scienter when combined with other facts.").

In attempting to establish scienter based on temporal proximity, Kusnier points to Statement 11, made by Linford on December 6, 2022:

---

[8] In advancing this argument, Kusnier again points to a statement not identified as one of the 11 at issue. The Court limits its analysis to only those statements Kusnier has alleged are the basis for his claims.

I think that specifically with respect to rate, I feel really, really good about how well we predicted what the rates will do to our business back in February, which is way before the rate curve started moving as much as it did.  We gave the market a framework for how to think about the impact of rates on our business in our February earnings call.  And we've come in a little bit better in the framework we've given folks, but it's been a really good way to think about it.  *In the super near term, there's less impact because we have less exposure to floating rate debt.*

*But in the longer term, we have some gross exposure that it's our job to mitigate.  And I feel really proud about our ability to manage and navigate through that.*  And yet, the challenges are by no means the highest.  We still have a lot of work to do continue to navigate what are, like you say, unprecedented economic types. [sic]

ECF 72 ¶ 71.  Kusnier argues that this statement was shown to be false by admissions made on February 8, 2023 and May 9, 2023.  ECF 80 at 29.  As alleged in the complaint, on February 8, 2023:

Affirm announced poor financial results for the second fiscal quarter of 2023 that ended on December 31, 2022.  In a shareholder letter released in connection with the quarter, the Company admitted that RLTC declined to 2.5% as a percentage of GMV on average between October 1, 2022 and December 31, 2022 because of the ballooning balance of loans held for investment on its balance sheet, credit losses, and higher interest rates and spreads remained a "headwind" for that metric in the short-term, but would allegedly "attenuate" as the Company "exits" fiscal year 2023 (which ends on June 30, 2023).  Additional admissions were made conceding that "increased funding costs" would have to be passed on to the consumer by charging interest of up to 36%, a usurious rate in many states.  Linford further admitted on a conference call held on the same day to discuss the financial results that RLTC guidance was "worse" because of "high yield pressure with respect to our forward flow partners," and that "the rising rate environment has put the yield threshold higher for all of these programs."

ECF 72 ¶ 77.  On May 9, 2023, in a shareholder letter, "Affirm claimed that higher funding costs would remain a headwind "for the next few quarters," and higher benchmark interest rates and credit spreads would continue to be a "headwind" for RLTC as a percentage of GMV."  *Id.* ¶ 78.

Missing from these allegations are facts that would plausibly establish that Linford was in possession of contrary information at the time he made Statement 11 on December 6, 2022.  "[T]he fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made."  *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996).  Nor is "a statement

19

of opinion is . . . misleading just because external facts show the opinion to be incorrect." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015). Without facts to support Kusnier's assertions, he has failed to make the "showing of knowing falsity" necessary to establish scienter based on temporal proximity. *See Jaszczyszyn*, 2024 WL 3463348, at *13.

v.      <u>Post Class Period Admissions</u>

Admissions made after the class period also fail to support a viable theory of scienter. In seeking to establish that here, Kusnier points to multiple purported admissions. First is a statement Linford made during a February 8, 2023 earnings call. ECF 80 at 29-30. When asked to explain why Affirm "cut revenue guidance for FY 2023 deeper than it cut transaction costs," Linford stated that the decision was due to "a lot of pressure on the yields that we need to generate for our capital partners. ECF 72 ¶ 98. He added "that RLTC guidance was 'worse' because of 'high yield pressure with respect to our forward flow partners,' and that 'the rising rate environment has put the yield threshold higher for all of these programs.' " *Id.* Second is Linford's statement of March 15, 2023, made during the Wolfe FinTech Forum. *Id.* ¶ 99. He said that "it's hard to see through [and] look round corners. The future has got so much uncertainty in it." *Id.* (modification in original).

Kusnier also points to two statements from other Affirm executives. On March 21, 2023, at the Bank of America Electronic Payments Symposium, Affirm's Senior Vice President of Finance Rob O'Hare, said "that the yields demanded by the Company's forward flow partners 'were increasing throughout the year' because of rising interest rates in 2022." *Id.* ¶ 100. On November 14, 2023, at an investor forum, Affirm's Chief Capital Office Major-Reid stated that " 'ABS and forward flow are *very susceptible* to market headwinds and shocks, as much like we saw over the last 12 to 18 months[.]' " *Id.* ¶ 101.

Relying on *In re Apple Inc., Securities Litigation*, No. 19-cv-02033-YGR, 2020 WL 2857397 (N.D. Cal. June 2, 2020), Kusnier argues that above statements directly contradict the "extremely confident assurances" Linford made during those 12 to 18 months, which cannot be dismissed as "fraud by hindsight." *See* ECF 80 at 29. But in *Apple*, the statements themselves

20

supported a finding of knowledge of falsity at the time they were made.  *Id.*  There, the plaintiffs alleged that China "represented a critically important market for Apple for which the Company was carefully tracking sales," and the "defendants 'saw' as 'the quarter went on' negative business indicators in China[.]' "  *Id.*  The court thus found it "implausible that [the CEO] would not have known that iPhone demand in China was falling mere days before cutting production lines," and similarly found it implausible that he "was unaware of emerging market issues in China despite admitting two months later that the Company observed worrying signs throughout the quarter." *Id.*  The court noted that the "defendants' decision to stop reporting unit sales – announced on the same call despite negative investor reaction" also "plausibly suggest[ed] that defendants expected unit sales to decline."  *Id.*

By contrast, while Defendants "watch[ed] the numbers like hawks," Kusnier does not explain how any specific information gleaned from that focused attention translates to contemporaneous knowledge of falsity as to any of the 11 statements alleged in the complaint. Rather, Kusnier generally asserts that the post-class period statements on which he relies "use the past tense to describe contemporaneous knowledge," *see* ECF 80 at 30, but "plaintiffs cannot merely speculate in hindsight that . . . that earlier statements of good financial health must have been inaccurate.").  *See In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020), *aff'd sub nom. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022)

### 2. Section 20(a)

"Section 20(a) of the Exchange Act imposes secondary liability on controlling persons involved in a primary Section 10(b) violation."  *In re: CCIV / Lucid Motors Sec. Litig.*, 2024 WL 3710186, at *3 (citing *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024); 15 U.S.C. § 78t(a)).  "Controlling persons liability under Section 20(a) of the Exchange Act is derivative, such that there is no individual liability where there is no primary violation of securities law."  *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th at 1180 (citing *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017); 15 U.S.C. § 77o).

///

1        Because Kusnier's Section 10(b) claim fails as discussed above, his Section 20(a) claim

2    also fails.  Accordingly, Defendants' motion to dismiss is **GRANTED** as to the Section 20(a)

3    claim.  *See Zaidi v. Adamas Pharms., Inc.*, 650 F. Supp. 3d 848, 865 (N.D. Cal. 2023) (dismissing

4    Section 20(a) claim to the extent the plaintiff had not stated a primary violation of Section 10(b)).

5    ## IV.    CONCLUSION

6        For the reasons set forth above, the Court **GRANTS** Defendants' motion to dismiss **WITH**

7    **LEAVE TO AMEND** and **DENIES AS MOOT** Defendants' request for judicial notice.  Kusnier

8    may file a third amended complaint within 30 days of this order.

9        **IT IS SO ORDERED.**

10   Dated: August 26, 2024

11

12

13   _____

     **ARACELI MARTÍNEZ-OLGUÍN**

     **United States District Judge**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California