1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    MARK KUSNIER, et al.,                    Case No. 22-cv-07770-AMO

                  Plaintiffs,
8
                                              **ORDER RE MOTION FOR LEAVE TO**
9         v.                                  **FILE MOTION FOR**
                                              **RECONSIDERATION**
10   AFFIRM HOLDINGS, INC., et al.,
                                              Re: Dkt. No. 86
                  Defendants.
11

12

13        Before the Court is Plaintiffs' motion for leave to file a motion for reconsideration of the

14   Court's August 26, 2024 Order dismissing their second amended complaint for failure to

15   sufficiently allege facts supporting a strong inference of scienter.  ECF 86 ("Mot.").  To obtain

16   such leave, Civil Local Rule 7-9(b) requires that Plaintiffs "specifically show reasonable diligence

17   in bringing the motion" and satisfy one of the following:

18            (1) That at the time of the motion for leave, a material difference in
              fact or law exists from that which was presented to the Court before
19            entry of the interlocutory order for which reconsideration is sought.
              The party also must show that in the exercise of reasonable diligence
20            the party applying for reconsideration did not know such fact or law
              at the time of the interlocutory order; or
21            (2) The emergence of new material facts or a change of law
              occurring after the time of such order; or
22            (3) A manifest failure by the Court to consider material facts or
              dispositive legal arguments which were presented to the Court
23            before such interlocutory order.

24   Civil L.R. 7-9(b).

25        Plaintiffs rely on subsection (b)(3), contending that there was a "manifest failure by the

26   Court to consider material facts or dispositive legal arguments" presented in the motion to dismiss

27   briefing.  Mot. at 6, 9.  Specifically, Plaintiffs argue that the Court (1) disregarded Defendants'

28   statements indicating their awareness of interest rate risks, (2) denied Plaintiffs the core operations

United States District Court
Northern District of California

1    inference, (3) disregarded statements of confidential witnesses, and (4) discounted the temporal

2    proximity of Linford's false statements to inconsistent information.  *Id.* at 9-17.  Finding no issue

3    with the timing of Plaintiffs' motion, and finding leave appropriate under Civil Local Rule Rule 7-

4    9(b)(3), the Court addresses each substantive issue Plaintiffs raised in their motion in turn.[1]

5            With respect to whether statements by Defendants showing awareness of interest rate risks

6    supported an inference of scienter, the Court determined:

7                    Kusnier's contention that Defendants' statements themselves
      raise an inference of actual knowledge of falsity is unavailing.  The
8     statements Kusnier points to in his opposition are not the 11
      statements identified as the basis for his claims.  *See* ECF 80 at 25-
9     26 (citing ECF 72 ¶¶ 29-30, 32, 33-34).  Kusnier has thus made no
      showing that the 11 statements at issue are themselves indicative of
10    scienter, and the Court declines to allow Kusnier to use his
      opposition brief as an opportunity to re-frame his claims.  *See Petrie*
11    *v. Elec. Game Card Inc.*, No. SACV 10-00252 DOC (RNBx), 2011
      WL 165402, at *4 n.2 (C.D. Cal. Jan. 12, 2011) (citation omitted)
12    ("[I]t is axiomatic that the complaint may not be amended by briefs
      in opposition to a motion to dismiss.").
13

14    Order at 15.

15           Plaintiffs contend the statements referenced in paragraphs 28-34 of the SAC "explained in

16    particularized detail why Defendants' own statements showed an acute awareness of interest rate

17    risks." Mot. at 11.  Those paragraphs read:

18                    28.     Defendants' own statements concede their Class
      Period knowledge of the misrepresented and concealed facts, raising
19    a strong inference of scienter.  Throughout the Class Period,
      Defendants touted their knowledge and awareness of interest rate
20    risks or reckless disregard for the risk of rising interest rates and
      their negative impact on the Company's funding costs in SEC filings
21    as well as commentary during public events.

22                    29.     Linford, in particular, spoke with a great degree of
      specificity on this topic throughout the Class Period.  For example,
23    Linford assuaged investors' rate fears just after United States
      Secretary of the Treasury Janet Yellen warned in early 2021 that the
24    Federal Funds Rate would soon need to increase.  On May 11, 2021,

25

26    [1] While the motion is styled as one for leave to seek reconsideration, Plaintiffs ask that "the Court
      grant Plaintiffs' Motion for leave to file a motion for reconsideration of the Court's August 26,
27    2024 Order and deny Defendants' Motion to Dismiss." Mot. at 17.  The Court therefore construes
      Plaintiffs' filing as a combined motion for leave and for reconsideration.  In analyzing the issues
28    presented in Plaintiffs' motion, the Court sets aside its previous finding that many of the
      statements Plaintiffs point to are not those identified as the basis for their primary claims.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1

2

3

4

Linford attended the MoffettNathanson Payments, Processors, and IT Services Summit.  At this conference call, Linford was specifically asked about "comments out of the Fed, Yellen, et cetera" concerning how the rising rate environment would affect Affirm's business, and Linford responded that Affirm had stress tested its revenue model and, based on the results of those tests, the Company was "well positioned to succeed in any rate environment that we've seen over the past 20 years."  He further stated that:

5

6

7

> We believe there's a real misconception about interest rates in Affirm out there right now.  ***We believe that we're really well positioned to succeed in any rate environment that we've seen over the past 20 years.***

8

9

10

11

> There -- ***we have gone back and stress tested our model, business model, revenue model, the level of what we call contribution profit or revenue less transaction cost, we've gone back 20 years of rates and stimulated it through our business and we're good, which means we can get it for like 650 basis points of rates.***

12

13

14

15

16

> And like while we believe that like everybody that rates won't stay at zero forever and that we are going to have to start reacting to a higher rate environment, we think the first derivative, i.e., the change in rates it just doesn't impact us.  ***Seventy-five percent of our portfolio is funded with fixed rate or no polluting -- no interest rate exposure at all and the 25% that's funded with interest rates, but that we're in complete control over.***

17

18

19

20

21

22

23

24

25

> ***So, in the short-term kind of first derivatives shocks doesn't worry us at all.  And longer-term we can go back over two decades and still be good with respect to our unit economics and that's before we pull any of our cost or revenue levers, which are huge.***  So, on the revenue side, look, the higher the break the more valuable a 0% offer is.  It's just definitional, right?  If you're a consumer -- if you're a consumer and rates are 0, a 0% offer is less compelling as when the rates are at 3%, 4% or 5%.  So we know that the product is more valuable and how we monetize it is a thing that we can do either through the merchant, which we tested during COVID where we had to tighten credit and our product was valuable enough that merchants chose to continue to pay us more merchant fees to support the same level of approvals.  ***And we think the same will hold out in a higher rate environment.***

26

27

28

30.      The Federal Funds Rate was over 5% between 2006 and 2007.  It did not cross over 5% during the Class Period.  It has not come close to "650 basis points."  Given Linford's affirmative representations about stress test results over a 20-year period, and his repeated assurances throughout the Class Period that there would

3

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

be little to no short-term impact on Affirm from an increase in interest rates, Affirm's funding costs should not have unexpectedly increased, as the Company ultimately admitted they would when it announced disastrous financial results for the second quarter of 2023 on February 8, 2023.  There are only two possible inferences to be made based on Linford's guarantee based on the stress tests results: either (1) he lied about conducting the stress tests or (2) he knew from their results that Affirm could not withstand an increase in rates to 4% or more, and recklessly ignored the prospect of misleading investors by withholding that crucial information.  Baseless assertions that the stress tests were correct at the time they were conducted are utterly illogical.  Either the business could survive rate hikes of over 4% or it could not.  The passage of time cannot change that result.  Even more importantly, Linford and the Company have never publicly stated that the stress tests were not conducted or that their results were faulty.  Linford's and the Company's conspicuous silence on this topic further enhances an inference of fraud.

31.     Funding costs increased within weeks of Linford's misrepresentation that the short term risk was minimal, as detailed herein in Paragraphs 41 through 74, Paragraphs 76 through 79, and Paragraphs 97 through 101 because of an increase in interest rates as Defendants ultimately admitted, reducing RLTC as a percentage of GMV, a metric that Defendants repeatedly emphasized as key to the Company's success, from a Class Period high of 5.9% to a low of 2.5% between the quarter ending June 30, 2021 and the second quarter of 2023.

32.     On May 25, 2022, Levchin attended the JP Morgan Global Technology, Media & Communications Conference.  At this event, Levchin was specifically asked by an analyst whether any forward flow partners could pull back, and he responded: "we watch the numbers like hawks to make sure that we are never on the wrong side of any deal – and I think in rougher or more complicated times, which is certainty where we are now.  These partnerships are tested, but people also flight to quality.  Like there's a real sense that I've got several conversations that I've had with our funding partners that they don't just love our assets that they always have, they expect us to be one of the partners that they rely on to place more capital."

33.     Similarly, on June 14, 2022, Linford attended a Fireside Chat hosted by Autonomous Research LLP.  This event took place less than eight months before Affirm suddenly announced poor financial results in February 2023 and conceded that a rise in funding costs due to increased interest rates would impair its performance.  ***At this event, Linford talked at length about how the Company had onboarded funding "all the way through May 2024," had a few deals with "episodic pricing renewals," but assured the market that "there's not a lot of short-term rate exposure to the business.  We have a lot of certainty in the next 6 or 12 months on where things would be."***  This is again an instance where both things cannot be true.  Either Affirm had onboarded funding "all the way through May 2024," and no negative impact from interest rate hikes could occur during the Class Period or it had

United States District Court
Northern District of California

1
2
3
4

not.  Regardless, this statement shows that Linford knew about the status of deals and whether or not funding had been onboarded to absorb any macroeconomic shocks during the Class Period.  Linford further stated that the Company had "thought about this a lot," was "very careful on protecting the profit in the loan," built funding capacity "for the future at all times," and minimized "volatility" in the macroeconomic environment because "there's a lot less short-term exposure."

5
6
7
8
9

34.    On August 25, 2022, the Company held an earnings conference call to discuss the financial results for the fourth quarter of 2022 where Linford continued to provide assurances about the Company's ability to mitigate the risk of a continued rise in interest rates on the grounds that 95% of forward flow capacity was already locked in and did not need to be renewed, and specifically represented that the risk of "higher cost of funds" or the chance of lower yields on loan sales would be "delayed," i.e., the problems did not impact the Company in the short run.

10    ECF 72 ("SAC") ¶¶ 28-34 (footnote omitted).

11    The Court reconsiders this issue as follows.  The cases on which Plaintiffs rely in the

12    instant motion illustrate why, even if these statements demonstrated an acute awareness of interest

13    rate risks, they would nonetheless fail to support a strong inference of scienter.  For example, in

14    *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, the plaintiffs' allegations of a

15    company-wide pressure campaign were sufficient to raise a strong inference of scienter.  63 F.4th

16    747, 772 (9th Cir. 2023).  In that case, the plaintiffs relied on statements from confidential

17    witnesses indicating, among other things, that: "it was normal practice to misidentify deals with

18    only a 50% chance of closing as 'committed,' " defendant's chief revenue officer "pressured sales

19    representatives to identify illusory deals as 'committed,' " other executives pressured employees

20    to "report that a $2 million deal would close before September 2019 even though the client had

21    told [defendant's executive] in a conference call with [one of those employees] that it could not

22    meet this timeline."  *Id.*  These allegations "were bolstered by Plaintiffs' allegations that

23    [executives] had access to information about the sales pipeline and the status of deals through

24    internal reports and . . . a revenue platform used to track deals."  *Id.* at 773.  In a footnote, the

25    Ninth Circuit made clear "[w]e offer no opinion as to whether the access to information

26    allegations, on their own, would support a strong inference of scienter.  We hold only that these

27    allegations enhance the strong inference already raised by the pressure campaign allegations."  *Id.*

28    at 774 n.5.

United States District Court
Northern District of California

1    In *In re Quality Systems, Inc. Securities Litigation*, the plaintiffs alleged not only that "the

2    individual defendants were aware in real time of QSI's financial information," but also that they

3    "knew that their statements about the current and past state of QSI's sales pipeline as well as their

4    projections of future revenue and earnings were inconsistent with this information." 865 F.3d

5    1130, 1138 (9th Cir. 2017). In *Nursing Home Pension Fund, Local 144 v. Oracle Corp*, the

6    plaintiffs' allegations that "CEO Ellison said, 'I love getting involved in every detail of the

7    business,' and that all three top executives said that they monitored portions of Oracle's global

8    database[,]" were insufficient on their own to establish scienter. 380 F.3d 1226, 1234 (9th Cir.

9    2004). Those allegations adequately pleaded scienter only when considered together with others

10    about "hard numbers and . . . large portions of Oracle's sales data[,]" suspicious stock sales,

11    improper revenue accounting records, and admissions supporting the inference "that, even as it

12    was making optimistic statements to the public, Oracle had known that it would not make its third

13    quarter sales projections due to declining sales to dot-com businesses and defects in [a software

14    product]." *Id.* at 1231-33.

15    Given the absence of facts in paragraphs 28-34 of the SAC that would liken this case to

16    those Plaintiffs cited, the Court still finds the statements contained in those paragraphs insufficient

17    to support a strong inference of scienter, even when viewed holistically with Plaintiffs' other

18    scienter allegations.

19    With respect to the core operations doctrine, the Court determined:

20          The core operations doctrine also does not advance
21    Kusnier's theory. "The 'core operations' doctrine allows the
       knowledge of certain facts that are critical to a business's 'core
       operations' to be attributed to a company's key officers." *Webb v.
22    *Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018). The cases in
       which the doctrine "has supported a strong inference of scienter
23    typically involve specific admissions from top executives that they
       are involved in every detail of the company, or where the nature of
24    the relevant fact is of such prominence that it would be absurd to
       suggest that management was without knowledge of the matter[.]"
25    *See Espy v. J2 Global, Inc.*, 99 F.4th 527, 539 (9th Cir. 2024).

26          Kusnier's cursory allegations support no such inference here.
27    He alleges:

28          Affirm is a subprime lender that derives all of its
          revenue from lending related activities, sells and

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13

> packages loans, profits from interest and/or merchant fees and servicing fees associated with loans, and its funding sources are heavily sensitive to changes in interest rates. As such, the core operations doctrine can be invoked to support scienter because managing interest rate risks touches on all facets of Affirm's business and rising interest rates did ultimately impact the Company's bottom line as alleged elsewhere herein.

> ECF 72 ¶ 75. In his opposition, Kusnier asserts that "[i]t would be absurd to assume that Defendants were unaware of the risks from rising interest rates, particularly when Levchin and Linford both made statements to suggest that they closely monitored any changes and had thought a lot about their impact on the Company." ECF 80 at 26. Those statements, however, are not among the 11 Kusnier has identified as being at issue here. *See id.* (referencing allegations from paragraphs 29-30 and 32-34 of the operative complaint). Without further factual allegations supporting Kusnier's assertions of absurdity, his resort to the core operations theory does not support a viable theory of scienter. *See Espy*, 99 F.4th at 539 (finding allegations that executive "signed off on every acquisition, received detailed reports, or were 'obsessed with numbers,' d[id] not compel a strong inference that they had knowledge of the alleged omitted information") (internal quotations and citations omitted).

14    Order at 15-16.

15          Plaintiffs assert that "Defendants' statements showing an acute awareness of interest rate

16    risks, the CW accounts, temporal proximity and post-Class Period admissions are additional

17    factors that must be taken collectively with the importance of interest rates to Affirm's business,

18    supporting a core operations inference." Mot. at 11.

19          The Court revisits the core operations issue as follows. The cases on which Plaintiffs rely

20    in the instant motion do not entitle them to the core operations inference. For example, in *Reese v.*

21    *Malone*, the plaintiffs' allegations, when viewed holistically, supported "the inference that BP

22    was, at the very least, deliberately reckless as to the false or misleading nature of their public

23    statements." 747 F.3d 557, 581 (9th Cir. 2014), *overruled on other grounds by City of Dearborn*

24    *Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). There,

25    the facts pleaded in the complaint "supported the conclusion that BP had been aware of corrosive

26    conditions for over a decade, and yet chose not to address them." *Id.* The complaint also alleged

27    "that BP intentionally adopted corrosion monitoring practices that deviated from industry

28    standards in an effort to cut costs," "suggest[ing] that BP had every reason to know, at the very

least, that they did not have accurate information regarding the condition of the Prudhoe Bay

pipelines." *Id.* In *Cutler v. Kirchner*, the defendant corporation "operated a low-margin business

and made large outlays based on promises of reimbursement from its customers." 696 F. App'x

809, 815 (9th Cir. 2017). It "depended on cash collections to stay afloat on a quarter-to-quarter

basis" such that information about the company's ability to generate invoices "would have been

tremendously important to [its] management." *Id.* In that case, statements from a confidential

witness – a company president – was "the key to [plaintiff's] scienter allegations." The witness

participated in quarterly meetings with the company's international executive board, at which the

individual defendants were informed of the problems with the company's invoicing platform. *Id.*

Here, the conclusory allegations in paragraph 75 of the SAC lack "detailed and specific

allegations about management's exposure to factual information within the company." *See Zucco*

*Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009) ("[a]llegations that . . .

management had access to the purportedly manipulated quarterly accounting numbers, or that the

management analyzed the inventory numbers closely, do not support the inference that

management was in a position to know that such data was being manipulated"). Thus, even when

considered alongside the other scienter allegations revisited in this order, these allegations still fail

to give rise to a strong inference of scienter, unlike in the cases cited by Plaintiffs.

With respect to the statements from confidential witnesses, the Court determined:

> Kusnier's reliance on statements of confidential witnesses
> fares no better. Information provided by former employees must
> "pass two hurdles" to establish scienter. *Zucco*, 552 F.3d at 995.
> "First, the confidential witnesses whose statements are introduced to
> establish scienter must be described with sufficient particularity to
> establish their reliability and personal knowledge. . . . Second, those
> statements which are reported by confidential witnesses with
> sufficient reliability and personal knowledge must themselves be
> indicative of scienter." *Id.* (citation omitted).

> Assuming, without deciding, that Kusnier's three
> confidential witnesses clear the first hurdle, they do not pass the
> second. The first confidential witness ("CW1") reported that Affirm
> delayed a $500 million asset-backed securitization "for reasons
> purely related to the interest rate risk." ECF 72 ¶ 36. According to
> CW1, "investors with larger orders reneged because the coupon
> rates offered were not high enough in light of the risk that interest
> rates would rise." *Id.* ¶ 37. Linford was aware of this and "was
> closely involved in the decision-making process because Major-Reid
> sent Linford 'play-by-play' text messages about the meeting, and

she would have also updated Levchin." *Id.* ¶ 38. Linford also "ha[d] detailed knowledge of these issues because Linford me[t] with Affirm's banking partners regularly." *Id.* The statements that CW1 claims were relayed to Linford, at some unspecified time and under unknown circumstances, do not constitute statements which are themselves indicative of scienter. *See Zucco*, 552 F.3d at 998 (finding conclusory allegations that executive must " 'have known what was going on with respect to the [c]ompany's inventory account manipulation' " without facts "establish[ing] that the witness reporting them has reliable personal knowledge of the defendants' mental state").

So too with the statement from confidential witness 2 ("CW2"). CW2 "stated that most of [his] team did not believe the [Linford and Levchin's] public statements concerning the minimal impact from rising interest rates." *Id.* ¶ 39. Kusnier does not tie the subjective beliefs of CW2's team to Linford and Levchin's mental states. Without it, CW2's statement does not support a strong inference of scienter. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021) (declining to credit, in assessing falsity, former employees' statement that production goals were impossible to achieve where the "[p]laintiffs had failed to plead facts showing that [the] defendants adopted the conservative timeline for production on which these employees' pessimism was based.").

Nor do the statements from a third confidential witness ("CW3") indicate intent to defraud. CW3 reported "that starting in late 2021 and 'repeatedly' between January 2022 and the middle of 2022, Linford was warned by several high-level executives, including CW3, of the serious risk from rising interest rates to Affirm's cost of funding and lending margin." ECF 72 ¶ 40. "[B]etween late 2021 and the middle of 2022, Linford was told of the increased risks from rising interest rates to Affirm's ABS business and its forward flow arrangements." *Id.* According to CW3, "Linford disregarded the warnings," relayed "in emails and through internal messaging applications at the Company[,]" and Affirm's bottom line deteriorated as a result. *Id.* In CW3's view, "Affirm was severely impacted by rising interest rates in the short-term because it increased the Company's cost of funding and its lending margin." *Id.* CW3's account demonstrates that "there was some disagreement within the corporation," but stops short of establishing scienter without further facts showing that Linford acknowledged or admitted the increased risks. *See Wochos*, 985 F.3d at 1194; *see also Zucco*, 552 F.3d at 999 (finding confidential witness account insufficient to support the required strong inference of scienter where it established disagreement and questioning about accounting practice but failed to establish that external auditors counseled against it or that management admitted or was aware that it was improper).

Order at 16-18 (footnote omitted).

Plaintiffs contend that the timing and circumstances of the events CW1 described are

sufficiently pleaded, that CW2's statements cannot be discounted for lack of a connection to the

1      Defendant's mental states, and that CW3's statements cannot be disregarded as a mere

2      disagreement with management.  Mot. at 12-15.

3              The Court reconsiders the CW statements issue as follows.  Notwithstanding the arguments

4      Plaintiffs raise in the instant motion, the CW statements on which Plaintiffs rely remain

5      insufficient.  As set forth in the Order, confidential witness statements must clear two additional

6      hurdles, and those proffered here do not satisfy the second, which requires that "statements which

7      are reported by confidential witnesses with sufficient reliability and personal knowledge must

8      themselves be indicative of scienter."  *See* Order 16-17 at (citing *Zucco*, 552 F.3d at 995).  CW1's

9      report that Linford knew a deal was delayed for reasons related to interest rate risk because

10     Affirm's chief capital officer sent him "play-by-play" text messages during a meeting, without

11     knowing more specifics – be it the timing of that meeting, the circumstances surrounding

12     communications between Linford and the chief capital officer, what the "play-by-play" text

13     messages said, or other some other details outlining circumstances "indicative of scienter," do not

14     compel the conclusion that statements Linford made "in the same month" about why the deal was

15     deferred were made with the intent to defraud.  *Cf. Forescout*, 63 F.3d at 772 (holding "only that

16     the[] allegations," based on confidential witness statements "enhance[d] the strong inference

17     already raised by the pressure campaign allegations.").

18             CW2's statements that Defendants' allegedly false statements were "disbelieved by

19     Affirm's own employees" also miss the mark.  That Affirm employees disbelieved Defendants'

20     statements falls short of the former employee statement credited in the Ninth Circuit case Plaintiffs

21     cite in support.  In *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, the plaintiffs asserted PSLRA

22     claims based on false and misleading statements the defendants made about the impact of

23     cryptocurrency sales on the company's financial performance.  81 F.4th 918, 923 (9th Cir. 2023),

24     *cert. granted sub nom. NVIDIA Corp. v. Ohman J*, 144 S. Ct. 2655 (2024), and *cert. dismissed as*

25     *improvidently granted*, 604 U.S. 20 (2024).  The Ninth Circuit concluded that the plaintiffs

26     sufficiently pleaded scienter, pointing to allegations that one individual defendant "had detailed

27     sale reports prepared for him[,]" "access to detailed data on both crypto demand and usage of

28     NVIDIA's products[,]" "was a meticulous manager who closely monitored sales data" and

United States District Court
Northern District of California

10

1   "admitted to closely monitoring sales data[,]" which "at the time would have shown that a large

2   portion of GPU sales were being used for crypto mining." *Id.* Plaintiffs highlight that in *NVIDIA*,

3   "the Ninth Circuit credited an account from a former employee who stated that Defendants 'sure

4   lied to everyone.' " Mot. at 13. They do not, however, point to comparable allegations in the

5   SAC.

6          CW3's reports that Defendants were warned about rising interest rate risks are also

7   insufficient. As set forth in the Court's prior order, these statements do not indicate intent to

8   defraud. Order at 17. Plaintiffs argue that the Court's reliance on *Zucco* is misplaced because

9   there "the complaint itself 'suppli[e]d facts indicating that management sincerely believed the

10  numbers generated . . . were incorrect and wanted to confirm these numbers through the use of

11  separate databases.' " Mot. at 14 (citing *Zucco*, 552 F.3d at 998-99). That factual distinction does

12  not disturb the principle from *Zucco* that guided this Court's original conclusion about scienter:

13  "generalized claims about corporate knowledge are not sufficient to create a strong inference of

14  scienter, since they fail to establish that the witness reporting them has reliable personal

15  knowledge of the defendants' mental state." *See Zucco*, 552 F.3d at 998; Order at 17.

16         With respect to the temporal proximity of certain statements by Defendant Linford and

17  post-class period admissions, the Court determined:[2]

18              Kusnier's reliance on the temporal proximity between certain
            statements and events also does not support a viable theory of
19          scienter. "Close temporal proximity between allegedly false
            statements and the disclosure of information contradicting those
20          statements may bolster an inference of scienter. . . . However,
            timing alone, absent a showing of knowing falsity, is insufficient to
21          support scienter." *Jaszczyszyn v. SunPower Corp.*, No. 22-CV-
            00956-AMO, 2024 WL 3463348, at *13 (N.D. Cal. July 17, 2024);
22          *see also In re Apple Inc. Sec. Litig.*, No. 19-CV02033-YGR, 2020
            WL 2857397, at *25 (N.D. Cal. June 2, 2020) ("Temporal proximity
23          between an allegedly false statements and a disclosure of the truth
            may bolster an inference of scienter when combined with other
24          facts.").

25              In attempting to establish scienter based on temporal
            proximity, Kusnier points to Statement 11, made by Linford on
26

27  _____
    [2] In its order, the Court noted that Plaintiffs relied on statements not identified as one of the 11 at
28  issue and limited its analysis to only those statements identified as the basis for Plaintiffs' claims.
    Order at 18 n.8.

                                                    11

United States District Court
Northern District of California

December 6, 2022:

> I think that specifically with respect to rate, I feel really, really good about how well we predicted what the rates will do to our business back in February, which is way before the rate curve started moving as much as it did.  We gave the market a framework for how to think about the impact of rates on our business in our February earnings call.  And we've come in a little bit better in the framework we've given folks, but it's been a really good way to think about it.  ***In the super near term, there's less impact because we have less exposure to floating rate debt.***
>
> ***But in the longer term, we have some gross exposure that it's our job to mitigate. And I feel really proud about our ability to manage and navigate through that.***  And yet, the challenges are by no means the highest.  We still have a lot of work to do continue to navigate what are, like you say, unprecedented economic types.

ECF 72 ¶ 71.  Kusnier argues that this statement was shown to be false by admissions made on February 8, 2023 and May 9, 2023.  ECF 80 at 29.  As alleged in the complaint, on February 8, 2023:

> Affirm announced poor financial results for the second fiscal quarter of 2023 that ended on December 31, 2022.  In a shareholder letter released in connection with the quarter, the Company admitted that RLTC declined to 2.5% as a percentage of GMV on average between October 1, 2022 and December 31, 2022 because of the ballooning balance of loans held for investment on its balance sheet, credit losses, and higher interest rates and spreads remained a "headwind" for that metric in the short-term, but would allegedly "attenuate" as the Company "exits" fiscal year 2023 (which ends on June 30, 2023).  Additional admissions were made conceding that "increased funding costs" would have to be passed on to the consumer by charging interest of up to 36%, a usurious rate in many states.  Linford further admitted on a conference call held on the same day to discuss the financial results that RLTC guidance was "worse" because of "high yield pressure with respect to our forward flow partners," and that "the rising rate environment has put the yield threshold higher for all of these programs."

ECF 72 ¶ 77.  On May 9, 2023, in a shareholder letter, "Affirm claimed that higher funding costs would remain a headwind "for the next few quarters," and higher benchmark interest rates and credit spreads would continue to be a "headwind" for RLTC as a percentage of GMV."  *Id.* ¶ 78.

> Missing from these allegations are facts that would plausibly

establish that Linford was in possession of contrary information at the time he made Statement 11 on December 6, 2022.  "[T]he fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996).  Nor is "a statement of opinion is [*sic*]. . . misleading just because external facts show the opinion to be incorrect." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015).  Without facts to support Kusnier's assertions, he has failed to make the "showing of knowing falsity" necessary to establish scienter based on temporal proximity.  *See Jaszczyszyn*, 2024 WL 3463348, at \*13.

Admissions made after the class period also fail to support a viable theory of scienter.  In seeking to establish that here, Kusnier points to multiple purported admissions.  First is a statement Linford made during a February 8, 2023 earnings call.  ECF 80 at 29-30.  When asked to explain why Affirm "cut revenue guidance for FY 2023 deeper than it cut transaction costs," Linford stated that the decision was due to "a lot of pressure on the yields that we need to generate for our capital partners.  ECF 72 ¶ 98.  He added "that RLTC guidance was 'worse' because of 'high yield pressure with respect to our forward flow partners,' and that 'the rising rate environment has put the yield threshold higher for all of these programs.' "  *Id.*  Second is Linford's statement of March 15, 2023, made during the Wolfe FinTech Forum.  *Id.* ¶ 99.  He said that "it's hard to see through [and] look round corners. The future has got so much uncertainty in it."  *Id.* (modification in original).

Kusnier also points to two statements from other Affirm executives.  On March 21, 2023, at the Bank of America Electronic Payments Symposium, Affirm's Senior Vice President of Finance Rob O'Hare, said "that the yields demanded by the Company's forward flow partners 'were increasing throughout the year' because of rising interest rates in 2022."  *Id.* ¶ 100.  On November 14, 2023, at an investor forum, Affirm's Chief Capital Office Major-Reid stated that " 'ABS and forward flow are very susceptible to market headwinds and shocks, as much like we saw over the last 12 to 18 months[.]' "  *Id.* ¶ 101.

Relying on *In re Apple Inc., Securities Litigation*, No. 19-cv-02033-YGR, 2020 WL 2857397 (N.D. Cal. June 2, 2020), Kusnier argues that above statements directly contradict the "extremely confident assurances" Linford made during those 12 to 18 months, which cannot be dismissed as "fraud by hindsight."  *See* ECF 80 at 29.  But in Apple, the statements themselves supported a finding of knowledge of falsity at the time they were made.  *Id.*  There, the plaintiffs alleged that China "represented a critically important market for Apple for which the Company was carefully tracking sales," and the "defendants 'saw' as 'the quarter went on' negative business indicators in China[.]' "  *Id.*  The court thus found it "implausible that [the CEO] would not have known that iPhone demand in China was falling mere days before cutting production lines," and similarly found it implausible that he "was unaware of emerging market issues in China despite admitting two months later that the Company observed worrying signs throughout the quarter."  *Id.*  The court noted that the "defendants' decision to stop reporting

1

2

> unit sales – announced on the same call despite negative investor reaction" also "plausibly suggest[ed] that defendants expected unit sales to decline." *Id.*

3

4

5

6

7

8

> By contrast, while Defendants "watch[ed] the numbers like hawks," Kusnier does not explain how any specific information gleaned from that focused attention translates to contemporaneous knowledge of falsity as to any of the 11 statements alleged in the complaint. Rather, Kusnier generally asserts that the post-class period statements on which he relies "use the past tense to describe contemporaneous knowledge," *see* ECF 80 at 30, but "plaintiffs cannot merely speculate in hindsight that . . . that earlier statements of good financial health must have been inaccurate."). *See In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020), *aff'd sub nom. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022).

9    Order at 18-21.

10         Plaintiffs' arguments on this issue rest on the following:

11

12

13

- "Linford falsely asserted that Affirm's short-term exposure to rising interest rates was minimal as late as December 2022, but the Company started to admit that the exact opposite was the case starting in February 2023. ¶¶76-79."

14

15

- "CW3 provided direct evidence of the contrary information Linford was provided before Linford made additional false statements in December 2022. ¶40."

16

17

- "Linford admitted to the negative impact of rising interest rates on Affirm's funding costs after the Class Period ended. ¶¶97-98."

18

19

- "Two senior executives at Affirm told investors that rising interest rates negatively impacted Affirm during the Class Period or while Linford was making false statements. ¶¶99-101."

20    Mot. at 15-17.

21         With respect to CW3's statements, the Court has explained why those statements are

22    insufficient above and does not repeat that logic here. With respect to the remaining statements

23    Plaintiffs highlight, those do not establish scienter for the reasons explained in the Court's August

24    26, 2024 Order.

25         Having resolved Plaintiffs' motion, the Court directs the parties to meet and confer

26    regarding next steps in this case. The August 26, 2024 Order granted Plaintiffs leave to amend

27    their complaint within 30 days. Should Plaintiffs wish to amend, they shall notify Defendants of

28    their intent to do so, and within 21 days of this order, submit a stipulation and proposed order with

United States District Court
Northern District of California

14

1  a deadline for their amended pleading and a briefing schedule for any anticipated motion to

2  dismiss.  Alternatively, should Plaintiffs elect to stand on their complaint, they shall also notify

3  Defendants of their intent to do so, and within 21 days of this order, file a notice with the Court

4  and a joint proposed form of judgment.  Should the parties require more time to meet and confer,

5  they may file a stipulation and proposed order requesting an extension of the above deadlines.

6  **IT IS SO ORDERED.**

7  Dated: August 14, 2025

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

United States District Court
Northern District of California

15